IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

| | |
|---|---|
| UNITED INVESTOR COMMUNITY, INC., et al., )  | Case No.:  24-23359-Civ-Williams |
| Plaintiff, ) | Hon. Judge Kathleen M Williams |
| -against- ) | |
| ) | |
| OMEGAPRO FOREX TRADING, LTD, et. al., ) | |
| Defendants. ) | |

_____

**PLAINTIFFS' OPPOSITION TO DEFENDANT JORDAN ROSS BELFORT's
<u>MOTION TO DISMISS COMPLAINT</u>**

Plaintiffs United Investor Community, Inc., Lyadunni Udugba, and Olungbenga Bernard Adesuyi (collectively, the "Plaintiffs"), through undersigned counsel, hereby submit their response to Defendant Jordan Ross Belfort's ("Belfort") Motion to Dismiss. [ECF No. 53]. For the reasons stated below, Plaintiffs respectfully request that the Court deny Belfort's motion in its entirety.

DISCUSSION

**A. The Complaint States Plausible Federal and Florida RICO Claims Against Belfort**

Belfort contends that the Complaint fails to state Federal and Florida RICO claims on three grounds: (1) a lack of specific factual allegations and deficiencies in general pleading; (2) the RICO claims are not adequately pled, citing an absence of specific misrepresentations by Belfort and any financial gain on his part; and (3) an insufficient basis for alleging a RICO conspiracy. [ECF 53 at 12-16]. However, these arguments are unpersuasive when viewed against the detailed and specific allegations presented in the Complaint. The claims against Belfort are backed by precise factual assertions that meet the heightened pleading requirements of Fed. R. Civ. P. 9(b) and

1

satisfy the elements of both Federal and Florida RICO statutes. Moreover, when defendants conspire to defraud investors through a Ponzi scheme and utilize the U.S. mails and wires to carry out and conceal the scheme, it is RICO. *Coquina Investments v. TD Bank, N.A.*, 760 F.3d 1300 (11th Cir. 2014).

### 1. Plaintiffs satisfied the pleading requirements under Fed. R. Civ. P. 9(b)

Belfort contends the Complaint fails to meet Rule 9(b)'s heightened specificity required by failing to allege any "misrepresentation by Belfort, much less when, where and to whom a misrepresentation was made, or how any class member was misled by a misrepresentation by Belfort", "what Belfort gained" or any "fraudulent conduct by Belfort ". [ECF 53 at 15].

On a motion to dismiss, courts must accept the Complaint's allegations as true and interpret them in the light most favorable to plaintiffs. *Resnick v. AvMed, Inc.,* 693 F.3d 1317, 1325 (11th Cir. 2012). Under Fed. R. Civ. P. 8(a)(2), the complaint need only include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fraud claims must meet a heightened pleading standard. See Fed. R. Civ. P. 9(b). This requires plaintiffs to allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud." *Ambrosia Coal & Constr. Co. v. Morales*, 482 F.3d 1309 (11th Cir. 2007).

Here, the Complaint satisfies 9(b)'s heightened specificity requirement. It details the misrepresentations Belfort made to promote the OmegaPro Enterprise Ponzi Scheme as a legitimate, licensed platform, including false promises of a 15% monthly return and 200% annual return, and false statements concerning the Return on Investments (ROI) earned by investors —

2

through social media, US mail, email, and Zoom calls, and supported this deception with fabricated ROI figures posted weekly on OmegaPro's portal while falsely representing OmegaPro as a registered hedge fund and licensed financial advisor, misleading investors about its legitimacy. The Complaint alleges specific times, places, content, and methods of the false statements, as well as Belfort's involvement and intent to deceive investors and his personal financial gains from the scheme, demonstrating a clear, particularized claim of fraud.

For instance, the Complaint alleges, with particularity, that "each and every individual and corporate defendant" including Belfort did participate in the Ponzi scheme with the intend to defraud the Plaintiffs:

> Belfort was "aware that trading cryptocurrency on behalf of investors required registration[,] that OmegaPro operated as a Ponzi scheme, with no actual investments, and that funds from new investors were being used to pay bonuses and returns to earlier investors." [ECF 1 at 168].
>
> Belfort "assure[d] investors that the[] scheme was legitimate and compliant with all applicable laws, [and] made material misstatements about OmegaPro's licenses and registrations." [Id. at ¶ 169].
>
> Belfort "advertised OmegaPro as a trading platform that generated profits from trading investors' cryptocurrency. But this was false." [Id. at ¶ 170.
>
> Belfort "made, or caused to be made, untrue statements of material fact and material omissions to investors and potential investors, including [that] OmegaPro is a registered hedge fund in the United States … OmegaPro is a registered investment adviser… OmegaPro is a registered broker …" [Id. at ¶ 239].
>
> Belfort "used social media platforms such as FaceBook, You Tube, WhatsApp, Telegram groups, Instagram and Zoom meetings, in person meetings, and other means to promote OmegaPro. [Id.at ¶ 162].
>
> Belfort "promoted OmegaPro to investors through emails and Zoom calls, where [he and his co-denfendants] presented slides promising a monthly return of 15% and a 200% return on investments." [Id. at ¶ 128].

3

"Each Individual Defendant, in connection with the acts, conduct and other wrongs alleged, directly or indirectly, used the United States mail, interstate telephone communications, and the Internet via zoom and other social media platforms, to facilitate their fraud and criminal activities." [[Id. at ¶ 249].

"Every Friday, on its investor portal, OmegaPro posted ROI purportedly derived from weekly trading profits for the prior week." [Id. at ¶ 154].

"The ROI posted weekly to investors' accounts was entirely fabricated by the Defendants." [Id. at ¶ 186].

"Defendants' statements about OmegaPro's consistent returns from trading and profits were false [] OmegaPro solicited over 10 billion dollars' worth of investor cryptocurrency but traded only $3 million dollars' worth of cryptocurrency from August 2019 through April 2022." [Id. at ¶ 192].

"The remainder of those billion dollars' worth of cryptocurrency sat in OmegaPro's wallets at a payment processor and was distributed to Defendants." [Id. at ¶ 193].

As such, and contrary to Belfort's assertions, the Complaint provides precise details of his fraudulent conduct to meet the heightened 9(b) pleading standards to give Belfort fair notice of the claims against him and the grounds upon which they rest, including:

(a) **Precise misrepresentations made by Belfort:**

The Complaint specifically identifies multiple instances where Belfort falsely promoted OmegaPro as a legitimate, high-return investment opportunity. Belfort assured potential investors that OmegaPro was a licensed hedge fund offering consistent returns of 15% per month and annual returns exceeding 200%. These false assurances were critical in misleading investors into believing that the platform was a legitimate and safe investment vehicle.

(b) **Time, place, and person responsible for misrepresentations:**

The Complaint details the time and place of Belfort's misleading statements, which were made publicly between 2019 and 2022 through various channels, including social media posts, online webinars, and promotional videos.  Belfort utilized platforms such as YouTube, Instagram, Facebook, and emails to reach a broad audience, presenting himself as a credible advocate of the investment scheme.  His and his co-defendants statements were broadcast to thousands of potential investors during live events, including online seminars and recruitment webinars, directly attributing the false claims to Belfort himself.

(c) **Content and manner in which misrepresentations misled plaintiffs:**

The content of Belfort's misrepresentations centered on his endorsement of OmegaPro as a risk-free, lucrative investment opportunity, emphasizing its alleged compliance with financial regulations and its capacity to deliver guaranteed returns.  Belfort's promotional activities leveraged his public persona as "**The Wolf of Wall Street**" to gain the trust of potential investors, who relied on his endorsements in making their investment decisions.  The Complaint outlines how these statements, presented with the authority of Belfort's celebrity status and financial expertise, created a false sense of security and legitimacy, directly misleading investors about the true nature of the Ponzi scheme.

**What Belfort gained from the fraud:**

The Complaint alleges that Belfort's active participation in promoting OmegaPro was financially motivated. Specifically, it states that Belfort received substantial payouts, including bonuses and commissions, because of his recruitment activities. These payments were made from the fraudulent proceeds of the scheme, distributed to Belfort as compensation for his role

in attracting new investors. The Complaint specifies that Belfort, along with other top promoters, collected tens of millions of dollars, which were diverted from investor funds under the guise of investment returns and promotional bonuses. For example, Belfort made several public appearances in the United States and other places around the world promoting Omegapro where he said: "….Omegapro is a legitimate business…". This video link below is just one example of how Belfort promoted Omegapro.[1]

### 2. The RICO claims are adequately pled

Next, Belfort argues that "there are no well-pleaded allegations that might plausibly give rise to an entitlement to relief.  Simply put, a Complaint which fails to identify specific misrepresentations by a particular defendant or the financial benefit to that defendant fails to state a plausible RICO claim against that defendant." [ECF 53 at 15].  As such, Belfort's contention that Plaintiffs fail to state plausible RICO claims is limited to a challenge based on a purported lack of any specific misrepresentations by Belfort and/or any financial gain on his part.

Contrary to his contentions and for the reasons stated in Section A(1), *supra*, the Complaint meets Rule 9(b) heightened specificity by providing detailed factual allegations about Belfort's precise misrepresentations, the time and place of these statements, the manner in which they misled investors, and the financial benefits he received.   These well-pleaded facts (together with the remainder of the RICO allegations contained in the Complaint which Belfort

---

[1] https://www.youtube.com/watch?v=EPap21FBGbE.  In this video clip, Belfort made many untrue statements about Omegapro. Over 5 million people worldwide have seen the video with over five thousand comments. Mr. Belfort promoted the Ponzi Scheme because he was making money.

concedes and waives any challenge thereto)[2] are sufficient to state plausible claims under both federal and Florida RICO statutes.

### 3. The RICO conspiracy claims are adequately pled

As for the conspiracy claim, Belfort contends that the Complaint "fails to allege facts that might extend liability to [him] as a member of a RICO conspiracy", citing an absence "of any allegation that [he] agreed to the overall objective of the conspiracy" or that he "agreed to commit two predicate acts in furtherance of the racketeering activity." [ECF 53 at 15-16]. He further complains that Plaintiffs identify "the predicate acts as money laundering, mail fraud and wire fraud. But there is not a single allegation that Belfort engaged in any specific act that might constitute these violations." *Id*. Belfort contends that the absence of concrete, specific allegations fail to meet Rule 9(b) heightened pleading standard for conspiracy claims.

Contrary to Belfort's contentions, the Complaint alleges that Belfort agreed to the overall objectives of the conspiracy, and further agreed to the commission of at least two predicate acts to further the scheme. [ECF 1 at ¶¶ 325-328]. Moreover, the Court may properly infer from Belfort's commission of the alleged predicate acts that he agreed to participate in the OmegaPro Enterprise Ponzi Scheme conspiracy through a pattern of racketeering activity. *See U.S. v. Starrett*, 55 F.3d 1525, 1549 (11th Cir. 1995)*; see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010).

Belfort's contention that the conspiracy claim fails to meet Rule 9(b) standards is erroneous for the same reasons stated in Sections A(1-2), supra, which establish the allegations

---

[2] Belfort does not contest, and therefore concedes and waives any challenge thereto, the Complaint's allegations regarding the essential elements of the Complaint's RICO claims, including jurisdiction, the enterprise, pattern of racketeering, continuity, causation and injury, etc.

satisfy the heightened Fed. R. Civ. P. 9(b) pleading standard by detailing the misrepresentations made by Belfort (and others) to promote OmegaPro Enterprise Ponzi Scheme as a legitimate, licensed platform.  This includes false promises of a 15% monthly return and 200% total yearly returns, and false statements concerning the Return on Investments (ROI) earned by investors —through social media, US Mails, email, and Zoom calls, and he and his co-defendants supported this deception with fabricated ROI figures posted weekly on OmegaPro's investor portal and falsely represented OmegaPro as a registered hedge fund and licensed financial advisor, misleading investors about its legitimacy.  [ECF 1 at ¶¶ 128, 154, 162, 168-170, 186, 239 & 249].

By detailing the times, places, content, and methods of these statements, along with the Belefort's intent to deceive investors and his financial gains from the scheme, the Complaint sets forth a particularized claim of fraud and a pattern of racketeering activity, supporting the allegations that he conspired to conduct or participate, directly or indirectly, in the OmegaPro Enterprise Ponzi Scheme through a pattern of racketeering activity, including wire fraud, mail fraud, and money laundering. [ECF 1 at ¶¶ 273-278].

**B. The State Law Claims Against Belfort Are Adequately Pled**

    **1. Securities Fraud**

Belfort's argument that the Florida state securities fraud claims are inadequately pleaded, [ECF 53 at 16-17], is incorrect.

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") aims to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *See* Fla. Stat. § 501.202(2); see also <u>Delgado v. J.W. Courtesy Pontiac GMC-</u>

*Truck, Inc.*, 693 So. 2d 602, 605-06 (Fla. 2d DCA 1997).  To state a claim for damages under FDUTPA, a plaintiff must allege: (1) a deceptive or unfair act; (2) causation; and (3) actual damages.  See *Chicken Unlimited, Inc. v. Bockover*, 374 So. 2d 96, 97 (Fla. 2d DCA 1979).

Belfort's role in promoting the OmegaPro Enterprise Ponzi Scheme constitutes a deceptive act, leading investors to rely on false representations to their financial detriment. The Complaint alleges that tens of thousands of investors suffered damages after investing their funds in OmegaPro based on misleading information provided by Belfort and his co-defendants. Therefore, the state securities fraud claims have been sufficiently pleaded, and the motion to dismiss these claims should be denied.

**2. Common Law Fraud**

Belfort argues that the Court should dismiss Plaintiff's claim as the fraud allegations are deficient according to Florida Law.  [ECF 53 at 17-19].  Under Florida Law four elements must be alleged sufficiently for a viable claim to exist:

> (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation.

See *Cohen v. Kravit Estate Buyers, Inc.*, 843 So. 2d 989, 991 (Fla. 4th DCA 2003).

However, for the reasons previously discussed, the Complaint fulfills the prerequisites for this cause of action and sufficiently alleges each element of fraud and misrepresentation with the requisite heightened specificity, i.e. fraudulent marketing practices by Defendant that caused tens of thousands of people to invest in the fraudulent OmegaPro Enterprise Ponzi Scheme.  See Sections A(1-3), supra.  The Complaint meticulously details the specific misrepresentations, specifying who made them, the content of the statements, when and where they were made,

9

and the context in which Plaintiffs were misled. It also establishes Belfort's intent to induce reliance, as well as the consequent injury suffered by Plaintiffs, and what Belfort gained by this alleged fraud. *See Id.*

### 3. Aiding and Abetting Fraud

The aiding and abetting fraud claim against Belfort is properly pled, despite his assertions to the contrary [ECF 53 at 19]. Under Florida law, to state a claim for aiding and abetting, a plaintiff must allege:

> (1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor. For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.

<u>Taubenfeld v. Lasko</u>, 324 So.3d 529, 534 (Fla. App. 2021)).

The Complaint fully meets each element required for aiding and abetting. First, it identifies multiple underlying state law violations committed by Belfort and his co-defendants. Second, it alleges that Belfort was aware that OmegaPro operated as a Ponzi scheme, intended to defraud investors. Third, the Complaint specifies how Belfort provided substantial assistance to his co-defendants by using his influence and affiliation to recruit tens of thousands of investors into the fraudulent scheme.

Additionally, the Complaint satisfies the heightened pleading standards of Rule 9(b) by clearly alleging each element of fraud and misrepresentation. As discussed in Sections A(1-3) and B(1-2), *supra*, it provides detailed accounts of Belfort's fraudulent marketing activities, including the specific misrepresentations made to investors, the content of those statements,

and the context in which they were conveyed via social media, email, and webinars. The Complaint further establishes Belfort's intent to induce investor reliance, the damages suffered by Plaintiffs, and the financial benefits Belfort gained from his involvement in the OmegaPro Enterprise Ponzi scheme. Accordingly, the aiding and abetting claim against Belfort is sufficiently pled and should proceed.

4. **Civil Conspiracy**

Belfort argues that the Complaint fails to meet the heightened specificity requirements for pleading a conspiracy to commit fraud because it does not include specific allegations that he knowingly joined the conspiracy or engaged in any predicate acts to further it. [ECF 53 at 20]. However, as outlined above, the Complaint satisfies the pleading standard by detailing the misrepresentations made, the timing and context of those statements, the parties responsible (including Belfort), and the way these statements misled Plaintiffs. See Sections A(1-3) and B(1-3), supra. Since the Complaint adequately alleges a common law fraud claim, which forms the basis for civil conspiracy, the civil conspiracy claim is also properly pled. See _Raimi v. Furlong_, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).

5. **Conversion/Theft/Embezzlement**

Belfort raises two main arguments in support of his claim that Plaintiffs failed to adequately plead embezzlement, theft, or conversion [ECF 53 at 20-21]. First, Belfort asserts that the Complaint does not provide specific details regarding "the amounts received by Belfort, when the funds were received, the purpose of the payments, or [his] knowledge that the funds were paid from money intended for investment." He argues that without such specifics, the claims for embezzlement, theft, or conversion cannot stand. [ECF 53 at 21]. This argument is

directly contradicted by the Complaint, which specifically alleges that from 2019 to 2022, Belfort induced Plaintiffs to invest by promising a guaranteed 5% weekly return, while knowing that the funds were not invested as represented. Instead, the majority of the funds were misappropriated or converted for the personal use and benefit of Belfort and his co-defendants. Moreover, the Complaint states that despite demands from Plaintiffs, Belfort and his co-defendants failed to return the invested funds. [ECF 1 at ¶¶ 128, 154, 162, 168-170, 186, 192-193, 249, and 371-376].

Second, Belfort contends that if cryptocurrency is considered "money," it cannot be subject to conversion because the Complaint does not specify an exact amount transferred to him at a particular time. [ECF 53 at 21]. He cites *Taubenfeld v. Lasko*, 324 So. 3d 529, 542 (Fla. Dist. Ct. App. 2021), which states that "money can be the subject of conversion so long as it consists of specific money capable of identification." This argument fails, as the Complaint clearly alleges that Belfort and his co-defendants converted at least $50 billion between 2019 and 2022, with the precise amount to be determined at trial. [ECF 1 at ¶¶ 192, 375]. Additionally, Belfort's reliance on *Taubenfeld* is misplaced. The court in *Taubenfeld* explicitly recognized that conversion actions are broad and extend beyond tangible property to include "a wrongful taking of intangible interests in a business venture," covering even intangible assets like goodwill. Thus, conversion claims can appropriately be brought for the wrongful taking of cryptocurrency, further undermining Belfort's argument.

### 6. Fraudulent Conveyance

Belfort offers two main arguments for why he believes the fraudulent conveyance claim should fail. First, he argues that the Complaint does not allege that the Ponzi entities or Defendants transferred property or assets to him to evade creditors. [ECF 53 at 22]. This

argument is incorrect. The Complaint explicitly states that "Defendants developed and implemented a scheme to transfer assets among themselves and others to place them beyond the reach of their creditors, including members of the Class," and that these transfers were made with the actual intent to hinder, delay, or defraud the Class members. [ECF 1 at ¶¶ 508-509]. These allegations are sufficient to state a fraudulent conveyance claim. *See, e.g.*, Eurovest, Ltd. v. Segall, 528 So. 2d 482, 483 (Fla. Dist. Ct. App. 1988) ("To constitute a fraudulent conveyance, there must be a creditor to be defrauded, a debtor intending fraud, and a conveyance of property applicable by law to the payment of the debt due.").

Second, Belfort contends that even if the allegations sufficiently plead fraudulent conveyance, the claim should be brought against the debtor (i.e., the Ponzi entities that allegedly disbursed funds), not against the recipients of the transferred funds. He further argues that if Plaintiffs allege that Belfort himself made fraudulent transfers, the Complaint fails because it does not specify any particular transfer made by him. [ECF 53 at 22]. This argument also fails. The Complaint specifically alleges that Belfort and his co-defendants "developed a scheme to transfer assets among themselves and others to place them outside the reach of creditors, including members of the Class". [ECF 1 at ¶ 508]. Thus, the claim is properly brought against Belfort as a party who acted with fraudulent intent. In Eurovest, Ltd. v. Segall, *supra*, the court clarified that fraudulent intent may relate to both existing and subsequent creditors, and where the creditor was not in existence at the time of the transfer, evidence of actual fraudulent intent is sufficient to support the claim. This supports the propriety of the claim against Belfort.

**7.   Breach of Contract and Breach of the Implied Covenant of Good Faith & Fair Dealing**

Belfort argues that the Complaint fails to state claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  [ECF 53 at 22].  He bases his argument on his contention that there are no allegations that he was a party to any contract with any Plaintiff of class member, or that they transferred or paid any asset to him on the promise that he would invest in cryptocurrency.  Id.  As such, as a non-party to any contract, he cannot, as a matter of law, be liable for any such alleged breach. Id.  However, this is incorrect.

An implied contract is an "enforceable contract that is based on an [implicit] promise that is inferred in whole or in part from the conduct of the parties and not solely on their words." *See* 17 Am. Jur. 2d Contracts § 3 (1964); *see also* <u>SBP Homes, LLC v. 84 Lumber Co.</u>, 384 So. 3d 241 (2024).  "A contract implied in fact is not put into promissory words with sufficient clarity, so a fact finder must examine and interpret the parties' conduct to give definition to their unspoken agreement."   1 Arthur Linton Corbin, *Corbin on Contracts* §§ 562 (1960).  Under Florida law, defining an implied contract involves determining "the effect which the parties, as fair and reasonable men, presumably would have agreed upon if, having in mind the possibility of the situation which has arisen, they had contracted expressly thereto." <u>Policastro v. Myers</u>, 420 So. 2d 324, 326 (Fla. 4th DCA 1982).

Belfort's role as a promoter for the OmegaPro Enterprise Ponzi Scheme, where he recruited tens of thousands of investors with promises of guaranteed 5% weekly returns, establishes the necessary implied contractual obligations owed to Plaintiffs [ECF 1 at ¶¶ 342-349].  Additionally, whether an implied contract exists hinges on factual disputes, making it

14

inappropriate to resolve at the motion to dismiss stage. Thus, Plaintiffs' breach of implied contract claim is sufficiently pled.

Under Florida law, every contract, whether express or implied, inherently includes the covenant of good faith and fair dealing. The Eleventh Circuit in *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999), affirmed this principle, recognizing Florida's imposition of an obligation of honest performance in all contractual agreements. Here, Plaintiffs allege that Belfort breached an express term of the implied contract by falsely guaranteeing a 5% weekly return on investment, despite knowing this promise was false. [ECF 1 at ¶¶ 350-361]. This misrepresentation directly undermines the performance of the implied contract and violates the covenant of good faith. See e.g., *Harrison Land Dev., Inc. v. R.H. Holding Co., Inc.*, 518 So. 2d 353, 355 (Fla. Dist. Ct. App. 1988).

Therefore, Florida law supports Plaintiffs' claim that Belfort breached an express term within the implied contract. Plaintiffs have demonstrated the existence of a contractual obligation that warrants this cause of action. Accordingly, the claim is adequately pled and should not be dismissed.

**8. The Intentional Infliction of Emotional Distress**

Belfort argues that Plaintiffs have failed to adequately plead a claim for Intentional Infliction of Emotional Distress (IIED). [ECF 53 at 23]. He contends that the Complaint lacks specific allegations regarding his conduct, knowledge, or intent, relying instead on conclusory statements. According to Belfort, once these conclusory averments are disregarded, there are no factual allegations of conduct—let alone outrageous conduct—that would support an IIED claim or meet the fair notice standard of Rule 8(a). Id.

However, as discussed above, the Complaint satisfies both the heightened specificity requirements of Rule 9(b) and the general pleading standards of Rule 8(a), providing Belfort with fair notice of the claims against him. *See* Sections A(1-3) and B(1-7). The Complaint details how Belfort knowingly and intentionally recruited thousands of innocent investors into a Ponzi scheme, conduct that he knew or should have known would likely cause severe emotional distress. Belfort's actions, which resulted in substantial financial losses for vulnerable investors, including elderly victims who lost their life savings, constitute extreme and outrageous conduct. This behavior goes beyond all bounds of decency and can be deemed "atrocious and utterly intolerable," satisfying the standard established in *Ponton v. Scarfone*, 468 So. 2d 1009, 1011 (Fla. 2d DCA 1985).

Accordingly, the Complaint alleges facts sufficient to meet each element of an IIED claim: (1) intentional or reckless conduct that was likely to cause emotional distress; (2) conduct that was extreme and outrageous, surpassing all bounds of decency; (3) actions that actually caused emotional distress; and (4) emotional distress that was severe, as set forth in <u>LeGrande v. Emmanuel</u>, 889 So. 2d 991, 994 (Fla. 3d DCA 2004). Plaintiffs have thus specifically alleged conduct by Belfort that satisfies all necessary elements for an IIED claim [ECF 1 at ¶¶ 485-492].

**9. Unjust Enrichment**

Belfort repeats his earlier, flawed argument that the Complaint fails to allege any specific sum paid to him, the source of these funds, or whether they originated from the fraudulent activities of the Ponzi Defendants, as the basis for asserting that Plaintiffs have not adequately pled unjust enrichment. [ECF 53 at 22]. This contention is incorrect. In his role within the OmegaPro Enterprise Ponzi scheme, Belfort misled unsophisticated investors with promises of a

guaranteed 5% weekly return, despite knowing that the funds were not invested as represented. Instead, the majority of the money was stolen or diverted for the personal use and benefit of Belfort and his co-defendants. [ECF 1 at ¶¶ 362-370]. This conduct resulted in direct financial gain for Belfort at the expense of the Plaintiffs, constituting unjust enrichment.

Under Florida law, when defendants collaborate to unjustly receive benefits, each participant can be held liable for unjust enrichment, even if the benefit was not conferred directly by the plaintiff. See <u>State Farm Mut. Auto. Ins. Co. v. Brown</u>, No. 16-cv-80793, 2017 WL 1291995, at *7 (S.D. Fla. Mar. 30, 2017). Here, the Complaint alleges that Belfort acted in concert with others to deceptively obtain funds, fulfilling the elements necessary for an unjust enrichment claim. Therefore, Plaintiffs have adequately stated a claim for unjust enrichment.

**(a) Remaining Claims**

To the extent not specifically addressed, Plaintiffs contest any such claims based on the grounds raised herein.

**Conclusion**

For the reasons set forth above, Plaintiffs respectfully request the Court deny Belfort's Motion to dismiss in its entirety.

Respectfully Submitted,

<u>/s/ J.Wil Morris</u>
J. Wil Morris, Esquire

Attorney for Plaintiff
2800 Biscayne Blvd, Suite 530
Miami, Florida 33137
Telephone: 305-444-3437
Fax: 305-444-3457
Florida Bar No.: 069493

**Certificate of Service**

I, Wil Morris, hereby certified that on November 13, 2024, a Copy of the foregoing Plaintiffs' response to Defendants' motion to dismiss was served on all the attorneys listed in this case via ECF.

<u>/s/ J.Wil Morris</u>