**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MIAMI**

_____

UNITED INVESTOR COMMUNITY, INC.,
LYADUNNI UDUGBA
OLUNGBENGA BERNARD ADESUYI
(Individually and on behalf of all others
similarly situated).

Civil Case No.: 1-24-cv-23359 -KWW

**SECOND AMENDED CLASS ACTION
COMPLAINT FOR FRAUD
RACKETEERING,
CIVL CONSPIRACY, BREACH OF
CONTRACT, AIDING AND
ABETTING FRAUD**.

Plaintiffs,

-against-

ANDREAS SZAKACS *aka*
ANDREAS ATTILA SZAKACS
UNITED ARAB EMIRATES
CITY OF DUBAI
ONECOIN LIMITED aka ONE NETWORK
SERVICES, LTD aka ONEECOSYSTEM aka
ONELIFE aka DEALSHAKER
NADER POORDELJOO
MICHAEL SHANNON SIMS
OMEGAPRO FOREX TRADING, LTD
GO-GLOBAL, LTD
SHEIKH MOHAMMED BIN MAKTOUM BIN
JUMA AL MAKTOUM
SHEIKH SAOUD FAISAL SULTAN AL QASSIMI
DILAWARJIT SINGH
ARES GLOBAL, LTD *dba* TRUBLUE FX
DANIEL ONOJA
JORDAN ROSS BELFORT
STEVEN SEAGAL
MARINA WORRE
ERIC WORRE
FRANCISCO DAVID STORY
FREDERICK "TED" SAFRANKO *aka*
TEDDY JOSEPH SAFRANKO
PAULO TUYMAN
AK KHALIL
ROBERT D. COLLAZO JR.
MAHOUSSI RODRIGUE SODANSOU
OMNIA GLOBAL MALTA LIMITED

**JURY TRIAL DEMANDED**

1

SHEIKH SAOUD FAISAL SULTAN AL QASSIMI
GULF CAPITAL, LTD
HOLTON BUGGS
PAULO TUYNMAN
NEVZAT DIKMEN
RIITTA DIKMEN
JUAN CARLOS REYNOSO SR.
OMEGA WORLD, LTD
MOHAMED MEHDI CHERIF
ROBERT VELGHE
ERIC THOMAS
LES BROWN
DARIN KIDD
JOHN C. MAXWELL
CHRISTOPHER HAMILTON
ALGO CAPITAL, LLC
GARY GUILFORD
VIOLA MONEY (EUROPE) LIMITED
MARCUS TODD BRISCO
JUAN HERMAN
SAEG CAPITAL MANAGEMENT, LLC
TRADERS DOMAIN FOREX, LTD
YAS CASTELLUM FINANCIAL, LLC
YAS CASTELLUM, LLC
DUNCAN MALCOLM ARTHUR
TIN QUOC TRAN
JOHN DOE 1 TO 1,000

Defendants.

_____/

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### PRELIMINARY STATEMENT

Plaintiff UNITED INVESTOR COMMUNITY, INC., ("UIC") on behalf of its members, and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, the Law Offices of Morris Legal, LLC for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted

by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls, zoom calls and public announcements public appearance, YouTube Channel/videos made by the defendants, published by and regarding OMEGAPRO ("OMEGAPRO" "GO GLOBAL "or the "Company"), and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Plaintiffs  bring this Complaint for money laundering, fraud, civil conspiracy to commit fraud, civil violations of the Federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1964(c)) ("Federal RICO"), civil violations of the Florida Racketeer Influenced and Corrupt Organizations Act (FLA Article 865) ("Florida RICO"), breach of contract, breach of fiduciary duty, unjust enrichment, intentional and negligent infliction of emotional distress, negligence, fraud, aiding and abetting fraud, embezzlement, misappropriation  and failure to supervise against the Defendants.

This is an action alleging the causes of actions listed above on behalf of a class consisting of all persons and entities (other than Defendants, and all promoters, directors or anyone who has withdrawn more money than they initially invested) who purchased or otherwise acquired investment services from the Defendants between January 2017 and through January 2024 (the "Class Period").  Plaintiffs seek to recover compensable damages caused by Defendants' violations of the Racketeering Acts and other laws.

1. Defendants together as a group, defrauded hundreds of thousands of investors worldwide out of over 10 billion dollars by promoting two consecutive fraudulent investment

schemes.[1]  The first was a fraudulent investment scheme called OMEGAPRO, LTD ("OMEGAPRO") and the second, another fraudulent scheme, called GOGLOBAL, LTD ("GoGlobal").  Each was a pyramid scheme where promoters who invested in the scheme earned crypto currency for recruiting others to do the same.  In the OMEGAPRO scheme, investors were promised profits from cryptocurrency trading but were paid from the cryptocurrency assets of other investors.[2]  The structure of the scheme was such that the referral bonuses, based on each of the investor's own efforts and profiting from the recruited investments, played a primary role in each investor's own anticipated success and profitability.

2.    The Defendants' also employed affinity fraud by promoting the schemes to investors in their respective languages.[3]  For example, in different part of the world including, Africa, Asia, Europe, North and South America, the Defendants recruited native of the countries to promote the Ponzi Scheme. In certain minority communities, both in the United States and Europe, Defendants used the native language of the targeted community to promote the Ponzi Scheme. Defendants also used and/or employed rich, famous and powerful people such as American Actors Steven Seagal, Jordan Belfort from the "Wolf of Wall Street" and the Crowned Sheikhs of Dubai in order to convince people that their investment business is legitimate. The

---

[1]   Between 2017 and 2022, the Defendants participated and promoted OMEGAPRO collecting millions of dollars from hundreds of thousands of victims worldwide promising 200% return on their money using the internet domain: www.omegapro.com

[2]   A pyramid scheme is a fraudulent and unsustainable investment pitch that relies on promising unrealistic returns from imaginary investments. The early investors actually get paid those big returns, which leads them to recommend the scheme to others. Investors' returns are paid out of the new money flowing in. Eventually, no new investors can be found and the pyramid collapses. https://www.investopedia.com/insights/what-is-a-pyramid-scheme/

[3]   Affinity fraud is a type of investment fraud in which a con artist targets members of an identifiable group based on things such as race, age, religion, etc. The fraudster either is or pretends to be, a member of the group. Often the fraudster promotes a Ponzi or pyramid scheme. https://www.investopedia.com/terms/a/affinityfraud.asp#:~:text=What%20Is%20Affinity%20Fraud%3F,a%20Ponzi%20or%20pyramid%20scheme.

famous people employed should have known or had reasons to believe that OMEGAPRO was a Ponzi Scheme designed to defraud people.

## NATURE OF THE ACTION

3.     This is an action alleging fraud, civil conspiracy to commit fraud, racketeering, breach of contract, breach of fiduciary duty, money laundering, aiding and abetting fraud, on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired investment services from the Defendants between January 2018 and through August 2024, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the Racketeering Acts, money laundering, civil conspiracy, fraud, breach of fiduciary duty, intentional infliction of emotional distress, negligent infliction of emotional distress.

### A.     OMEGAPRO, LTD

4.     Defendant OMEGAPRO FOREX, LTD ("OMEGAPRO") was an illegal pyramid scheme which guaranteed a 200% return on investment ("ROI") from cryptocurrency investment.

5.     From approximately 2018 to 2023, the Defendants together and in concert acting on behalf of each other and with each other's consent promoted OMEGAPRO by promising 15-20% monthly returns and 200% returns on investment in 13-16 months period.

6.     OMEGAPRO rewarded its participants for recruiting new investors (or "downlines"), by awarding them 10% of amounts invested by their downlines, additional bonuses, and ceremonial titles.     The more investors recruited, the more grandiose the promoter title. Defendant OMEGAPRO's promises of guaranteed 200% returns were fraudulent and its scheme was unsustainable.

7.     The structure of the scheme was such that the referral bonuses, based on each of the investor's own efforts and profiting from the recruited investments, played a primary role in each investor's own anticipated success and profitability.

8.     OMEGAPRO and the associated named Defendants recruited millions of people from all the over the world including the United States to invest in the Ponzi Scheme. They used other co-defendants who are famous such as the Sheikhs of Dubai, Steven Seagal, a famous actor, and the City of Dubai including the Country of the United Arab Emirates to legitimize their illegal activities.

9.     On or about the month of November 2022, following three weeks of complete non-payment of withdrawals, the Plaintiffs received the first indication of financial issues within the OmegaPro Team. [4]

10.     On November 24, 2022, OmegaPro informed the public via Facebook and Instagram that some unknown hacker(s) had disrupted the payment systems and took control of the data and accounts of every single OmegaPro investor, which turned out to be a big lie.

11.     In an apparent bid to fix the problem and provided immediate respite or recourse to the Plaintiffs, the OmegaPro Team introduced the Broker Group, LTD which the Plaintiffs were led to believe, would take immediate custody of all the crypto accounts that were hacked, retrieve the hacked data/funds, and return the accounts to the pre-hacked status within 3 – 6 months.

---

[4]     OmegaPro in September 2022 also marketed its collaboration with Meldi Cherif – Pulse World CEO and Michal Letynski - Pulse World CTO to lunch XPL token on a platform called Pulse World (www.pulseworld.com) during an invent (Diamond Retreat) in Maldives in first week of November 2022. The Launch of the XPL token was also heavily subscribed to by the OmegaPro investors. Subsequently, OmegaPro pulled out a "we got hacked!" ruse in third week of November 2022. Successively, OmegaPro Team introduced the Broker Group, which the investors were led to believe, would take immediate custody of all the accounts that were hacked, retrieve the hacked data/funds, and return the accounts to the pre-hacked status within 3 – 6 months, that is, to the investors. Till date, the Broker Group Portal (https://portal.broker-group.com/) is still up and running and investors can only see their funds but can't access it.

12.     Because this reported problem was occurring for the first time, the Plaintiffs chose to be patient and eagerly anticipated the curative, restorative process ostensibly embarked upon by the OMEGAPRO Team.

13.     On or about March 2023, the Omegapro team completely ceased all communications and, to add salt to injury, the trading portal of the Omegapro became inaccessible to the investors.

14.     On or about April 2023, the investors learned that Defendants TRAN, BRISCO and SIMS were involved with three interconnected commodity pools that have wrongfully solicited and misappropriated, and or laundered the investors' funds from Omegapro.

15.     At around the same time, Plaintiff learned that Defendant Andreas Attila Zsakacs and Michael Shannon Sims and others have created a series of shell companies to launder the funds collected from millions of people.

16.     Each and every corporate defendant named herein is owned and controlled by one of the individual defendants named herein. The companies did not trade or make money. They were created for the sole purpose of laundering the funds.

**B. GOGLOBAL FOREX, LTD**

17.     After the collapse of OMEGAPRO in November of 2022, Defendants started another fraudulent scheme, and by December of 2023, they founded and promoted what was to become an even larger fraudulent investment scheme called GOGLOBAL.

18.     Through GOGLOBAL, Defendants defrauded hundreds of thousands of investors, including at least over a hundred thousand members of the class residing in the United States.

19.     GOGLOBAL promised to generate profits primarily from trading cryptocurrency and currency pairs on the foreign exchange (Forex) using GOGLOBAL's own trading platform.

Like in OMEGAPRO, GOGLOBAL paid lucrative bonuses to promoters for recruiting new investors. It too was an illegal pyramid scheme.

20.     Defendants preyed upon the same victims of OMEGAPRO when recruiting for GOLOBAL, capitalizing on the exclusion of these communities from traditional markets.

21.     Defendants falsely marketed GOGLOBAL as "a registered hedge fund broker" and a financial advisor.

22.     Defendants fraudulently misrepresented that GOGLOBAL which replaced OMEGAPRO was licensed to trade cryptocurrency in the United States and Forex abroad, that it maintained consistent profits from trading of 5-10% per week (i.e., over 200% per year), and that investors could withdraw their capital and profits at any time.

23.     Even though GO GLOBAL was to replace OMEGAPRO and supposedly took over the initial investors' accounts from OMEGAPRO, none of the investors was ever able to withdraw their money from GOGLOBAL.

24.     Defendants promised "easy" income with weekly ROI, as advertised, in written and verbal form, including postings on the GOGLOBAL Website and other internet advertisement. The Defendant.

25.     Defendants' representations about GOGLOBAL however, were materially false and misleading. GOGLOBAL was not licensed by any regulatory entity in the United States or abroad and did not generate profits from trading sufficient to pay the announced weekly ROI or recruitment bonuses.

26.     Investors worldwide deposited over 108 billion dollars' worth of cryptocurrency with OMEGAPRO and GO GLOBAL from January 2017 through November 2023, and none of that money was ever traded on either platform.

27.     Yet, throughout the entirety of the scheme, OMEGAPRO and GOGLOBAL together with BROKER's GROUP announced and paid investors positive weekly ROI, even when cryptocurrency markets around the world uniformly plunged in the spring of 2022.

28.     On the Go Global portal, investor account balances falsely purported to continually grow and compound, reaching over 10 billion dollars by May 5, 2023, bearing no relation to the real dollar value of investor cryptocurrency held by GO GLOBAL.

29.     Both OMEGAPRO and GO GLOBAL failed to return cryptocurrency deposited by investors and tens of thousands of investors were left with hundreds of millions of dollars in losses.

30.     At the same time, Defendants transferred tens of millions of dollars' worth of cryptocurrency out of OMEGAPRO.

31.     Defendants individually and through their entities, made off with millions of dollars in recruitment payments and profits.

32.     Defendants' scheme to defraud investors by luring them into OMEGAPRO and their scheme to defraud investors by founding and selling investments in GO GLOBAL, including their material misstatements and omissions, constitute fraudulent practices in violation of Florida General Business Law.

33.     Defendants promoted or granted participation in OMEGAPRO and GO GLOBAL, which were illegal pyramid schemes known in Florida as chain distributor schemes, in violation of Florida § 895.01 et al.

34.     Defendants repeated fraudulent and illegal acts in the carrying on, conducting, and transacting of business violated Florida Deceptive and Unfair Trade Practices Act.

35.     This action seeks, inter alia, an order permanently enjoining Defendants from engaging in deceptive, fraudulent and illegal acts and practices in violation of the Federal

Racketeering Act; from participation in any chain distributor schemes or multi-level marketing companies; from serving as directors or officers of any company doing business in the United States; and directing Defendants to pay restitution, disgorgement and damages.

## C.    TRADERS DOMAIN FOREX, LTD

36.    Defendant TRADERS DOMAIN, FX Inc., aka Traders Domain was incorporated in Saint Vincent and the Grenadines in July 2017 by Defendant TED SAFRANKO.  Since 2017 up to and including the year 2023 Traders Domain operated a website www.tradersdomain.com.

37.    Via this website, Traders Domain solicited investors in the United States which laundered over $500 million using crypto in a wide-ranging Ponzi scheme.

38.    From 2017 to about 2023, Traders Domain laundered millions of dollars of investors' funds collected from OMEGAPRO, GO GLOBAL, and BROKERS GROUP, LTD.

39.    In January 2033, the Commodity Futures Trading Commission (CFTC) sued Traders Domain alleging that it was a front for a scheme that defrauded at least $144 million from more than 900 investors.

40.    In the lawsuit, the CFTC alleged that the individuals behind the platform had been involved in three "interconnected fraudulent schemes" where they solicited investments for a forex trading firm that did not exist.

41.    The CFTC says the funds were instead misappropriated for personal use while customers were provided with fake account statements. The lawsuit resulted in the shutdown of the Traders Domain website.

42.    However, the scheme was far bigger than what the CFTC presented, with the Regulator overlooking $500 million the firm laundered through cryptocurrencies.

43.     Traders Domain directly and indirectly solicited funds through lifestyle and business influencers, who presented Traders Domain as a high-yield firm managed by a veteran trader or trading bot.

44.     Once signed up, investors could watch their account's performance on a website.

45.     Traders Domain used its pool of funds to pay out investors who withdrew their money, lending the venture short-term credibility and effectively making it a Ponzi scheme.

46.     While some customers wired their funds to Traders Domain, the primary method for routing investor money was through crypto transactions.

47.     Based in the Caribbean Island of Saint Vincent and the Grenadines, Defendant Traders Domain presented crypto transfers as a workaround for the American clients its website admitted it was not licensed to accept. Traders Domain used crypto to launder over $500 million.

48.     Traders Domain used crypto to channel over half a billion dollars to a fraudulent Trading platform. In association with the following corporate Defendants below, Traders Domain conspired with Algo Capital, LLC, Yas Castellum, LLC, Yas Castellum Financial, LLC, SAEG Capital Management, ZXN Investment Holding, LTD, Omegaworld, LTD, Neptune Trade, LTD, OMP Money, LTD, OMP Exchange, Broker Group, LTD, Pulse World, and Five Star Club, LTD to defraud members of the class of their investments and laundered the money received from the Ponzi scheme to benefit each and every one of the corporate defendants.

## D.     THE CORPORATE DEFENDANTS LAUNDERED THE PONZI SCHEME MONEY

49.     From about 2017 to about 2023, the corporate defendants[5] conspired among themselves to defraud investors of OMEGAPRO, GO GLOBAL, BROKERS GROUP by

---

[5]     The Corporate Defendants that laundered the Ponzi scheme money include: ALGO CAPITAL, LLC, YAS CASTELUM, LLC, YAS CASTELUM FINANCIAL, LLC, SAEG CAPITAL MANAGEMENT,

laundering over 25 billion dollars collected from the Ponzi Schemes operated by OMEGAPRO, GO GLOBAL and BROKERS GROUP.

50.    For example, Yas Castellum. LLC, and YAS CASTELLUM FINANCIAL, LLC are two companies controlled and operated by Defendant Michael Shannon Sims. Both companies were used as criminal vehicle to launder millions of dollars from OMEGAPRO. At the same time Michael Shannon Sims served as OMEGAPRO representative in the United States recruiting tens of thousands of class members to invest in the Ponzi Scheme.

51.    Algo Capital, LLC, a company duly incorporate in the State of Florida, owned and operated by defendant Robert Collazo Jr, Juan Herman, was used as passed through to launder millions of dollars from several Ponzi Scheme including Omegapro and Go Global.

52.    Since January 2022, the defendants participated in a scheme to defraud members of the class and others of their money by marketing a fictitious algorithmic trading platform.

53.    Defendant collected millions of dollars from members of the class for purpose of Investment, but most if not all the money was used for personal expenses, while defendant falsified statements and documents to make it appears that the Plaintiff account was performing as expected.

54.    This defendant conspired with the other corporate and individual defendant, worked together in operating the fraudulent scheme through wire and mail communications.

55.    The above defendants conspired among themselves and between each other to defraud investors by assisting OMEGAPRO, GO GLOBAL and BROKERS GROUP in laundering the proceeds of the Ponzi scheme.

---

OMEGA WORLD, LTD, BROKER GROUP, OMNIA GLOBAL MALTA LIMITED, GULF CAPITAL, LTD AND OMEGAPRO.

56. From 2017 to 2023 each of the above corporate defendants used wire communications with the intent to defraud members of the class and did defraud members of the class.

57. Each of the above corporate Defendant participated in the fraud by laundering Money collected from the members of the class, as such each corporate defendant were part of the criminal enterprise.

## I.     THE PARTIES

### A.  The Plaintiffs

58. Plaintiff, UNITED INVESTOR COMMUNIY, ("UIC") is not-for-profit Corporation duly incorporated in the State of Florida. The organization represents tens of thousands of members who were preyed upon by the Defendants to invest in the Ponzi Scheme. Its members collectively invested over 500 million dollars with OMEGAPRO and GO GLOBAL.

59. Plaintiff, LYADUNNI UDUGBA is a United States citizen residing in the State of Florida. Named Plaintiff is a member of UIC and is suing in her capacity as an investor seeking to represent the interest of similarly situated individuals who were defrauded by the each named Defendants listed in this complaint.

60. Plaintiff, OLUNGBENGA BERNARD ADESUYI is a United States Citizen residing in Miami, Florida. This Plaintiff is a member of UIC and is suing on his own name and capacity as an investor of both OMEGAPRO and GO GLOBAL seeking to represent other similarly situated investors.

### B.     The Defendants

#### i.     <u>Sovereign Country & Political Entity</u>

61.     Defendant, THE UNITED ARAB EMIRATES, is a sovereign country located in the Middle East. The Defendant is being sued on its capacity as the employer of the Sheikh of Dubai for failure to supervise.

62.     Defendant, THE CITY OF DUBAI, is part of the United Arab Emirates and the capital of the United Emirate of Dubai. This Defendant is being sued in its official capacity as the employer of the Sheik of Dubai, a Defendant herein.

63.     Defendant SHEIKH SAOUD FAISAL SULTAN AL QASSIMI, is a citizen of the United Arab Emirates. Defendant is a member of the royal family, a billionaire belonging to the most elite family in the Middle East. From 2019 to 2023, Defendant used his fame and influence to promote several Ponzi Scheme. Defendant was the purchaser of ONECOIN another Ponzi Scheme that operated in Dubai between 2015 and 2018.[6]

64.     Defendant, SHEIKH MOHAMMED BIN MAKTOUM BIN JUMA AL MAKTOUM, CROWN SHEIKH OF DUBAI is a citizen of the United Arab Emirates. Defendant is a billionaire, belonging to one of the most elite powerful families in the Middle East. Defendant is not simply just rich and powerful but very influential in the world. From 2019 to 2024, Defendant used his fame, fortune and influence to promote OMEGAPRO. In the last three to four

---

[6]     Sheikh Saoud bin Faisal Al Qassimi holds a bachelor's degree in business administration from the Ajman University of Science and Technology. H.H.Sheikh Saoud began his career in banking and investments with the United Arab bank, where he has spent many years and gained extensive experience. Currently, H.H. Sheikh Saoud is the Secretary-General of the Intergovernmental Collaborative Action Fund for Excellence (ICAFE), is on the advisory board of the World Association of Former United Nations Memos and Fellows (WAFUNIF), an official United Nations Peace Messenger since 2016, and is also a member of the Asian Federation of Bodybuilding and Fitness. In addition to these roles, H.H. Sheikh Saoud bin Faisal Al Qassimi holds several key positions in various organizations. He serves as the Chairman of the Marvellex Group of Companies, the SBF establishment, the Royal Business Club, and the Best Home Real Estate. Furthermore, he is a Director at Faisal Holding, contributing his expertise and leadership to the company's activities.

years, Defendant have made several appearances on behalf of OMEGAPRO for the purpose of promoting, recruiting others to invest in what the Defendant knew or had reason to know was a criminal enterprise, a Ponzi Scheme designed to defraud people in America and the rest of the world. The extent of the Defendant's involvement with the criminal enterprise is not yet fully known, but Plaintiffs have enough evidence in the form of video, speech, and pictures of the Defendant holding public meetings with officers of OMEGAPRO in Dubai and other places.[7]

---

[7] Sheikh Mohammed bin Maktoum bin Juma Al Maktoum, a member of Dubai's royal family, who has a multifaceted career that traverses numerous sectors—ranging from technology and aviation to government affairs, sports consultancy, healthcare, education, oil & gas services, real estate, and fashion — He has established himself as a notable businessman, contributing significantly to global enterprises while also being involved in the economic sectors of the United Arab Emirates.  In the technology sector, Sheikh Mohammed has been a visionary partner, specializing in large-scale national infrastructure projects that facilitate transformational change. His expertise in secure digital identities, Web3 technologies, Central Bank Digital Currencies (CBDCs), and blockchain infrastructure has empowered governments, multinational corporations, and institutions to actualize a future filled with boundless possibilities. https://sheikhsaoud.com/#:~:text=H.H.%20Sheikh%20Saoud%20bin%20Faisal,years%20and%20gained%20extensive%20experience.



OmegaPro co-founders Dilawar Singh (L) and Andreas Szakacs (R) have a photo-op with Steven Seagal and Dubai's Sheiks. This is a great example of a Ponzi scheme using legitimacy via assocation.

 **OmegaPro**
14 hrs · 🌐

What an honor to welcome His Highness Sheikh Mohammed Bin Maktoum Bin Juma Al Maktoum and Hollywood Legend Steven Seagal and to our OmegaPro Global convention. It was an absolute surprise that gave us even more energy to do what we do best which is to impact people's lives positively. 💯



### ii. **Individual Defendants**

65.    Defendant MICHAEL SHANNON SIMS ("MSM") is a United States Citizen, residing in Sunny Isles Beach, Florida. At all times relevant, MSM was OMEGAPRO representative in the United States serving as Chief Strategic Advisor for OMEGAPRO from 2018 to its collapse in 2023.[8]

66.    Defendant JOHN C MAXWELL, ("JCM") is an American citizen, residing in the State of Georgia.   At all times relevant, Defendant was OMEGAPRO ambassador and representative in Georgia. As an ordained Minister JCM used his influence to recruit thousands of people to invest in OMEGAPRO Ponzi Scheme.

67.    Defendant, JORDAN ROSS BELFORT, aka "The Wolf of Wall Street" is a United States Citizen, a very well-known actor who made his name in the movie "The Wolf of Wall Street". Defendant resides in Miami Beach, Florida. At all times hereinafter mentioned, Defendant used his fame and status to promote OMEGAPRO and caused hundreds of thousands of people to invest in the Ponzi Scheme.[9]

---

[8]    In 2023, the CFTC filed a civil case against Defendant Michael Shannon Sims for fraud. The complaint was filed in the U.S. District Court for the Southern District of Texas, charging fraud and misappropriation against defendants Marcus Todd Brisco, Yas Castellum LLC, Yas Castellum Financial LLC, Tin Quoc Tran, Francisco Story, Fredirick Safranko a/k/a Ted Safranko, SAEG Capital General Management LP, and Michael Shannon Sims. [Civil Action No. 23-cv-00336] [See CFTC Press Release No. 8665-23]

In its continuing litigation, the CFTC seeks full restitution to defrauded pool participants, disgorgement of any ill-gotten gains, civil monetary penalties, permanent trading and registration bans, and a permanent injunction against further violations of the Commodity Exchange Act and CFTC regulations, as charged. https://www.cftc.gov/PressRoom/PressReleases/8675-23.

CREDIT FOR PHOTOS:  Https://behindmlm.com/companies/omegapro-trots-out-scam-ambassador-steven-seagal/

[9]    Jordan Ross Belfort is an American former stockbroker, financial criminal, and businessman who pleaded guilty to fraud and related crimes in connection with stock-market manipulation and running a boiler room as part of a penny-stock scam in 1999.[4] Belfort spent 22 months in prison as part of an agreement under which, becoming an informant for the FBI and wearing a wire, he gave testimony

68.     Defendant, ANDREAS ATTILA SZAKACS, is a Swedish Citizen and Co-founder of OMEGAPRO. He is currently in the custody of the Turkish government. At all times hereinafter mentioned, this Defendant conceived and operated OMEGAPRO as a Ponzi Scheme with the intent to defraud millions of investors. [10]

69.     Defendant DILAWAR SINGH upon information and belief is a German citizen and Co-founders and Chief Network Officer of OMEGAPRO.   At all times relevant, Defendant conceived, and operated OMEGAPRO as a Ponzi Scheme with the specific intent to defraud as many investors as possible. [11]

---

against numerous partners and subordinates in his fraud scheme.[5] He published the memoir The Wolf of Wall Street in 2007, which was adapted into Martin Scorsese's film of the same name released in 2013, in which he was played by Leonardo DiCaprio.

Belfort was born in 1962 in the Bronx, a borough of New York City, to Jewish parents, Maxwell "Max" Belfort and Leah (née Markowitz).[6] They were both accountants.[7][8][9] His paternal grandfather, Jack Belfort (1904–1970), was an immigrant from Russia, while his grandmother was a Second Generation American born to Lithuanian parents in New Jersey.[10][11] Belfort was raised in Bayside, Queens.[1][12][13][8][14][15] Between completing high school and starting college, Belfort and his close childhood friend Elliot Loewenstern earned $20,000 selling scooped Italian ice from styrofoam coolers to people at Jones Beach Field 2 and West-end 2.[16]

Belfort went on to graduate from American University with a degree in biology.[14][17] Belfort planned on using the money earned with Loewenstern to pay for dental school,[18] and he enrolled at the University of Maryland School of Dentistry. However, the dean of the dental school gave a welcoming speech on the first day in which he said, "The golden age of dentistry is over. If you're here simply because you're looking to make a lot of money, you're in the wrong place." Belfort subsequently elected not to attend the graduate program.[19][20]

[10]   Andreas Szakacs, the Chief Executive Officer and co-founder of OMEGAPRO FOREX, LTD and his co-defendants have defrauded millions of people worldwide. But on August 9, 2024 Turkish authorities arrested Andreas Szakacs, the co-founder of OmegaPro, one of the world's largest and most infamous online multi-level marketing (MLM) scams.  Szakacs, who had been on the run since November 2022, was apprehended after a year-long international manhunt. His arrest marks a pivotal moment in the pursuit of justice for the millions of investors defrauded by the OmegaPro scam. https://www.wikifx.com/en/newsdetail/202408144104699495.html.

[11]   On May 1, 2024We,  investors of OmegaPro, collectively known as the OPANI CLASS OF OMEGAPRO INVESTORS, urgently call upon the Sheikh of Dubai and the entire Government of Dubai to initiate a comprehensive investigation into the activities of OmegaPro Forex Trading company that operated out of Dubai and their Co-Founders and top operatives, namely Andreas Szakacs; Dilawar

70.    Defendant, NADER POORDELJOO upon information and belief is a Dutch citizen, residing in Germany. At all times hereinafter mentioned, Defendant served as President of OMEGAPRO and currently serving as GOGLOBAL Chief Operating Officer.



71.    Defendant, ERIC THOMAS, upon information and belief is a United States Citizen, and a motivational speaker who used his influence to convince hundreds of thousands of

---

Singh; Mike Simms; and Paulo Tyneman, who we believe currently reside in Dubai, and are running illegal Ponzi schemes to defraud people from all over the world, including Nigeria.

OmegaPro Forex Trading is a Dubai-based company that was registered and operated within your Dubai jurisdiction. Their world headquarters is based in Dubai, and over $100 billion of depositors' funds were remitted to them in Dubai via cryptocurrency and dollar transfers. This petition represents the voices of countless investors globally, including those of over 10,000 members of the OPANI CLASS ACTION from Nigeria who collectively have over N200 billion (part of an estimated $100 billion globally) invested in what has now been revealed as a very elaborate Ponzi scheme. https://www.change.org/p/nigerian-investors-petition-dubai-govt-to-investigate-omegapro-owners-for-ponzi-scheme.

people to invest in OMEGAPRO. At all times hereinafter mentioned, this Defendant served as an ambassador, promoter of OMEGAPRO in the United States.

72.     Defendant, STEPHANE PLANTE is a Canadian citizen residing in Quebec, Canada. At all times hereinafter mentioned, Defendant, served as a serial promoter of several Ponzi Scheme including OMEGAPRO. Defendant used the internet to reach and recruit U.S. citizen to invest in the Ponzi scheme.

73.     Defendant, NICK LEMAY is a Canadian citizen residing in Quebec, Canada. Defendant is a serial promoter of Ponzi Scheme. At all times hereinafter mentioned, Defendant served as an ambassador and promoter of OMEGAPRO in the United States and Canada using the Internet to reach people in the United States.

74.     Defendant, JUAN CARLOS REYNOSO, SR. upon information and belief is a United States Citizen, residing in Miami Beach, Florida. At all times hereinafter mentioned, Defendant served as Manager of OMEGRAPRO in Latin America. Defendant is currently working as GOGLOBAL Chief Sales Officer. From 2019 to 2024 Defendant used his influence to convince hundreds of thousands of people in the United States, and Latin America to invest in OMEGAPRO and GOGLOBAL, both companies have been operating as a Ponzi Scheme.

75.     Defendant, JUAN CARLOS REYNOSO, JR., is a United States citizen residing in Miami Beach, Florida. He is the son of Defendant REYNOSO SR. This Defendant is a serial promoter of Ponzi scheme, having promoted several Ponzi Scheme in the past. From 2019 to present, Defendant and his father promoted OMEGAPRO and GOGLOBAL as a legitimate business knowing that both companies are Ponzi Schemes designed to defraud investors.

76.     Defendant, AK KHALIL, upon information and belief is a United States Citizen residing between Dubai and Northville Michigan. Defendant is the Chief Executive Officer of

GOGLOBAL, LTD. At all times hereinafter mentioned, Defendant as the CEO is responsible for the operation of GOGLOBAL. Defendant is operating GOGLOBAL as a Ponzi Scheme with the intent to defraud its investors.

77.     Defendant, ERIC WORRE, upon information and belief, is a United States Citizen, residing in Henderson, Nevada. At all times hereinafter mentioned, Defendant served as OMEGRAPRO strategic coach recruiting thousands of people to invest in the Ponzi Scheme.

78.     Defendant, MARINA WORRE, upon information and belief is a United States Citizen and the wife of Defendant ERIC WORRE. At all times hereinafter mentioned, Defendant served as a promoter of OMEGAPRO. From 2019 to present, Defendant have recruited thousands of people to invest in OMEGAPRO and GOGLOBAL.

79.     Defendant, STEVEN SEAGAL, is a dual citizen (United States and Russia) currently residing in Moscow, Russia. Defendant is a famous. Movie star, and all times hereinafter mentioned Defendant used his fame and fortune to promote OMEGAPRO, and did promote OMEGAPRO by making several public appearances with officers of OMEGRAPRO for the purpose of convincing people to invest in OMEGAPRO.  The extent of this Defendant's involvement in the criminal enterprise is not yet known but with the opportunity to conduct discovery, Plaintiff expects to find more information.[12]

80.     Defendant, MARCUS TODD BRISCO, is a United States Citizen residing in Hawaii. This Defendant is the brother-in-law of Defendant Michael Shannon Sims. At all times hereinafter mentioned, this Defendant worked with his brother-in-law and from 2019 to 2023

---

[12]    Steven Frederic Seagal The U.S. state of New Jersey has issued a cease-and-desist order to an initial coin offering (ICO) endorsed by film actor Steven Seagal.

served as a promoter of OMEGRAPRO, and caused hundreds of thousands of people to invest their money in what the Defendant knew was a Ponzi Scheme.

81.     Defendant, TIN QUOC TRAN, upon information and belief is a United States Citizen residing in Santa Ana, California. At all times hereinafter mentioned, Defendant served as the ringleader of a $145 million dollars fraudulent scheme, diverting funds received from OMEGAPRO. In a lawsuit filed by the Federal Trade Commission ("FTC") accused TRAN of failing to register as a Commodity Pool Operator (CPO). The Defendant is the co-owner of SAEG Capital Management, LP a registered company with the NFA.

82.     Defendant, FRANCISCO DAVID STORY, is a United States Citizen residing in UTAH. At all times hereinafter mentioned, the Defendant was the co-owner of Defendant SAEG Management LP. This Defendant used his corporation to launder money stolen from OMEGAPRO and GOGLOBAL.

83.     Defendant, FREDIRICK "TED" SAFRANKO, aka TEDDY JOSEPH SAFRANKO, is a Canadian citizen and the founder of TRADERS DOMAIN, and executive Officer of SAEG Capital Management. At all times hereinafter mentioned, Defendant used his company to launder money stolen from OMEGARPO and GOGLOBAL.

84.     Defendant, ROBERT D. COLLAZO JR., is a United States Citizen, residing in Florida, at all times hereinafter mentioned, Defendant was the founder and co-owner of ALGO CAPITAL, LLC. Defendant used his company to launder money stolen from OMEGAPRO and GOGLOBAL. Defendant used his company to promote OMEGAPRO with the intent to defraud OMEGAPRO and GOGLOBAL investors.

85.     Defendant, JUAN HERMAN, upon information and belief is a United States citizen residing in Hialeah, Florida. At all times hereinafter mentioned, Defendant served as the Vice

President and co-owner of ALGO CAPITAL, LLC. Defendant used his company as a criminal organization laundering money stolen from the investors of OMEGAPRO and GOGLOBAL.

86.     Defendant CHADLI MEKID, upon information and belief is a French Citizen residing in Paris. At all times hereinafter mentioned, Defendant served as an ambassador to Omegapro and focusing his recruitments on members of the African Diaspora in France, the United States and England. Defendant is a serial promoter of Ponzi Scheme, having promoted several Ponzi Scheme from 2015- to present.  Defendant maintained a YouTube chanel – "Multifilms" and used said Chanel to promote Omegapro.[13]

87.     Defendant MOHAMED MEDHI CHERIF, is a citizen of Tunisia residing in United Arab Emirates. At all times hereinafter mentioned, Defendant was the Chief Executive Officer and co-founder of Pulse World. From 2015 to 2023, the Defendant promoted both Pulse workd and Omegapro. Defendant knew that both Pulse World an Omegapro were Ponzi Scheme designed to defraud investors.

### iii. Corporate Defendants

88.     Defendant OMEGAPRO, LTD is a foreign corporation, and upon information and belief is incorporated in the Country of Saint Vincent and the Grenadines since 2017 with its last known address in the City of Dubai.

89.     Defendant, GO GLOBAL FOREX, LTD is a foreign company and upon information and belief is incorporated in the city of Dubai with its headquarters in Singapore.

90.     Defendant, ALGO FX CAPITAL ADVISOR, LLC, is a United States corporation, duly incorporated in the State of Delaware. At all times hereinafter mentioned Defendants Michael

---

[13] "Lets your money work for you" is one of the video on YouTube chanel: https://youtube.be/JNfhUAMRF4?si=OVmgkp5o0ZT_ODDF. Through his Youtube chanel, Defendant was able to reach people both anywhere in the World including in Florida where many members of the class of African descent invested money because of Defendant's promise of high returns.

Shannon Sims and Marcus Todd Brisco controlled the corporation and used said corporation for laundering money from Defendant TRADERS DOMAIN and OMEGAPRO.

91.     Defendant YAS CASTELLUM, LLC, upon information and belief is a United States Corporation duly incorporated in the State of Delaware. At all times hereinafter mentioned, Defendant Michael Shannon Sim used said corporation to launder money stolen from OMEGAPRO and TRADERS DOMAIN.

92.     Defendant, YAS CASTELLUM FINACIAL, LLC, is a United States corporation duly incorporated in the State of Colorado as a subsidiary of YAS CASTELLUM, LLC, from 2019 to 2023, Defendant Michael Shannon Sims and others used this corporation to launder money stolen from OMEGAPRO and TRADERS DOMAIN.

93.     Defendant, TRADERS DOMAIN is a foreign corporation, duly incorporated in the Country of Singapore. This Defendant laundered money from OMEGAPRO and GO GLOBAL from 2018 to present.

94.     Defendant, SAEG CPITAL MANAGEMENT, LP is an American corporation duly incorporated in the State of UTAH. At all times hereinafter mentioned, Defendant laundered money received from OMEGAPRO and GOGLOBAL.

95.     In connection with the acts, conduct and other wrongs alleged in this Complaint, every single Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications, and the Internet to facilitate the fraud.

96.     Defendant, BROKER GROUP, LTD is a foreign corporation registered in Panama and operating in Dubai since 2022. The company is owned and operated by Andreas Szakacs from Sweden, Michael Shannon Sims from the United States and Dilawar Singh from Germany.

97.     Defendant, PULSE WORLD is a foreign corporation registered in Panama, and operating in Dubai. The company is owned and operated by Defendant MEHDI CHERIF.  From 2017 to present Defendant laundered money from OMEGAPRO and GO GLOBAL.

98.     Defendant, OMEGA WORLD, LTD is a Foreign Corporation registered the British Islands of Saint Vincent and the Grenadines. The company is owned and operated by Andreas Szakacs, Michael Shannon Sims and Dilawar Singh. From 2017 to about 2023 the individual defendants used this company to launder money from the Ponzi schemes.

99.     Defendant, NEPTUNE TRADE, LTD is a foreign corporation duly incorporated in United Kingdom.  The company is owned and controlled by Defendant PATEL REHANA. From about 2018 to 2024, Defendant laundered millions of dollars collected from the OMEGAPRO Ponzi Scheme with the intent to defraud members of the class.

100.    Defendant, OMP MONEY, LTD is a foreign corporation upon information and belief is incorporated in the United Kingdom. The company is owned and operated as a shell company for OMEGAPRO. Defendants Andreas Szakacs, the Chief executive officer of OMP MONEY, LTD referred to the company as a bank. The defendant used this company to launder money from the Ponzi scheme.[14]

101.    Defendant, OMP EXCHANGE is a for corporation and upon information and belief is incorporated in the United Kingdom. The company is the alter ego of Defendant Andreas Szakacs. From 2018 to about 2023, Defendant SZAKACS used OMP EXCHANGE to launder money collected from Omegapro, Go Global and Broker Group.

---

[14]   Being a ponzi scheme, Omegapro could not use its own name after France and Spain issued fraud warning against Omega Pro, the defendant used OMP Money  to launder money. See www.amf-france.org. Also, Spain issued fraud warning against Omegapro in 2020. See www.cnmv.es. The commission Nacional del Mercadeo de Valores has issued fraud warning against Omegapro.

102.   Defendant, ZXN INVESTMENT HOLDING, LTD, upon information and belief is a foreign corporation registered in the United Kingdom, Australia and Panama. The company operates out of Dubai. On October 25, 2022, the company lost its license for allege fraud. The company is owned and controlled by Defendant MARC DESPALLIERES. From about 2018 to 2023, the Defendant laundered millions of dollars collected from Omegapro and Go Global.[15]

103.   Defendant, SAEG CAPITAL MANAGEMENT, upon information and belief is a U.S. Corporation duly incorporated in the state of UTAH. From 2018 to about 2023, Defendant laundered money collected from members of the class via Omegapro and Go Global.[16]

---

[15]   Forex broker Vantage to lose Vanauty license for alleged fraud. The company  comprises entities in Australia, Cayman Islands and Vanuatu lost its financial license for alleged fraud. See: www.offshorealert.com.

[16]   The Commodity Futures Trading Commission today announced it filed a civil enforcement action in the U.S. District Court for the Southern District of Texas, charging fraud and misappropriation against Marcus Todd Brisco of Wailuku, Hawaii and his companies Yas Castellum LLC of Denver, Colorado, and Yas Castellum Financial LLC of Wailuku, Hawaii; Tin Quoc Tranof Katy, Texas; Francisco Story of Draper, Utah; Fredirick "Ted" Safranko of Vancouver or Ontario, Canada; Michael Shannon Sims of either Sunny Isles Beach, Florida or Roswell or Atlanta, Georgia; and SAEG Capital General Management LP(SAEG) of Draper, Utah.

The complaint alleges that beginning in approximately April 2020, Tran, Brisco and his companies, and Sims were involved with three interconnected commodity pool scams that fraudulently solicited and misappropriated pool participant funds. The complaint further alleges that Story, Safranko, and SAEG lied to the National Futures Association (NFA) in order to conceal one or more of the scams.

In its continuing litigation, the CFTC seeks full restitution to defrauded pool participants, disgorgement of any ill-gotten gains, civil monetary penalties, permanent trading and registration bans, and a permanent injunction against further violations of the Commodity Exchange Act (CEA) and CFTC regulations, as charged.

**CFTC Obtains Statutory Restraining Order**

On February 6, 2023, District Court Judge Lee Rosenthal entered a statutory restraining order against the defendants, freezing their assets, and giving the CFTC immediate access to their books and records. In addition, the court scheduled a preliminary injunction hearing for February 22, 2023.

**Case Background** As alleged in the complaint, Tran operated a fraudulent scheme from approximately April 2020 to the present. He directly accepted at least $144,043,883 from approximately 913 pool participants. Some, if not all, of the funds were intended for trading either forex or margined or leveraged gold-U.S. dollar pairs. However, Tran did not send any pool participant funds to a trading

104.   Each of the Individual Defendants:

(a) directly participated in the management of the Company;
was directly involved in the day-to-day operations of the Company at the highest levels;

(b) was privy to confidential proprietary information concerning the Company and its business and operations;

(c) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

---

firm; rather, he misappropriated some of the pool participant funds by using them to pay invoices, a loan, individuals not involved with the commodity pool, and to subsidize his unrelated businesses.

Further, as alleged in the complaint, from approximately October 2020 to May 2022, Brisco and Yas Castellum LLC misrepresented to potential pool participants Yas Castellum LLC 's historical trading records; how they would trade pool participant funds; where they would maintain pool participant funds; and who would do the trading. Based on these material misrepresentations and omissions, at least 43 pool participants transferred no less than $470,780 to Yas Castellum LLC to participate in its purported commodity pool. Rather than trade pool participant funds, Brisco and Yas Castellum LLC, with the direction and assistance of Sims, transferred the funds to entities Tran controlled.

The complaint further alleges that Brisco closed Yas Castellum LLC and then launched Yas Castellum Financial LLC in June 2022. Brisco and this new company engaged in many of the same misrepresentations and omissions as the former company. Based on these material misrepresentations and omissions, at least 57 pool participants transferred approximately $1,585,261 to participate in Yas Castellum Financial LLC's purported commodity pool. However, Yas Castellum Financial LLC also misappropriated pool participant funds by transferring most of the funds to a Tran-controlled entity, and by Brisco paying himself for purported trading profits that did not exist.

According to the complaint, to conceal Tran's scheme from regulators, Story, Safranko, and SAEG knowingly submitted falsified bank statements to the NFA during an examination of SAEG.  The CFTC appreciates the assistance of the NFA. The Division of Enforcement staff responsible for this matter are Alison B. Wilson, Sean Hennessy, Maura Viehmeyer, Erica Bodin, and Rick Glaser.

**CFTC's Commodity Pool Fraud Advisory** The CFTC has issued several customer protection Fraud Advisories and Articles, including the Commodity Pool Fraud Advisory, which provides information about a type of fraud involving individuals and firms, often unregistered, offering investments in commodity pools. The CFTC also strongly urges the public to verify a company's registration with the Commission before investing funds. If an entity is unregistered, a customer should be wary of providing funds to that entity. A company's registration status can be found using NFA BASIC.

Customers and other individuals can report suspicious activities or information, such as possible violations of commodity trading laws, to the Division of Enforcement via a toll-free hotline 866-FON-CFTC  (866-366-2382)  or file a tip or complaint online  or  contact  the  CFTC Whistleblower Office. Whistleblowers are eligible to receive between 10 and 30 percent of the monetary sanctions collected, paid from the CFTC Customer Protection Fund financed through monetary sanctions paid to the CFTC by violators of the CEA.

(d) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f) approved or ratified these statements in violation of the federal laws.

(g) knew this was a fraud and intentionally participated in it.

105.   The Sovereign country, Political entity, Companies and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## II.   JURISDICTION AND VENUE

106.   This Court has original subject-matter jurisdiction pursuant to 18 U.S.C. § 1964(c) and U.S.C. § 1331 because this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO").

107.   This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs and there is complete diversity of citizenship between Plaintiff and the Defendants.

108.   This Court has jurisdiction over Plaintiffs' related state and common law claims pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

109.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district.

110.   Venue is further proper in this District pursuant to 18 U.S.C. § 1965(a) because each defendant is found and/or transacts her affairs in this District given each defendant's participation in the OMEGAPROFX Enterprise, as alleged above.

## III.   FACTUAL ALLEGATIONS (APPLICABLE TO ALL DEFENDANTS)

111.   Unless otherwise noted, the following allegations describe the enterprise-wide scheme, marketing practices, and course of conduct that apply to all Defendants."

28

A.     **OMEGAPRO, FOREX TRADING, LTD Fraudulent Scheme**

112.    Defendant, OMEGAPRO, LTD, was incorporated in Saint Vincent and the Grenadines in May 2018 by foreign nationals ROBERT VELGHE and ANDREAS SZAKACS. OmegaPro's website (https://www.omegapro.com) invited investors to earn passive income of up to 300% by participating in one of the world's biggest and most profitable investment opportunity.

113.    Defendant OMEGAPRO, GO GLOBAL and BROKERS GROUP, together with each of the individual Defendants listed above, promoted Omegapro cryptocurrency investment which entitled investors to profits from cryptocurrency investment.

114.    Omegapro promised to distribute monthly profits to investors and stated on its website that "your investment is guaranteed to 300% return of purchase price."

115.    Until returns equaled 200%, investors were able to withdraw their monthly payments, but the original investment was locked on OMEGAPRO's platform and could not be withdrawn.

116.    Defendants targeted unsophisticated investors, many of whom did not know about cryptocurrency, its volatility, or the risks involved.

117.    Defendants helped these investors, especially the elderly, to create email accounts, open accounts with a cryptocurrency platform, such as Binance, Gemini or Coinbase, purchase cryptocurrency on those platforms, and to transfer cryptocurrency from a platform to OMEGAPRO's crypto account provided to investor by Omegapro's principals.

118.    All investors who put money in Omegapro were eligible to recruit new investors, receive a 10% direct referral bonus for each new investor recruited and each new investment made, and additional recruitment bonuses.

119.    Defendants ANDREAS ATTILA SZAKACS, MICHAEL SHANNON SIMS and STEVEN SEAGAL, became top promoters with the highest ceremonial title of "ambassadors," having recruited over 200,000 investors who collectively invested at least $900 million.

120.    Defendants MICHAEL SHANNON SIMS, ANDREAS SZAKACS enticed others to recruit new investors by advertising that payments for recruitment were much more lucrative than just profits.

121.    The structure of the scheme was such that the referral bonuses, based on each of the investor's own efforts and profiting from the recruited investments, played a primary role in each investor's own anticipated success and profitability.

122.    Defendant, OMEGAPRO prepared slide decks it made available through its investor portal on its website.  These slide decks contained promises about investment returns, including 15% monthly returns, return of original investment in six months, and 200% returns in 13-14 months.

123.    The Defendants, presented these slide decks to prospective investors, repeating the misrepresentations contained therein.

124.    For example, in a YouTube video dated June 21, 2018, titled "OMEGARPO SUCCESS", Defendant, Andreas Szakacs, Michael Shannon Sims promised that "people can make [a] ridiculous amount of passive income" including a monthly return of 15% and a 200% return on investment.

125.    Defendant, MICHAEL SHANNON SIMS, presented a video presentation slide deck to prospective investors at a conference organized by Defendant, Andreas Szakacs promising a monthly return of 15% and a 200% return on investment.

126.   On or around March 20, 2019, Defendant, Andreas Szakacs also hosted an event in Dubia, attended by the Prince of Dubai, and Steven Seagal promoting OMEGAPRO as a safe investment.

127.   Following the Dubai event, defendants used the videos created during the event, translated into different language, and engaged distributed/posted the videos on all social media platforms.

128.   Following the release of the video with the Prince of Dubai, HIS HIGHNESS SHEIKH MOHAMMED BIN MAKTOUM BIN JUMA AL MAKTOUM, SHEIKH of DUBAI and famous actor Steven Seagal in attendance, hundreds of thousands of people flooded the website to invest money.   Website traffic to Omegapro increased by 100-fold from previous months.

129.   Defendant, Andreas Szakacs, Michael Shannon Sims presented the Omegapro slide deck during Zoom meetings he organized with potential investors all over the world, where he promised a monthly return of 15% and a 200% return on investment. Below is one of the ads circulated announcing the corporate call to explain the OMEGAPRO investment program



130.   Defendant participated in a WhatsApp group chat promoting Omegapro, enticing others from Africa and other parts of the world to recruit more people to invest in the Ponzi Scheme.

131.   In fact, a week after the publication of the video of the appearance of the Sheikh of Dubai and Steven Seagal, members of United Investor Community doubled their initial investment specifically because they believed that the Sheikhs of Dubai would not have participated in this promotion event of OMEGAPRO if OMEGAPRO was a Ponzi scheme.

132.   Defendant, Andreas Szakacs advertised OmegaPro in several foreign languages including several African dialects seeking to attract more investors from different part of the world.

133.   On November 21, 2018, Defendant, ANDREAS SZAKACS told his Youtube viewers about the success of Omegapro and how a rate of return of "15% per month," and doubled

their money in 16 months. He repeated those same statements in his segment on January 6, 2019. Defendant directed investors to his website.

134.   Defendant Andreas Szahacs also met with investors in person in via zoom and presented the Omegapro slide deck to them, including the slides promising a monthly return of 15% and a 200% on investment.

135.   Defendant, Michael Shannon Sims, helped some investors open an account with Cryptocurrency trading platforms and took them to their bank to help them transfer funds to these platforms to facilitate their investments in OmegaPro.

136.   All the individual Defendants named herein promoted OmegaPro to investors through emails and Zoom calls, where they presented slides promising a monthly return of 15% and a 200% return on investment.  Defendant, SIMS recruited thousands of investors into OMEGAPRO directly and those investors recruited additional investors. The Defendants promised that OMEGAPRO generated a 15% monthly return and 200% return on investments in 13 to 16 months from cryptocurrency investment, as well as a guarantee of 200% return on investment on its website, to which these Defendants referred investors, were false.

137.   These promised investment returns were not guaranteed, and many investors lost money.  While repeatedly promising consistent high returns, Defendants failed to inform investors about the risks inherent in their investment, including that cryptocurrency is extremely volatile, that its price is subject to fluctuations affecting the value of rewards, and that they could lose their entire savings in the scam.

138.   From 2018 to 2022, Defendant collected over 4 billion dollars from investors all over the world. In November of 2022, Defendant informed investors that its website had been hacked by some unknown hackers. See below press release published in Instagram.



139.   In the above communication, defendant promised that clients would be able to access their accounts and make withdrawals of their funds. This never occurred. Broker Group, LTD was another ruse to delay investors from taking actions again Omegapro.

**B.  How the OMEGAPRO Ponzi Scheme Worked**

140.   The OMEGAPRO Ponzi Scheme was created as a pyramid, where those who came first and invested recruited others to invest and profited from the investments of those they brought

in. Recruiters received 10 percent of the money invested.  And as they bottom-line grew, investors made more and more money from the investors they brought in, who also recruiting others.

141.   For example, Person A invested a sum money and was told by the Defendants to recruit three people who would also invest under them as a pyramid as shown below:



142.   Once these three people invested their money, Person A received 10% of the money invested.  As more people signed up and became investors, the initial investors or head of the team made more money at the expense of later investors.

143.    The structure of the pyramid scheme was such that the referral bonuses, based on each of the investor's own efforts in recruiting others to invest and profiting from the recruited investments, played a primary role in each investors own anticipated success and profitability.

144.   The Plaintiff invested money in the OMEGAPRO Enterprise Ponzi Scheme upon the false representations and the coercions of the individual defendants.  Each investor had an online crypto account through which was designed to lead them to believe that their investment returns were growing on a daily basis, but each account depicted false earnings. The collected funds were never actually invested as represented and the fraudulent scheme continued until OMEGAPRO Enterprise Ponzi Scheme collapsed at which time the investors began to realize that had been scammed.

**C.  The Structure of the OMEGAPRO PONZI Scheme**

145.   Defendants MICHAEL SHANNON SIMS, JORDAN BELFORT, ANDREAS SZAKACS, DILAWARJIT SINGH, NADER POORDELJOO, PAULO TUYMAN and JUAN CARLOS REYNOSO SR. were the founders and the "visionaries" behind OmegaPro. Defendants Steven Seagal, Michael Shannon Sims, Jordan Belfort lured investors by promising profits from trading their cryptocurrency and touting themselves as "some of the Industry's Top Leading Professionals worldwide."

146.   According to the OMEGAPRO website, Defendant, ANDREAS SZAKACS, was responsible for the strategic direction of OMEGAPRO, and overseeing the company's overall operations," including OMEGAPRO 's finances.

147.   Defendant, MICHAEL SHANNON SIMS and JORDAN BELFORT, however, did not disclose to investors their financial history, including her personal bankruptcies and money judgment against them.

148.   From 2018 to its collapsed in November of 2022, Defendants MICHAEL SHANNON SIMS, JOHN   BELFORT and others collected tens of millions of dollars from American investors of OMEGAPRO.

149.   Omegapro corporate structure was such each part of the world had a representative. For example, in the United States defendant SIMS was Omegapro's representative. In Latin America JUAN REYNOSO SR. was OMEGAPRO's representative causing hundreds of thousands of people to invest money in Omegpro.

150.   In furtherance of the scheme, the above Defendants recruited famous people such as Steven Seagal, Jordan Belfort, the Prince of Dubai to participate in public and private events with the principals of Omegapro. These public and private appearances would be videotaped and

translated into several languages. Thereafter, the videos would be published in all social media platforms as to make it appear that Omegapro was a legitimate company.

151.   This fraudulent marketing practice caused tens of thousands of people to invest money with OMEGAPRO.

152.   The dollar amount of cryptocurrency deposited by investors with Omegapro was reflected in their "trading" accounts on the OmegaPro investor portal accessed through the Omegapro website.

153.   In actuality, however, OmegaPro directed investors through its website to send their cryptocurrency, intended for trading by OmegapPro, to a payment processor that did not trade cryptocurrency for OmegaPro but merely stored it in OmegaPro's wallets.

154.   Defendants represented to investors that OmegaPro pooled their cryptocurrency and that its "experienced team of traders" traded it on Omegapro's own trading platform.

155.   OmegaPro's trading platform was a trading software called "White Label MetaTrader 5" which OmegaPro licensed from Prime Brokerage Services, doing business as B2Broker ("B2Broker").

156.   OmegaPro exercised total discretion over investor cryptocurrency and promisedinvestors consistent passive income and that they could "earn without having to trade…No experience needed."

157.   Defendants decided how much, if any, investor cryptocurrency was traded on the OmegaPro trading platform.

158.   OmegaPro represented that it calculated its trading profits on a weekly basis and that it retained 30% of the weekly profits as a "performance fee" and divided the remaining 70% among investors.

159.   Every Friday on its investor portal OmegaPro posted ROI purportedly derived from weekly trading profits for the prior week.

160.   Every Saturday, OmegaPro posted recruitment bonuses on the same investor portal which Omegapro claimed were paid out of its 30% share of the weekly trading profits.

161.   Weekly ROI and commissions for recruiting new investors were added on OmegaPro's investor portal into investors' "bonus" accounts.

162.   Investors could reinvest their funds from the "bonus" accounts by moving them into their "trading" account, known as "compounding," or withdraw them into an outside cryptocurrency wallet.

163.   Starting in the fall of 2020, investors could choose to automatically direct their weekly bonus into their "trading" account.

164.   Defendants' key selling point was that, unlike other similar investment schemes, OmegaPro allowed investors to withdraw any amount of their funds, including their original investment, at any time.

165.   OmegaPro promoters received referral bonuses for recruiting new investors. They were also given ceremonial titles that reflected the amount of money they convinced others to invest. These ceremonial titles ranged from Platinum Associate, with $25,000 in downline investments to 2-Star Ambassador with downline investments of $100,000,000.

166.   The structure of the scheme was such that the referral bonuses, based on each of the investor's own efforts and profiting from the recruited investments, played a primary role in each investor's own anticipated success and profitability.

167.   Defendants used social media such as Facebook, YouTube, WhatsApp, Telegram groups, Instagram and Zoom meetings, in-person meetings, and other means to promote OmegaPro.

168.   Defendant SIMS created slide decks describing the OmegaPro investment and marketing scheme and loaded them to the OmegaPro investor portal on the OmegaPro website together with various other information about the company, including the weekly performance reports.

169.   The Defendants used these slide decks and the weekly performance reports to recruit new investors without modifying them. During their training sessions aimed at recruiting new investors, Defendant Michael Shannon Sims, Jordan Belfort, Andreas Szakacs repeated all the misstatements contained in the slide decks.

170.   Defendant, ERIC WORRE, one of the top promoters of OmegaPro, opened an account in his name and two additional accounts for the entities he owned and controlled and strategically placed recruited investors under his three accounts to maximize his recruitment bonuses. Defendant, WORRE, received all the ROI payments and recruitment bonuses awarded to his entities by OmegaPro.

171.   Through this design, his entity TPN (The People's Network), and Traders Domain, ERIC WORRE became an Ambassador for Omega, helping OmegaPro recruit more victims and at the same time sweeps millions of dollars in Ponzi fraud.

172.   Defendant,   ERIC   WORRE,   operated   a   Youtube   Channel,   and https://youtu.be/uA1mfYlgakEsi=5a6ucPNWlot6OtFH used his YouTube Channel to promote Omegapro and other MLM Ponzi Scheme which he knew were Ponzi Schemes.

### D.  Defendants Made Material Misstatements and Omissions to Promote OmegaPro as a Legitimate Business

173.   Every individual and corporate defendant named in this complaint was aware that trading cryptocurrency on behalf of investors required registration. Each of them knew that OmegaPro was a Ponzi Scheme because they were no investment, and that the money collected from new investors were being to pay bonus and old investors.

174.   From 2020 through January 2022, OmegaPro's slide deck stated that OmegaPro was a "legally Registered Hedge Fund company."

175.   Defendant, Michael Shannon Sims continued to misrepresent OmegaPro as a registered hedge fund through at least June 22, 2022, including in a March 10, 2022, YouTube video OmegaPro, and a June 10, 2022, YouTube video OmegaProFX.

176.   Defendants presented the same OmegaPro slide decks to potential OmegaPro investors during their weekly Zoom meetings and misrepresented that OmegaPro was a registered hedge fund.

177.   Additionally, in a video uploaded on YouTube on February 19, 2022, titled on OmegaPro – the Next Steps, Defendant, SIMS, stated that OmegaPro was a "licensed hedge broker." That video was viewed at least 21,000 times.

178.   Defendants' statements that OmegaPro was a "registered hedge fund company" or a "registered hedge. fund broker" or a "licensed hedge fund broker" were materially false and misleading.

179.   OmegaPro had no licenses or registrations to solicit investments or to trade on behalf of investors and was not registered with FINRA, the SEC, or any other places in the world, but yet the individual defendants continued to promote OmegaPro as a legitimate, licensed financial company.

180.   Defendant, OmegaPro, and Defendants SHIMS, BELFORT, WORRE also misrepresented OmegaPro as a "licensed" to do business as an investment adviser or as a financial advisor.

181.   In a 2019 YouTube video titled OmegaPro Leader Discussion with Early Leaders,Defendant Andreas Szakacs stated that "we have a U.S. entity that we work with that allows us to do business in the United States."

182.   From at least October 23, 2020, through July 16, 2022, OmegaPro's website falsely represented that OmegaPro was licenced to do business in the United States.

183.   However, Omegapro was not a "license" to do business as an investment adviser or a financial advisor.  OmegaPro was not registered as an investment advisor in Florida or anywhere else and Defendants' statements to the contrary were false.

184.   Defendant OmegaPro and Defendants Andreas Szakacs, Nader Poordeljoo, Dilawarjit Singh, and Juan Carlos Reynolso Sr. also misrepresented that OmegaPro was licensed to trade cryptocurrency in the U.S. and Forex abroad. For example, in a January 5, 2020, YouTube video titled OmegaPro interview on Trading Forex & Crypto, posted on the OmegaPro Official YouTube channel, OmegaPro's CTO (Defendant, Michael Shannon Sims) falsely stated that OmegaPro was licensed to trade cryptocurrency in the U.S.

185.   These statements were false. OmegaPro was not licensed or registered with any state or federal regulators in the U.S. to trade cryptocurrency for investors.  OmegaPro was not "licensed" to trade Forex abroad. [17]

---

[17]   Saint Vincent and Grenadines financial Authorities issue a fraud warning against Forex trading companies. https://svgfsa.com/wp-content/uploads/2022/02/UNLICENSED-FOREX.pdf..

186.   Omegapro was registered in Saint Vincent and the Grenadines.  However, the FSA of St. Vincent and the Grenadines does not license companies to engage in Forex trading or brokerage and did not issue Forex or brokerage licenses to OmegaPro.

187.   OmegaPro was not licensed or registered to trade Forex elsewhere. Statements that OmegaPro was licensed to trade Forex outside of the U.S. were false.

**E. Defendants Made Material Misrepresentations About Training and Profits at OmegaPro**

188.   Defendants advertised OmegaPro as a trading platform that generated profits from trading investors' crypto currency.  But that was false.

189.   From August 2017 through November 2022, OmegaPro took in over 10 billion dollars' worth of investor cryptocurrency but the vast majority of it remained in OmegaPro's wallets with the payment processor.

190.   Only a tiny fraction, $16 million, was ever deposited by Defendants with the OmegaPro trading platform for trading. The ROI posted weekly to investors' accounts was entirely fabricated by the Defendants.

191.   In Ponzi scheme fashion, the "profits" and recruitment bonuses Omegapro paid to investors did not come from trading profits but from deposits of other investors.

**F. Defendants Misrepresented OmegaPro's Trading Profits**

192.   Defendants represented that OmegaPro paid out returns on investments from the weekly profits it generated primarily by trading investor cryptocurrency on the OmegaPro trading platform.

193.   For example, in a YouTube video dated May 31, 2021, titled ROI Training, posted on OmegaPro. Official channel, Michael Shannon Sims stated that weekly profits or ROI were

"based on trading activity taking place during the week." That video was viewed thousands of times.

194.   OmegaPro promised that payments for recruiting new investors would come from the company's share of the weekly trading profits. But in reality that money comes from money invested by members of the class.

195.   Throughout the OmegaPro scheme, Defendants emphasized consistency of returns despite such consistency being at odds with live trading, especially in volatile cryptocurrency and Forex markets. In an April 7, 2021, YouTube video titled ROI Training, Defendant Andreas Szakacs explained that "our practice is to make sure that over a period of time that you have some steady progression of income or profit."

196.   Defendants' statements about OmegaPro's consistent returns from trading and profits were false. As stated above, OmegaPro solicited over 10 billion dollars' worth of investor cryptocurrency but traded only $3 million dollars' worth of cryptocurrency from August 2019 through April 2022.

197.   The remainder of those billion dollars' worth of cryptocurrency sat in OmegaPro's wallets at a payment processor and was distributed to Defendants: Andreas Szakacs, Michael Shannon Sims, Jordan Belfort, Steven Seagal and others either as payouts to investors and bonuses to promoters or for the benefit of Defendants. In fact, when Defendant Andreas Szakacs was arrested by Turkish authorities, his telephone was confiscated and searched and Turkish authorities found 184 million dollars' worth of bitcoins in an account belonging to him.

198.   The week ending, May 5, 2022, just a few months before hackers supposedly took over the Omegapro's website, the defendants announced ROI of 4.98% for that week. OmegaPro's internal ledger indicated that as of May 5, 2022, OmegaPro had over $13 billion of cryptocurrency

in investors' "trading" accounts from their deposits and reinvested "profits." To pay ROI on that amount, OmegaPro would have needed to generate trading profits for that week (after the deduction of 30% company profit share) of over $160 million.  OmegaPro never made $160 million from trading in any one week (or in total trading over almost 4 years).

199.   On March 17, 2022, after French and Spanish authorities issued cease and desist letters and letters- of-fraud-alert to Omegapro, B2Broker terminated OmegaPro's license to its trading software.  As a result, OmegaPro ceased what little trading it did on its trading platform. OmegaPro concealed the loss of its trading platform and continued to announce weekly ROI.

200.   The ROI was entirely fabricated by Defendants Szakacs and others. They manually keyed in the fake weekly ROI percentage into OmegaPro's internal accounting software, which then calculated and allocated ROI for each investor based on the balance in his "trading" account for that week.

201.   To further perpetuate the fraud, Defendants Szakacs made it appear that the weekly ROI was moving up and down together with the fluctuations in the performance of the cryptocurrency markets, further misleading investors into believing that OmegaPro actually traded their cryptocurrency.

202.   Additionally, OmegaPro did not make weekly cryptocurrency withdrawals from its trading platform to pay investors the announced weekly profits and only withdrew funds from the trading platform a handful of times in almost four years.

203.   In reality, the funds used to pay investors came from OmegaPro's wallets at its payment processor and were not profits from trading, but funds deposited by other investors.

**G. Defendants Concealed that OmegaPro was an Illegal Ponzi Scheme on the Verge of Collapse**

204.    The walls began to close in on OmegaPro when a cryptocurrency platform, Gemini, used by many investors to transfer cryptocurrency to OmegaPro became suspicious in the summer of 2021 of investors' large and frequent transfers of cryptocurrency to OmegaPro's payment processor.

205.    By February 2022, Gemini alerted customers that they were sending funds to "a scam called Omegapro," that Omegapro was a "Ponzi" scheme, that sending funds to Omegapro from Gemini was not permissible, and that any transaction with Omegapro would result in closure of the investor's account.

206.    Below is a sample of one such email to a OmegaPro investor from Gemini on March 18, 2022:

> Based on our review, it appears that you have fallen victim to an investment scam by **OmegaPro**. These investment scams (also known as "get rich quick" or "ponzi" schemes) can be rather elaborate…If you would like to continue with **OmegaPro** despite these warnings, we kindly ask that you withdraw your funds from Gemini and please use a different platform.

207.    Gemini froze the assets of many investors who transferred and received cryptocurrency to and from Omegapro. In response, Defendant, Andreas Szakacs, and Michael Shannon Sims, suggested that users whose accounts were frozen should find another platform because Gemini.

208.    As November 2022 was approaching, Defendants szakacs, Sims, Singh, Poordeljoo, Reynoso Sr, Meldi Cherif and others went to great lengths to assure investors of OmegaPro's legitimacy. They dismissed allegations that OmegaPro was a fraud and a Ponzi scheme and told investors to ignore all criticism of OmegaPro as "fear, uncertainty, and doubt" emanating from competitors, and some promoters appealed to the piety of their investors proclaiming, "Faith over Fear!"

209.   Defendants continuously assured investors that OmegaPro was not a fraud but a "sustainable" program which paid its investors out of trading profits and not out of the funds of other investors.

**H. OmegaPro Suspends Withdrawals From "Trading" Accounts**

210.   On November 10, 2022, Omegapro announced on social media platform that unknown hackers had taken over its website and the data and accounts of all its investors with it, and that no one could access any of the accounts.

211.   Shortly thereafter, Omegapro announced that it had reached a deal with Broker Group, LTD a British Company that would take over all the investors' account and deal with the hacking issue.

212.   None of it was true. There was never any hacking on the Omegapro website. The truth was the French and Spanish authorities had issued fraud alert a few months before and investors started to realize that Omegapro was a Ponzi Scheme, and people were not investing as before.

213.   Omegapro then announced that the problem had been resolved with Broker Group, and that all of the existing accounts would be transferred to Go Global.

214.   Defendants, Andreas Szakacs, and others moved over from OmegaPro to Go Global, another Ponzi Scheme.

215.   The Defendants asked existing investors of OmegaPro to move over to Go Global, another Ponzi Scheme created by the defendant for the purpose of defrauding the public and member of the class action.[18]

---

[18]   See        https://beaubourg-avocats.fr/en/class-action-criminal-proceedings-go-global-ex-omegapro-france/. Go Global, formerly known as OmegaPro, is at the center of major concerns in France, where criminal proceedings are underway against its practices.

216.    OmegaPro's unilateral suspension of withdrawals from investors' trading accounts violated OmegaPro's key promise to investors that they would always have access to their capital.

217.    Investors have voiced their immediate frustration as a group of investors from Nigeria who are members of United Investor Community filed a petition requesting the government of Dubai to initiate a criminal investigation against Omegapro and Go Global. [19]

218.    Despite the promise that through Go Global investors would be able to access their accounts and withdraw their money, the Defendants had no intent of doing that.

---

This article aims to enlighten investors and potential victims on the legal steps being taken against Go Global. After OmegaPro's dubious transformation into Go Global, questions are being raised about the legitimacy of their operations and the safety of the funds invested. Here, we explore the details of the case, the allegations of illegal practices, and the options available to recover the investments made.

This article is an essential resource for anyone concerned with or affected by Go Global's activities in France, offering advice and insights for navigating this complex legal situation. https://www.change.org/p/nigerian-investors-petition-dubai-govt-to-investigate-omegapro-owners-for-ponzi-scheme.

We are currently assisting over 1,500 people with a Class Action (criminal proceedings) against OmegaPro in France. This positions us ideally to lead this legal battle against Go Global, enabling victims to seek redress through the reimbursement of their investment.

[19]   We, the undersigned investors of OmegaPro, collectively known as the OPANI CLASS OF OMEGAPRO INVESTORS, urgently call upon the Sheikh of Dubai and the entire Government of Dubai to initiate a comprehensive investigation into the activities of OmegaPro Forex Trading company that operated out of Dubai and their Co-Founders and top operatives, namely Andreas Szakacs; Dilawar Singh; Mike Simms; and Paulo Tyneman, who we believe currently reside in Dubai, and are running illegal Ponzi schemes to defraud people from all over the world, including Nigeria.

OmegaPro Forex Trading is a Dubai-based company that was registered and operated within your Dubai jurisdiction. Their world headquarters is based in Dubai, and over $100 billion of depositors' funds were remitted to them in Dubai via cryptocurrency and dollar transfers. This petition represents the voices of countless investors globally, including those of over 10,000 members of the OPANI CLASS ACTION from Nigeria who collectively have over N200 billion (part of an estimated $100 billion globally) invested in what has now been revealed as a very elaborate Ponzi scheme.

Omegapro, owned by Dubai-based residents Andreas Szakacs, Mike Simms, and Dilawar Singh, Paulo Tyneman etc were introduced into Nigeria, and other Nigerians in Diaspora members.

219.   On or about July 2, 2024, a French law firm filed a class action lawsuit against Omegapro and Go global alleging criminal fraud. Since the filing of the law firms, the defendants associated with Omegapro and named in this complaint had gone into hiding. Finally, on July 10, 2024, Turkish authorities arrested the master mind behind Omegapro, Andreas Szakacs, and are still searching for the rest of Omega's principals.

## I.   Involvement of Each Individual and Corporate Defendant

220.   Each Individual and Corporate Defendant directly participated in the management of OmegaProFX and was directly involved in the day-to-day operations of the Company at the highest levels.

221.   Each Individual and Corporate Defendant was privy to confidential proprietary information concerning the Company and its business and operations.

222.   Each Individual and Corporate Defendant was directly or indirectly involved in drafting, producing, reviewing and/or disseminating false and misleading statements and information alleged herein.

223.   Each Individual and Corporate Defendant was directly or indirectly involved in the oversight or implementation of the Company's internal controls.

224.   Each Individual and Corporate Defendant was aware of or recklessly disregarded the fact that the false and misleading statements were being made concerning the Company.

225.   Each Individual and Corporate Defendant knew Omegapro was a fraud and intentionally participated in it.

226.   Each Individual and Corporate Defendant knew that Omegapro was a Ponzi Scheme, and that the money paid to investors were not from investment in crypto currency, but money from new investors.

227.    Each Individual and Corporate Defendant, in connection with the acts, conduct and other wrongs alleged in this Complaint, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the Internet via zoom and other social media platforms, to facilitate their fraud and criminal activities.

## IV.    DEFENDANT-SPECIFIC FACTUAL ALLEGATIONS

228.    The following allegations plead with particularity the who/what/when/where/how for each principal Defendant, and what each obtained, consistent with Rule 9(b)."

### A.  ANDREAS ATTILA SZAKACS  (Co-Founder/CEO; Spokesperson; Event Host; Content Originator)

229.    In about May 2018, ANDREAS SZAKACS and ROBERT VELGHE incorporated OMEGAPRO, LTD, in Saint Vincent and the Grenadines, and launched OmegaPro's website (https://www.omegapro.com), which invited investors to earn passive income of up to 300% by participating in what they claimed was one of the world's biggest and most profitable investment opportunities.

230.    SZAKACS was involved in the Omega Pro Scheme from at least May 2018 through at least July 2023.

231.    Defendants ANDREAS SZAKACS and ROBERT VELGHE knowingly and falsely represented on the OmegaPro website that investors would receive monthly profits and a "guaranteed 300% return of purchase price," despite having no intention of investing the funds received. Instead, they created, ratified, approved, and disseminated these misrepresentations as part of a fraudulent scheme to induce public investment under false pretenses.

232.    On November 21, 2018 and again on January 6, 2019, Szakacs told YouTube viewers that OmegaPro would pay "15% per month" and that investors would "double their money

in 16 months," and he directed investors to affiliated websites.  These promises were reiterated in Zoom meetings he organized worldwide.

233.   On or about Mar. 20, 2019 (Dubai), Szakacs hosted an event—attended by dignitaries and celebrities—promoting OmegaPro as a safe investment; video from that event was then translated and pushed across social media to drive sign-ups.

234.   Szakacs created, ratified, and approved OmegaPro slide decks that falsely promised 15% monthly returns, return of principal in six months, and a 200% return on investment within 13–16 months. These materials were knowingly designed to mislead investors and were used by Szakacs and his co-defendants, including co-founder Sims, during corporate calls and recruiting sessions to facilitate and promote the fraudulent scheme.

235.   In a video message to the community, Szakacs directed viewers to "ompMoney.com," urged them to "check the FCA register" for "OMP Money," and represented that "we are regulated by the FCA," touting this as a unique credential.

236.   Szakacs and his co-defendants—some of whom were well-known public figures and specifically solicited to lend legitimacy to the enterprise—knew that the promised returns were unattainable and not backed by real trading activity.   The false representations regarding guaranteed returns, FCA registration, and "banking access anywhere" were deliberately crafted and disseminated to create an illusion of legitimacy and suppress investor skepticism.

237.   Plaintiffs and class members relied on these assurances between 2018 and 2022— including during a major promotional event in Dubai (Jan. 22–25, 2022, at the Coca-Cola Arena) and through subsequent online marketing efforts.

238.   Szakacs and his co-defendants benefited financially by diverting investor funds for their personal enrichment rather than investing them as promised. They profited through downline

recruitment, referral and bonus compensation, event-driven sales, and the monetization of platform migration efforts—all of which were central to the scheme's revenue generation.

239.   On or about July 2024, Turkish authorities arrested Szakacs in Istanbul, where he was also known as "Emre Avcı," in connection with a multi-billion-dollar international fraud investigation focused on the OmegaPro enterprise and related entities.

240.   Following Szakacs's arrest, Turkish law-enforcement reportedly seized 32 cold wallets, computers, and other digital devices linked to OmegaPro, and investigators traced substantial cryptocurrency flows alleged to be scheme proceeds.

241.   When Turkish authorities searched Szakacs's phone, they found an accounting of transactions containing approximately $184 million in bitcoin associated with him.

242.   The Turkish criminal investigation concerns the same actors, time period, marketing script (guaranteed extraordinary returns, false licensure/"banking" claims), event-driven/social-media promotions, withdrawal obstructions, and crypto wallet movements alleged here.

**B. ROBERT VELGHE (Co-Founder; Website/Slide Content Originator & Approver; Ratifier of Marketing Claims)**

243.   In about May 2018, co-founders ROBERT VELGHE and ANDREAS SZAKACS incorporated OMEGAPRO LTD in Saint Vincent and the Grenadines and launched the public-facing omegapro.com site. The site invited investors to "earn passive income up to 300%," and stated that "your investment is guaranteed to 300% return of purchase price."

244.   Velghe was involved in the Omega Pro Scheme from at least May 2018 through at least July 2023.

245.   OmegaPro prepared slide decks made available through its investor portal that promised 15% monthly returns, return of principal in six months, and 200% returns within 13–16

months; those decks were then presented to prospective investors and repeated in corporate presentations.  At all times relevant, Velghe created, approved, and ratified the publication of these slides and their use in solicitations.

246.   OmegaPro and its leadership also promoted the related "OMP Money" initiative as FCA-regulated, directing community members to "check the FCA register" for "OMP Money." At all times relevant, Velghe approved and ratified the dissemination of these regulatory claims across OmegaPro's official channels to convey legitimacy.

247.   These statements (fixed monthly returns, 200%–300% ROI timelines, principal-return promises, and FCA/"banking access" assurances) were materially false because profits were not generated by real trading and because the enterprise lacked the represented regulatory authorization; the messaging was designed to project legitimacy and suppress red flags, and investors reasonably relied on it in 2018–2022 when deciding to deposit funds and recruit others.

248.   Those same slide-deck promises were presented in corporate calls and live events to drive sign-ups and downline growth.  At all times relevant, Velghe continued to approve and ratify use of the deceptive decks and web copy during this period as part of OmegaPro's unified message architecture.

249.   Velghe benefited from enterprise revenues driven by investor deposits, downline expansion, event-driven sales, and migration-related monetization—all core features of the OmegaPro model that rewarded recruitment and network growth.

250.   Public reporting reflected in the pleadings states that in 2024, Turkish authorities arrested OmegaPro co-founder Robert Velghe in connection with the OmegaPro investigation, corroborating his central role in the enterprise and scienter regarding the fraudulent marketing program.

### C. DILAWARJIT ("DILAWAR") SINGH (Co-Founder/Chief Network Officer; Spokesperson)

251.   On or about November 28, 2022, during an "OmegaPro Official Leadership Call" conducted via Zoom, DILAWARJIT SINGH falsely assured investors that OmegaPro was "doing [its] part to restore investor access to trapped cryptocurrency."  Singh knowingly misrepresented the situation by referencing a prior "server fire" that he claimed had been "eventually resolved," and further downplayed the crisis by characterizing it as normal business "ups and downs," despite knowing that OmegaPro lacked the assets or liquidity to process investor withdrawals.

252.   Singh was involved in the Omega Pro Scheme from at least May 2018 through at least July 2023.

253.   On January 22–25, 2022, during the "RISE" promotional event hosted at the Coca-Cola Arena in Dubai, Singh appeared on stage before thousands of attendees and falsely projected the durability and future success of the OmegaPro program. Singh told the audience that with just "30 seconds of commitment," OmegaPro would become "unstoppable" for the next three years. These statements were knowingly false and designed to induce continued investor confidence and recruitment at a time when the platform's operations were already unstable.

254.   In a promotional video for the related "OMP Money" project, Singh falsely claimed that the platform would reach "over 1 million customers" and offer "worldwide banking solutions." Singh urged viewers and the investor community to "take advantage" of the opportunity, despite knowing that the OMP Money platform lacked any legitimate regulatory authorization or operational infrastructure to deliver the services promoted.

255.   Singh's public assurances and leadership messaging were intentionally misleading and falsely equated the growing liquidity crisis and failure to honor withdrawal requests with minor technical issues. These statements concealed the fact that OmegaPro was unable to return

investor funds and were made with the intent to suppress panic, preserve investor capital, and induce continued financial contributions. Plaintiffs and class members reasonably relied on Singh's assurances during the late-2022 period when withdrawals were stalled or blocked.

256.   Throughout his involvement in the OmegaPro Ponzi scheme, and with full knowledge that OmegaPro's representations on its website, platform, and social media—including guarantees of 15% monthly returns and profits from legitimate trading—were false, and that OmegaPro was operating as a Ponzi scheme, Singh actively encouraged potential investors to visit the OmegaPro website, follow its social media content, and persuade their family and friends to do the same in order to promote and expand the fraudulent enterprise. Singh made these solicitations personally in one-on-one conversations, publicly while speaking on stage at promotional events, during leadership Zoom calls, and in pre-recorded video content disseminated through OmegaPro's marketing channels.

257.   As a result of his participation in the fraudulent scheme, Defendant DILAWARJIT SINGH benefited financially through referral-based compensation, bonus earnings, and the continued expansion of his downline network—all while investors' assets remained inaccessible.

## D.  MICHAEL SHANNON ("MIKE") SIMS (Co-Founder/Strategic Advisor; Presenter; Coach)

258.   On or about December 18, 2019, during a leadership training event in Lima, Peru, MICHAEL SHANNON SIMS told attendees that he would "not risk [his] reputation on BS," that OmegaPro's compensation plan was "built to last," and that "everyone wins… even if someone becomes a customer and they don't ever talk to anyone." Sims further claimed that he and his partners had "aligned… with the best traders in the world." These statements were materially false, and Sims knew at the time that OmegaPro's profits were not derived from trading but from investor deposits recycled through a Ponzi structure.

259.   Sims was involved in the Omega Pro Scheme from at least May 2018 through at least July 2023.

260.   On or about June 9–10, 2022, at the "RISE LATAM" event held in Panama, Sims addressed a room of prospective investors and falsely represented that "the vision and future of OmegaPro is endless," that the company was "built on a solid foundation," and that "upgrades" to the back office were already underway. These statements were knowingly false and made for the purpose of inducing additional investments and recruitment into the OmegaPro scheme.

261.   Sims repeatedly presented OmegaPro's corporate slide decks to investor audiences, including during joint presentations with co-founder Andreas Szakacs. These slide decks falsely promised 15% monthly returns, principal repayment in six months, and 200% ROI within 13–16 months. Sims not only used these materials at events but also personally assisted investors in opening cryptocurrency exchange accounts and transferring funds into OmegaPro-controlled wallets—actions taken to further encourage investment into a knowingly fraudulent scheme.

262.   Throughout his involvement in the OmegaPro Ponzi scheme, and with full knowledge that OmegaPro's representations on its website, platform, and social media—including guarantees of 15% monthly returns and profits from legitimate trading—were false, and that OmegaPro was operating as a Ponzi scheme, Sims actively encouraged potential investors to visit the OmegaPro website, follow its social media content, and persuade their family and friends to do the same in order to promote and expand the fraudulent enterprise.  Sims made these solicitations personally in one-on-one conversations, publicly while speaking on stage at promotional events, during leadership Zoom calls, and in pre-recorded video content disseminated through OmegaPro's marketing channels

263.   Sims's statements—including "everyone wins," "built to last," and representations of guaranteed returns—were knowingly false and misleading. They falsely implied that OmegaPro was supported by real trading activity and institutional infrastructure.

264.   Plaintiffs and class members reasonably relied on these assurances when deciding to invest, including during events, Zoom calls, and one-on-one recruitment sessions between 2019 and 2022.

265.   As a result of his participation in the OmegaPro scheme, Defendant Sims benefited financially through the expansion of his referral downline, receipt of bonus compensation, and participation in the broader growth and monetization of the fraudulent enterprise.

### E.  PAULO TUYNMAN (a/k/a TUYNEMAN) (VP Sales/President of Affiliated Entity; Recruiter/Approver)

266.   Defendant PAULO TUYNMAN is a Dutch citizen who, during the relevant period, resided in Dubai, United Arab Emirates, with his wife, Amira Tuynman, and their children. Tuynman served as the Vice President of Sales for OmegaPro and later assumed the role of President of one or more affiliated successor entities involved in OmegaPro's post-collapse migration strategy, including Go Global.

267.   Tuynman was involved in the Omega Pro Scheme from at least 2019 through at least July 2023.

268.   In his leadership role at OmegaPro, Tuynman was responsible for coordinating and approving public-facing sales messaging used globally to promote the fraudulent enterprise. Plaintiffs allege that Tuynman was well aware from the outset that OmegaPro operated as a Ponzi scheme and, despite this knowledge, continued to recruit investors and facilitate investment through false representations of regulatory compliance, guaranteed returns, and institutional legitimacy.

269.    On or about November 2, 2019, at a physical launch event titled "Personal Finance," held at Jevinik Place, Isaac John Street, Ikeja, Lagos, Nigeria, Tuynman publicly represented that OmegaPro worked with "regulated traders," used an "FCA-regulated brokerage," and was "able to deliver sustainable results." He stated "…so we have here a system, where we work with regulated traders, using an FCA-regulated brokerage, where we are able to deliver sustainable results, and that's what we are doing for many months already. The company is operating in over 100 countries, and Nigeria is the stepping stone for the expansion in Africa."

270.    These statements were materially false and designed to give investors—particularly in Nigeria—false confidence in the legitimacy and regulatory compliance of OmegaPro. Tuynman used these representations to suggest the opportunity was both secure and uniquely positioned for African expansion, thereby inducing investors to transfer cryptocurrency under false pretenses in order to secure so-called "first-mover" advantages.

271.    Plaintiffs were further solicited through large-scale promotional events, including the "RISE" event in Dubai (January 22–25, 2022), where Tuynman appeared alongside other OmegaPro founders and executives. There, and in accompanying online campaigns, Tuynman helped promote false claims of guaranteed 200%–300% returns, FCA oversight, and banking partnerships designed to suppress skepticism and encourage continued investment. Plaintiffs relied on these representations in making their investment decisions.

272.    Throughout his involvement in the OmegaPro Ponzi scheme, and with full knowledge that OmegaPro's representations on its website, platform, and social media—including guarantees of 15% monthly returns and profits from legitimate trading—were false, and that OmegaPro was operating as a Ponzi scheme, Tuynman actively encouraged potential investors to visit the OmegaPro website, follow its social media content, and persuade their family and friends

to do the same in order to promote and expand the fraudulent enterprise.  Tuynman made these solicitations personally in one-on-one conversations, publicly while speaking on stage at promotional events, during leadership Zoom calls, and in pre-recorded video content disseminated through OmegaPro's marketing channels

273.    Tuynman also worked in close coordination with Nigerian promoter Daniel Onoja, aiding and abetting OmegaPro's strategic entry into African markets. Tuynman's efforts directly contributed to exponential downline growth in Nigeria and neighboring regions, driven by fraudulent assurances of regulated trading activity and fixed, high-yield returns.

274.    As a result of his involvement, PAULO TUYNMAN received substantial financial compensation and gained influence within the enterprise. He profited both from the growth of OmegaPro's investor network and from his leadership role in successor entities like Go Global, which sought to continue profiting from the same investor base following OmegaPro's collapse.

**F.  NADER POORDELJOO (President/Executive of Successor Platform; Migration Spokesperson)**

275.    Defendant NADER POORDELJOO served as President of OmegaPro during its operation and later assumed the role of Chief Executive Officer of Go Global, the successor entity promoted as a "solution" after OmegaPro's collapse. By positioning Go Global as the next phase of the operation, Poordeljoo knowingly ratified and extended the fraudulent scheme, encouraging investors and team leaders to migrate their accounts and downlines into the new platform under the false premise that their investments would be preserved or restored.

276.    Poordeljoo was involved in the Omega Pro Scheme from at least 2019 through at least July 2023.

277.    Throughout his leadership at both OmegaPro and Go Global, Poordeljoo had full knowledge that OmegaPro's public-facing representations—including guarantees of 15% monthly

returns, 300% ROI, and assertions of FCA-regulated trading operations—were materially false and that OmegaPro was, in fact, operating as a Ponzi scheme. Nevertheless, he continued to promote the enterprise and later its successor by actively encouraging investors to visit the OmegaPro website, follow its social media channels, and urge family and friends to do the same—all to drive further investment and recruitment.

278.    Poordeljoo delivered these misrepresentations and endorsements in person, during on-stage presentations at promotional events, in executive Zoom leadership calls, and via pre-recorded videos disseminated through official OmegaPro and Go Global communication channels. His messaging consistently assured audiences that OmegaPro was legitimate and well-capitalized and that Go Global offered a safe path forward—despite knowing both platforms lacked real trading operations or any lawful means of sustaining promised returns.

279.    Poordeljoo's promotion of Go Global as a recovery mechanism was especially deceptive. By falsely framing the platform as a "solution" to OmegaPro's collapse, he misled investors into believing their capital and returns would be secured, thereby stalling demands for repayment and encouraging the continued flow of funds into the new vehicle.

**G.  A.K. KHALIL (COO/Successor Platform Promoter; Reassurance Spokesman)**

280.    Defendant A.K. KHALIL served as Chief Operating Officer of Go Global, the platform launched and promoted as the successor to OmegaPro following its collapse. As COO and public spokesperson, Khalil actively participated in efforts to reassure investors, downplay OmegaPro's failures, and redirect investor capital and networks into Go Global.

281.    Khalil was involved in the Omega Pro Scheme from at least 2021 through at least July 2023.

282.   In or around late 2022, amid widespread concern over OmegaPro's suspension of withdrawals, Khalil recorded and disseminated video messages stating that investor funds were "safe," that the OmegaPro founders were "working to resolve the problem," and that investors should remain patient while a solution was implemented. In the same communications, Khalil actively promoted Go Global as that solution, urging viewers to remain engaged and transition to the new platform.

283.   These statements were materially false or made with reckless disregard for the truth. Khalil knew, or was deliberately indifferent to the fact, that OmegaPro's representations—including its claim to generate legitimate trading profits and its assurances of FCA regulation—were false, and that OmegaPro had been operating as a Ponzi scheme. His messages were designed to suppress panic, discourage withdrawal attempts, and retain investor funds for migration into Go Global.

284.   Khalil made these misrepresentations in recorded videos, live promotional sessions, and other digital content widely circulated through OmegaPro and Go Global channels. He presented himself as a credible operations executive offering transparency and stability, when in reality his communications were a continuation of the fraudulent scheme.

285.   Throughout his leadership at both OmegaPro and Go Global, Khalil had full knowledge that OmegaPro's public-facing representations—including guarantees of 15% monthly returns, 300% ROI, and assertions of FCA-regulated trading operations—were materially false and that OmegaPro was, in fact, operating as a Ponzi scheme. Nevertheless, he continued to promote the enterprise and later its successor by actively encouraging investors to visit the OmegaPro website, follow its social media channels, and urge family and friends to do the same— all to drive further investment and recruitment.

286.   As a result of his involvement in promoting the successor platform and assisting in the migration of captive investors, Khalil personally benefited through increased control, reputational leverage, and financial gain tied to the growth of Go Global and its monetization of the prior OmegaPro network.

### H.  DANIEL ONOJA (Trainer/Recruiting Leader; Content Disseminator)

287.   Defendant DANIEL ONOJA served as a leading trainer and recruiter for OmegaPro, actively presenting to teams and prospects in regional markets, including Nigeria. Onoja was a principal introducer and promoter of OmegaPro. In these roles, he reinforced the company's core fraudulent themes, including guarantees of 15% monthly returns, 200%–300% ROI, and universal profitability, and actively facilitated recruitment through structured onboarding and motivational events.

288.   Onoja was involved in the Omega Pro Scheme from at least 2019 through at least July 2023.

289.   Onoja regularly delivered OmegaPro's messaging in live training sessions, regional recruiting events, and online promotional content, directing investors to OmegaPro's website and social platforms to validate its legitimacy. Throughout his participation, Onoja had full knowledge that OmegaPro's public-facing representations—including claims of regulated trading, guaranteed returns, and banking partnerships—were false, and that OmegaPro operated as a Ponzi scheme. Despite this, he continued to promote both OmegaPro and its successor, Go Global, as viable and profitable programs.

290.   Onoja's messages included repeated assurances that "everyone can win," that OmegaPro was "backed by the best traders," and that its compensation model would "build wealth" even for passive participants. These falsehoods were delivered to both prospective and

existing investors in scripted presentations and mass-recruitment events. Plaintiffs reasonably relied on these representations when deciding to transfer cryptocurrency and enroll others into the program.

291.  As a result of his active promotion and recruitment efforts, Defendant DANIEL ONOJA personally benefited through network commissions, referral bonuses, and financial gains tied to exponential downline growth—including in emerging markets like Nigeria where he played a lead role in expanding OmegaPro's investor base.

## I.   ERIC WORRE (Official Strategic Coach; Training/Approval/Ratification)

292.  In or about May 2022, Defendant ERIC WORRE joined the OmegaPro executive team as Official Strategic Coach, publicly aligning himself with OmegaPro's leadership and training apparatus. In this role, Worre developed and delivered recruiter trainings, promoted and integrated his ticketed "Go Pro" events to OmegaPro audiences, and approved/ratified the message architecture used to solicit investor funds.

293.  At this time, Eric Worre accepted the role of "Official Strategic Coach" for OmegaPro and integrated his ticketed "Go Pro" events with OmegaPro's recruiting funnel, giving OmegaPro promoters a stage at his events while selling access back into the field—a symbiotic arrangement that amplified recruiting velocity.

294.  Eric Woore was involved in the Omega Pro Scheme from at least 2022 through at least July 2023.

295.  Eric Worre conducted live stage presentations, Zoom leadership calls, and recorded video trainings for OmegaPro promoters, instructing them on scaling the network and duplicating scripted recruiting pitches. In these forums, he endorsed and platformed OmegaPro spokespeople while they repeated claims of 15% monthly returns, 200%–300% ROI, and purported

banking/"FCA-regulated" affiliations—thereby lending credibility and operational discipline to the solicitation effort.

296.   These sustained coaching and platform integrations—before and after collapse—support scienter: Eric Worre approved/ratified the message architecture that repeated fixed-return claims and "regulated banking" narratives, and he continued the same recruiting playbook at Go Global rather than distance the field from false promises.

297.   At all relevant times, Eric Worre knew or was deliberately indifferent to the fact that OmegaPro's public-facing representations—including guaranteed returns and claims of profits from legitimate trading—were false, and that OmegaPro was operating as a Ponzi scheme. Nevertheless, he encouraged prospects and teams to visit OmegaPro's website, consume its social media content, and share it with family and friends, to drive further investment and recruitment.

298.   Plaintiffs and class members reasonably relied on Eric Worre's training role and endorsements—including his positioning as a "strategic coach" and the incorporation of his Go Pro brand—when deciding to invest or remain invested. His participation suppressed red flags, conveyed false legitimacy, and materially contributed to continued deposits and network expansion during the relevant period.

299.   As a result of his involvement, Eric Worre personally benefited through event ticket sales, speaker/training fees, and increased brand monetization tied to OmegaPro's expanding network and its migration to successor platforms. His training and approvals aided and abetted the scheme by professionalizing and amplifying the fraudulent solicitation machinery.

300.   Eric Worre also profited via event ticket sales, fees, and brand monetization tied to OmegaPro/Go Global network expansion.

301.   Following OmegaPro's collapse, Eric Worre remained aligned with the successor platform Go Global in a training capacity, continuing to professionalize and scale the same network for further monetization.

**J.  MARINA WORRE (Presenter/Endorser; Pulse/XPL Launch; Event Spokesperson)**

302.   MARINA WORRE, co-founder/president of NetworkMarketingPro.com and producer of the "Most Powerful Women in Network Marketing" event, was positioned by OmegaPro alongside Eric Worre as a strategic coach and event spokesperson, leveraging her industry standing to validate OmegaPro-affiliated offerings. (Role/placement; upon information and belief; corroborated by Plaintiffs' designations of Marina as an OmegaPro trainer/influencer).

303.   Marina was involved in the Omega Pro Scheme from at least 2022 through at least July 2023.

304.   On or about October 29–November 3, 2022, at the Pulse World / XPL Diamond Retreat in the Maldives, Defendant MARINA WORRE delivered on-stage presentations to OmegaPro community members promoting Pulse/XPL as a necessary opportunity and pathway forward. In substance, Worre warned that failing to embrace Pulse/XPL would mean "losing opportunities," thereby endorsing OmegaPro-affiliated products and channeling investors toward the purported "solution" while withdrawals at OmegaPro were impeded.

305.   In her role as a public spokesperson and endorser, Marina Worre appeared on stage at live events, in recorded promotional content, and across social media, encouraging prospects and existing investors to visit OmegaPro's websites, follow its social channels, and share those materials with family and friends to drive continued participation and migration into affiliated offerings (including Pulse/XPL and successor initiatives).

306. At all relevant times, Marina Worre knew or was deliberately indifferent to the fact that OmegaPro's public-facing representations—including guaranteed 15% monthly returns, 200%–300% ROI, and claims of FCA-regulated trading—were false, and that OmegaPro was operating as a Ponzi scheme. Nonetheless, she endorsed and promoted OmegaPro-affiliated products (including Pulse/XPL) in a manner designed to suppress red flags, discourage withdrawal attempts, and retain investor funds during the crisis period.

307. Plaintiffs and class members reasonably relied on Marina Worre's endorsements and event appearances, including her Maldives presentations, as validation that OmegaPro-affiliated offerings remained legitimate and that migration into Pulse/XPL would protect or restore value. Her statements and visibility materially contributed to continued deposits, rollovers, and recruitment during late-2022.

308. As a result of her participation, Marina Worre personally benefited through event-related revenues, brand/platform synergies tied to OmegaPro's network, and the monetization of audience migration into Pulse/XPL and related successor products—profits derived from the continued expansion and retention of the OmegaPro investor base.

309. Marina Worre has promoted other high-yield "programs" later alleged to be Ponzi schemes, reflecting familiarity with—and deliberate indifference to—the false fixed-return scripts and migration tactics at issue here. This pattern supports scienter and justifies punitive damages. (Pattern/intent).

## K.  LES BROWN (Celebrity Presenter/Endorser)

310. On or about 2020, during OmegaPro's first global convention conducted online due to Covid, Defendant LES BROWN appeared as a keynote speaker and told attendees that

OmegaPro "was created for people who want to create their own future … and that's what you are doing now."

311.   Brown spoke again during a second convention on March 19, 2021, in which he repeated similar assertions.

312.   Throughout his involvement with OmegaPro, Brown participated in recorded promotional content, live virtual presentations, and social media endorsements that directed prospects to OmegaPro's website and encouraged them to join, invest, and share the opportunity with others.  In doing so, he amplified OmegaPro's messaging—reinforcing false promises of 15% monthly returns, guaranteed ROI up to 300%, and institutional legitimacy.

313.   Brown's appearances and statements were disseminated across OmegaPro's official channels—including event recordings, social media, and WhatsApp—to validate the program and drive recruitment.   Investors understood his remarks as an endorsement of OmegaPro's legitimacy and profitability, and Plaintiffs and class members reasonably relied on his reputation as a trusted public figure when deciding to open accounts, deposit funds, and recruit others.

314.   Brown was involved in the Omega Pro Scheme from at least 2020 through at least 2021.

315.   At all relevant times, Brown knew, or was deliberately indifferent to the fact, that OmegaPro's public-facing representations—including its promises of fixed returns and claims of legitimate trading activity—were false, and that OmegaPro was operating as a Ponzi scheme. Nevertheless, Brown continued to lend his voice, brand, and credibility to OmegaPro's promotional efforts.

316.    Plaintiffs and class members reasonably relied on Brown's involvement and public endorsements, including his keynote speech and promotional appearances, as validation of OmegaPro's legitimacy. His high-profile participation helped suppress red flags, induced investor confidence, and materially contributed to continued recruitment and deposits during the scheme's growth phase.

317.    As a result of his participation, Defendant LES BROWN personally benefited through promotional fees, brand exposure, and compensation tied to his appearances—gains derived from his role in endorsing and perpetuating OmegaPro's fraudulent enterprise.

**L.  JUAN CARLOS REYNOSO SR. (Regional Executive/Successor Platform Officer)**

318.    JUAN CARLOS REYNOSO SR. served as OmegaPro's Manager for Latin America and later as Chief Sales Officer of the successor platform Go Global, placing him at the center of post-collapse "migration" messaging pitched as a solution to trapped investor funds.

319.    Reynoso was involved in the Omega Pro Scheme from at least 2019 through at least July 2023.

320.    Throughout the scheme period, Reynoso appeared in recorded promotional content, live virtual presentations, and social-media endorsements that directed prospects to OmegaPro's websites and urged them to join, invest, and share the program. In these forums, Reynoso repeated and ratified the enterprise's core sales script—fixed/guaranteed returns (including 200%–300%), monthly profits, licensure/"banking" affiliations, and withdrawal assurances—to induce deposits and suppress investor skepticism in Latin-America markets.

321.    As withdrawal problems escalated in late 2022, Reynoso participated in leadership messaging that reassured investors and urged them to remain in the system while accounts were purportedly being "migrated" to affiliated vehicles (including Broker Group and Go Global).

Reynoso's statements framed migration as a solution and discouraged withdrawals, even as investors remained unable to access funds.

322.   These representations were materially false and misleading. Reynoso knew, or was deliberately indifferent to the fact, that OmegaPro's public-facing claims—guaranteed monthly returns, 200%–300% ROI, legitimate trading profits, and regulatory/"banking" affiliations—were untrue, and that the migration narrative would not restore investor access to principal or profits.

323.   Plaintiffs and class members reasonably relied on Reynoso's regional leadership status and public endorsements—particularly during the late-2022 migration push—as validation that maintaining positions and migrating accounts would protect or restore value, which stalled withdrawals and induced additional deposits.

324.   Reynoso benefited financially from his participation through network/downline expansion, referral and leadership compensation, and monetization of post-collapse migrations into successor platforms, all while investors' assets remained inaccessible.

325.   On or about June 25, 2025, a federal grand jury returned an indictment charging Reynoso (together with co-defendant Michael Shannon Sims) with conspiracy to commit wire fraud and conspiracy to commit money laundering arising from their roles in the OmegaPro scheme. The indictment alleges a conspiracy period beginning in 2018 and details the same marketing script—extraordinary fixed returns, false licensure/affiliations, and event-driven/social-media promotions—that Plaintiffs allege herein.

326.   In related federal proceedings, authorities obtained a seizure warrant directing transfer of a specified quantity of bitcoin from a wallet associated with Reynoso and subsequently secured a civil-contempt order after non-compliance. These enforcement events demonstrate

knowledge, control over assets, and scienter, further corroborating his role in the fraudulent enterprise.

## M. FRANCISCO DAVID STORY (Presenter/Network Promoter)

327.  Defendant FRANCISCO DAVID STORY served as a presenter and network promoter for OmegaPro and affiliated successor offerings, appearing in recorded promotional content, live events, and virtual presentations directed at prospective and existing investors.

328.  In these appearances, Story repeated OmegaPro's core misrepresentations, including that investors would receive fixed/guaranteed returns (e.g., 15% per month and 200%–300% ROI), that OmegaPro operated through licensed/regulated trading and banking affiliations (including references to OMP Money/FCA), and that investors would have reliable withdrawal access.

329.  Story directed audiences to OmegaPro's websites and social channels, encouraged them to open accounts, deposit funds, and recruit others, and urged continued participation even as investor complaints and withdrawal problems mounted.

330.  Story was involved in the Omega Pro Scheme from at least 2019 through at least 2022.

331.  As withdrawal failures escalated in late 2022, Story endorsed "migration" narratives that pitched affiliated vehicles as solutions (including successor platforms), discouraging withdrawals and inducing investors to remain in the enterprise ecosystem despite the ongoing inability to access funds.

332.  These representations were materially false and misleading. Story knew, or was deliberately indifferent to the fact, that OmegaPro's public-facing claims—guaranteed returns,

legitimate trading profits, and regulatory/"banking" affiliations—were untrue and that the proposed "migration" would not restore investor access to principal or profits.

333. Plaintiffs and class members reasonably relied on Story's statements and endorsements when deciding to invest, remain invested, and recruit others, which stalled withdrawals and induced additional deposits during the scheme period.

334. As a result of his participation, Story benefited financially through promotional fees, referral fees, network/downline compensation, and monetization tied to post-collapse migrations, while investors' assets remained inaccessible.

## N. JORDAN BELFORT (Celebrity Presenter/Endorser; Promoted as "OmegaPro Coach")

335. On or about September 2022 (and in any event no later than late-2022), OmegaPro disseminated a corporate video to the community that presented JORDAN BELFORT (the "Wolf of Wall Street")—together with Eric Thomas, Eric Worre, and Les Brown—as "OmegaPro Coaches," endorsing the enterprise and urging participants to "make everything bigger and better."

336. Throughout his involvement with OmegaPro, Belfort participated in recorded promotional content, live virtual presentations, and social media endorsements that directed prospects to OmegaPro's website and encouraged them to join, invest, and share the opportunity with others. In doing so, he amplified OmegaPro's messaging—reinforcing false promises of 15% monthly returns, guaranteed ROI up to 300%, and institutional legitimacy.

337. Belfort's appearance and endorsement were used to lend legitimacy to OmegaPro's uniform sales script—guaranteed/fixed returns up to 200–300%, monthly profits, and purported licensure/"banking" affiliations—and to direct prospects to OmegaPro's websites and social channels for sign-up and deposits. Plaintiffs recognized Belfort as one of the "Trainers/major influencers" whose participation induced investment.

338.    These endorsements were materially misleading because OmegaPro's promised returns were unattainable and not backed by real trading activity; the "coach" framing and celebrity branding suppressed red flags and conveyed false legitimacy. Plaintiffs and class members reasonably relied on Belfort's visibility and endorsement when deciding to invest or remain invested.

339.    Belfort was involved in the Omega Pro Scheme from at least 2022 through at least 2023.

340.    As a result of his participation, Belfort benefited through promotional fees, brand exposure, and monetization tied to network growth and continued deposits—profits derived from the expansion and retention of the OmegaPro investor base.

## O.  JOHN C. MAXWELL (Leadership Speaker/Endorser; Training/Approval/Ratification)

341.    During 2021–2022, JOHN C. MAXWELL appeared in OmegaPro promotional/training content distributed to the community as part of the platform's "Trainer/major influencer" cohort, directing prospects to OmegaPro's website and events and ratifying the recruiting message architecture.

342.    Another virtual training seminar was conducted by Maxwell on September 23, 2022

343.    Throughout his involvement with OmegaPro, Maxwell participated in recorded promotional content, live virtual presentations, and social media endorsements that directed prospects to OmegaPro's website and encouraged them to join, invest, and share the opportunity with others. In doing so, he amplified OmegaPro's messaging—reinforcing false promises of 15% monthly returns, guaranteed ROI up to 300%, and institutional legitimacy.

344.    Maxwell's appearances and endorsements amplified OmegaPro's core misrepresentations—including fixed monthly returns up to 200–300% and claims of

regulatory/banking affiliations—and were circulated across social-media/WhatsApp channels to induce sign-ups and deposits.

345.   These endorsements were materially misleading, projecting legitimacy while withdrawals were impeded. Maxwell— a prominent motivational speaker and minister—was presented as a "coach" on OmegaPro's training platform (including tutorials tied to the "70/30 rule") and featured in recruiting materials and leadership calls circulated via social media and WhatsApp.

346.   His stature reassured participants, suppressed red flags, and implied regulatory bona fides; Plaintiffs and class members reasonably relied on that imprimatur to invest, upgrade, or remain invested.

347.   Maxwell was involved in the Omega Pro Scheme from at least 2021 through at least July 2022.

348.   As a result of his participation, Maxwell benefited through event-related revenues and brand/platform synergies tied to OmegaPro's expanding network.

**P.  DARIN KIDD (Recruiter/Trainer; Presenter/Endorser)**

349.   DARIN KIDD served as an OmegaPro "Trainer and major influencer," appearing in recruiting/training content disseminated to the community to enlarge downlines and drive deposits, and directing audiences to OmegaPro's website, events, and social channels.

350.   Throughout his involvement with OmegaPro, Kidd participated in recorded promotional content, live virtual presentations, and social media endorsements that directed prospects to OmegaPro's website and encouraged them to join, invest, and share the opportunity with others. In doing so, he amplified OmegaPro's messaging—reinforcing false promises of 15% monthly returns, guaranteed ROI up to 300%, and institutional legitimacy.

351.   In these forums, Kidd endorsed and platformed OmegaPro's uniform script—guaranteed monthly profits, 200–300% ROI within 13–16 months, and purported institutional/regulatory affiliations—thereby ratifying and amplifying the misrepresentations to prospective and existing investors.

352.   Kidd's endorsements were materially misleading and designed to induce reliance by conveying that OmegaPro was legitimate, sustainable, and well-regulated. Plaintiffs and class members reasonably relied on Kidd's trainer role and public endorsements when deciding to invest or remain invested.

353.   Kidd was involved in the Omega Pro Scheme from at least 2021 through at least 2022.

354.   As a result of his participation, Kidd benefited through training/promotion revenues and increased brand monetization linked to OmegaPro's network growth.

## Q.  ERIC THOMAS (Motivational Speaker/Coach; Event Spokesperson)

355.   On January 22–25, 2022, at OmegaPro's "RISE" Global Convention at the Coca-Cola Arena in Dubai, ERIC THOMAS delivered on-stage motivational remarks urging attendees not to "miss opportunities" presented by OmegaPro, messaging that was used to validate investment and retention during the scheme's growth phase.

356.   On April 15, 2022, OmegaPro promoted a multilingual "Super Training — Speech + Preach" webinar featuring ERIC THOMAS, broadcast to the global field via Zoom. In that presentation, Thomas lauded OmegaPro's "Rise" convention at Dubai's Coca-Cola Arena (Jan. 22–25, 2022) and positioned OmegaPro as a vehicle for life-changing financial outcomes, thereby endorsing the program to prospects and members. (Rule 9(b): date/format/platform; upon information and belief; event frame corroborated).

357.   Thomas's appearance and remarks were deployed across OmegaPro channels to drive recruitment and retention, encouraging viewers to "plug in" to official content and share it with family and friends; Plaintiffs and class members reasonably relied on his stature and endorsements.

358.   In or about September 2022, OmegaPro disseminated a corporate video to the community presenting Thomas—together with Eric Worre, Jordan Belfort, and Les Brown—as "OmegaPro Coaches," to "make everything bigger and better," thereby endorsing the enterprise during the period when withdrawal problems were escalating.

359.   Throughout his involvement with OmegaPro, Thomas participated in recorded promotional content, live virtual presentations, and social media endorsements that directed prospects to OmegaPro's website and encouraged them to join, invest, and share the opportunity with others. In doing so, he amplified OmegaPro's messaging—reinforcing false promises of 15% monthly returns, guaranteed ROI up to 300%, and institutional legitimacy.

360.   Thomas's event appearances and coach branding ratified and amplified the enterprise's core misrepresentations—fixed/guaranteed returns up to 200–300%, monthly profits, and claimed licensure/"banking" affiliations—and directed prospects to OmegaPro's websites and social media to join and deposit. Plaintiffs identified Thomas as a "Trainer/major influencer" whose participation influenced their decision to invest.

361.   At all relevant times, Thomas knew or was deliberately indifferent to the fact that OmegaPro's public-facing claims—including guaranteed monthly returns (up to 200–300%), "FCA-regulated" banking affiliations, and effortless profitability—were untrue or unsubstantiated, yet he continued to lend his brand and platform to OmegaPro's recruiting machinery. (What/why misleading).

362.   These endorsements were materially misleading because they conveyed legitimacy and suppressed red flags while investors faced impeded withdrawals. Plaintiffs and class members reasonably relied on Thomas's presence at the Dubai convention and in corporate videos to invest or remain invested.

363.   Thomas was involved in the Omega Pro Scheme from at least 2021 through at least 2022.

364.   As a result of his participation, Thomas benefited through event-related revenues and brand/platform synergies tied to OmegaPro's expanding network and migration efforts, as well as through speaker/training fees, brand growth, and increased sales attributable to OmegaPro-aligned events and content syndication.

## R. SHEIKH MOHAMMED BIN MAKTOUM BIN JUMA AL MAKTOUM (Public Endorser/Official Capacity Appearance; Event Spokesperson)

365.   Defendant SHEIKH MOHAMMED BIN MAKTOUM BIN JUMA AL MAKTOUM is an Emirati royal widely known as a senior member of Dubai's ruling family; from 2019–2024 he used his fame, fortune, and influence to promote OmegaPro.

366.   Between about February 2019 and May 2020, in Dubai, Sheikh Mohammed appeared at four separate public promotional events for OmegaPro, where he attended "speaking and promoting" OmegaPro on stage; photos and videos depict him alongside co-founder Andreas Szakacs and other named defendants.

367.   He attended and spoke in his official capacity "on behalf of the City of Dubai and the [United Arab Emirates]," thereby conveying government-level endorsement and legitimacy to OmegaPro's solicitations.

368.   These promotional appearances and statements were materially misleading because (a) they were used to validate OmegaPro's scripted claims of fixed, extraordinary returns and

regulatory legitimacy, and (b) French and Spanish authorities had already issued fraud alerts concerning OmegaPro months before the Sheikhs' public appearances.

369.   Throughout his involvement in the scheme, Sheikh Mohammed had full knowledge that OmegaPro's public-facing representations—including guarantees of 15% monthly returns, 300% ROI, and assertions of FCA-regulated trading operations—were materially false and that OmegaPro was, in fact, operating as a Ponzi scheme. Nevertheless, he continued to promote the enterprise and later its successor by actively encouraging investors to visit the OmegaPro website, follow its social media channels, and urge family and friends to do the same—all to drive further investment and recruitment.

370.   Plaintiffs and class members reasonably relied on the Sheikh's official-capacity appearances and endorsements; his participation "lent credence to the criminal enterprise," and many investors increased or maintained their deposits based on the apparent royal/official support.

371.   Sheikh Mohammed was involved in the Omega Pro Scheme from at least 2019 through at least 2023.

372.   By promoting OmegaPro while acting in an official capacity and in coordination with its founders at high-visibility Dubai events, Sheikh Mohammed materially aided OmegaPro's growth, network expansion, and investor retention—benefits integral to the scheme's continued fundraising and reach.

**S.   SHEIKH SAOUD FAISAL SULTAN AL QASSIMI (Public Endorser/Influencer; Prior Ponzi Purchaser)**

373.   Defendant SHEIKH SAOUD FAISAL SULTAN AL QASSIMI is an Emirati royal and billionaire who, from 2019–2023, used his fame and influence to promote Ponzi schemes; he was the purchaser of OneCoin in Dubai (2015–2018).

374.    From approximately February 2019 through March 2022, Al Qassimi participated in public and private meetings in Dubai with OmegaPro principal Andreas Szakacs and celebrity endorser Steven Seagal to promote OmegaPro to prospective investors.

375.    Throughout his involvement in the scheme, Sheikh Al Qassimi had full knowledge that OmegaPro's public-facing representations—including guarantees of 15% monthly returns, 300% ROI, and assertions of FCA-regulated trading operations—were materially false and that OmegaPro was, in fact, operating as a Ponzi scheme. Nevertheless, he continued to promote the enterprise and later its successor by actively encouraging investors to visit the OmegaPro website, follow its social media channels, and urge family and friends to do the same—all to drive further investment and recruitment.

376.    By appearing with OmegaPro's founders at these meetings and events, Al Qassimi ratified and amplified OmegaPro's core sales script (fixed monthly returns, guaranteed 200%–300% ROI, and institutional legitimacy), leveraging royal status to draw investors and to suppress skepticism regarding withdrawals and regulatory status.

377.    These endorsements were materially misleading because they conveyed false legitimacy to a scheme already under fraud alert by European authorities; given his role and visibility, Al Qassimi knew or was deliberately indifferent to the falsity of OmegaPro's claims and to the risks posed to investors.

378.    Class members reasonably took comfort from the Sheikhs' participation; the presence of Dubai royalty at OmegaPro promotions "lent credence to the criminal enterprise," causing investors to commit or maintain funds they otherwise would have withheld.

379.    Sheikh Al Qassimi was involved in the Omega Pro Scheme from at least 2019 through at least 2023.

380.   Through these appearances and meetings, Al Qassimi materially aided OmegaPro's solicitation effort by expanding attendance, reach, and deposits in Dubai-centered promotions, thereby furthering the enterprise's fundraising and downline growth.

## T.  UNITED ARAB EMIRATES

381.   At all relevant times, the United Arab Emirates ("UAE")—through senior officials acting in their official capacities—publicly associated with OmegaPro at multiple Dubai events and meetings, thereby endorsing, approving, and ratifying messaging used to solicit investor funds. Plaintiffs further allege the UAE owed a duty to avoid creating the impression that OmegaPro was endorsed by the UAE or its royal representatives.

382.   Between February 2019 and May 2020, OmegaPro was promoted in Dubai at four public events attended by a Dubai royal (Sheikh/"Prince of Dubai"), who spoke in support of OmegaPro; photos and videos of the royal with OmegaPro principals (including Andreas Szakacs) were disseminated to recruit investors worldwide. Plaintiffs allege these appearances were official-capacity engagements "on behalf of the City of Dubai and the United Arab Emirates."

383.   By the time of these events, French and Spanish authorities had issued fraud alerts regarding OmegaPro, putting the enterprise's legitimacy in serious question. Nevertheless, official-capacity appearances and continued amplification from the UAE's representatives conferred governmental legitimacy on OmegaPro's guarantees of fixed, extraordinary returns and claimed regulatory standing.

384.   The UAE was involved in the Omega Pro Scheme from at least 2019 through at least 2023.

385.   Plaintiffs and class members reasonably understood the UAE's official appearances as governmental endorsement, which suppressed red flags and induced investment and continued

holding of positions, including by audiences in Africa and Latin America who were targeted with event footage and social-media distribution from the Dubai promotions.

386. The UAE and its instrumentalities benefited through branding of Dubai as a global finance/entrepreneurship hub and from event-related commercial activity tied to OmegaPro's Dubai promotions—advantages obtained while investors' assets remained at risk.

387. Plaintiffs allege the UAE failed to supervise and counsel its royal representatives to refrain from participating in OmegaPro promotions that conveyed state endorsement, and that by promoting or permitting promotion of OmegaPro despite public fraud warnings, the UAE aided and abetted the underlying fraud.

## U. CITY OF DUBAI

388. The City of Dubai—acting through its royal/official representatives—appeared with OmegaPro's principals at Dubai events and meetings and thereby endorsed, approved, and ratified solicitation messaging disseminated to investors. Plaintiffs further allege the City owed a duty to avoid creating the impression that OmegaPro was endorsed by the City and its royal family members.

389. From February 2019 to May 2020, four Dubai events promoted OmegaPro; a Dubai royal (acting "on behalf of the City of Dubai") attended and spoke at each event, and images/videos of the royal with OmegaPro founder Andreas Szakacs and other promoters were used to drive recruitment and investment.

390. Prior public fraud alerts (including by French and Spanish regulators) preceded these appearances; despite those warnings, the City's official-capacity presence conveyed governmental vetting and legitimacy, materially bolstering OmegaPro's false claims of guaranteed returns and purported licensure/"banking" affiliations.

391.   Investors reasonably relied on the City's visible, official participation in Dubai events and associated media as validation that OmegaPro was legitimate and safe, which induced deposits, upgrades, and delayed withdrawals during the class period.

**392.**   The City benefited through enhanced branding and commercial activity from high-profile promotional events featuring international speakers and audiences, while the same content was used to perpetuate investor deception**.**

393.   The City was involved in the Omega Pro Scheme from at least 2019 through at least 2023.

394.   Plaintiffs allege the City failed to supervise and counsel its royal representatives to avoid participation that implied municipal endorsement, and by participating in, enabling, and permitting continued promotion after fraud alerts**,** the City substantially assisted OmegaPro's fraudulent scheme.

## V.   FEDERAL CRIMINAL PROCEEDINGS AGAINST OMEGAPRO ENTERPRISE PONZI SCHEME DEFENDANTS AND OVERALLPING ALLEGATIONS

### A.  United States v. Sims & Reynoso, No. 3:25-cr-00284-RAM (D.P.R.)

395.   On June 25, 2025, a federal grand jury in the District of Puerto Rico returned an indictment charging Michael Shannon Sims and Juan Carlos Reynoso with (Count 1) conspiracy to commit wire fraud, 18 U.S.C. § 1349, and (Count 2) conspiracy to commit money laundering, 18 U.S.C. § 1956(a)(1)(B)(i).

396.   The Indictment alleges, inter alia, that from about December 2018 through about April 2025, Sims, Reynoso, and others promoted and operated "OmegaPro," a multi-level marketing ("MLM") scheme to obtain money by materially false statements, including promising

extraordinary investment returns (e.g., 300% ROI), misrepresenting licensure/regulatory status, and staging lavish global promotional events and social-media campaigns to project legitimacy (including projecting the logo on the Burj Khalifa).

397.   It further alleges that victims were induced to keep funds in OmegaPro by threats of large withdrawal fees and that victims across the world-including the U.S.-were unable to withdraw their funds even after OmegaPro claimed to have transferred accounts to "Broker Group."

398.   Between about August 2019 and November 2022, the equivalent of over $650 million in virtual currency was allegedly sent to OmegaPro-controlled wallets, then dispersed to insiders and promoters.

399.   The public docket reflects that the case was unsealed following Sims's arrest on July 8, 2025; that he was arraigned, pleaded not guilty, and was released on an unsecured bond with standard conditions; and that the government is prosecuting Counts 1 and 2.

**B. United States v. Reynoso, No. 3:25-mc-00068-FAB (D.P.R.)**

400.   In a related forfeiture enforcement proceeding, the United States moved to hold Juan Carlos Reynoso in contempt for violating a January 31, 2025, seizure warrant directing the transfer of 119.65 BTC from a specified wallet to a government-controlled address within 24 hours.

401.   On March 4, 2025, the court granted the government's motion, held Reynoso in civil contempt, and ordered compliance (transfer of the BTC). Plaintiffs seek notice of the motion, the order to show cause, and the court's civil-contempt ruling compelling transfer.

402.   The government's contempt motion (filed Feb. 7, 2025) alleges service of the seizure warrant on Reynoso's counsel, specific wallet addresses, and that, after service, the bitcoin was "offloaded" from the subject wallet contrary to the order not to obstruct the seizure.

### C.  Overlap With Plaintiffs' Allegations Here

403.   The federal filings above describe the same enterprise, actors, time period, channels, modus operandi and techniques Plaintiffs have alleged here: (i) repeated promises of guaranteed, extraordinary returns (e.g., 200-300% within 13-16 months); (ii) misrepresentations regarding licenses/registrations and claimed "hedge fund" or "licensed broker" status; (iii) reliance on social-media/influencer-driven promotion and high-profile events to project legitimacy; (iv) a persistent inability of investors to withdraw funds and a "Broker Group" migration ruse; and (v) routing of large volumes of cryptocurrency through wallets under the control of principals/promoters.

404.   Plaintiffs allege those facts independently and upon information and belief; the federal records corroborate the existence of these allegations and the government's parallel theory.

### D.  Pleading Posture and Use

405.   Plaintiffs incorporate the foregoing solely to (1) place Defendants on notice of the government's parallel allegations concerning the same scheme; (2) demonstrate Defendants' knowledge, motive, intent, opportunity, and plan; and (3) support the inference that the misrepresentations, omissions, laundering, and asset-movement alleged herein were not isolated or accidental.

## VI.   INTERNATIONAL CRIMINAL PROCEEDINGS AGAINST OMEGAPRO ENTERPRISE PONZI SCHEME DEFENDANTS AND OVERALLPING ALLEGATIONS

### A.  Arrests of OmegaPro Defendants in Turkey

406.   On or about July 2024, Turkish authorities arrested Andreas Attila Szakacs, also known as "Emre Avc?", a co-founder and senior executive of OmegaPro, in Istanbul, Turkey. Public reports attribute the arrest to a multi-billion-dollar international fraud investigation into the OmegaPro enterprise and related entities.

407.   Following Szakacs's arrest, Turkish law enforcement officials reportedly seized 32 cold wallets, computers, and other digital devices linked to OmegaPro. Investigators also traced large volumes of cryptocurrency alleged to be proceeds of the fraudulent scheme.

408.   As reported by international media relying on Turkish law enforcement sources, Szakacs had acquired Turkish citizenship and was operating under an alias identity at the time of his arrest, further evidencing intent to evade detection and accountability.

409.   On or about September 2024, Turkish authorities arrested a second high-ranking OmegaPro executive, identified as Robert Velghe, a Dutch national and OmegaPro managing director, also in Istanbul. Velghe was taken into custody in connection with the same ongoing criminal investigation.

410.   According to public reporting, Velghe's arrest followed investigative leads derived from Szakacs's seized devices. Turkish authorities reportedly identified crypto flows exceeding $160 million associated with the seized wallets and devices, further corroborating the scale and international nature of the alleged scheme.

411.   Both arrests were publicly attributed to an investigation by Istanbul's financial crimes division, focused on OmegaPro's global solicitation of deposits with promises of "up to 300%" investment returns, misrepresentations regarding regulatory status, and promotion through coordinated social media campaigns, events, and online platforms.

## B.  Arrests of OmegaPro Defendants in Turkey

412. The arrests of Szakacs and Velghe, and the underlying Turkish criminal investigation, concern the same actors, period, representations, and fraudulent mechanics alleged in this civil action, including: (i) repeated false promises of guaranteed, extraordinary returns (e.g., 200–300%); (ii) global promotion using social media, influencer marketing, and high-profile events; (iii) deceptive claims about OmegaPro's licensure, regulatory status, and connection to "hedge funds" or "brokers"; (iv) investor inability to withdraw funds, including under the pretext of a migration to "Broker Group"; and (v) use of cryptocurrency wallets controlled by OmegaPro principals and insiders to obscure, launder, and redistribute proceeds.

413. The reported Turkish arrests and investigative disclosures corroborate the existence of the scheme alleged herein and bolster Plaintiffs' allegations of Defendants' knowledge, motive, and intent.

## C. Pleading Posture and Use

414. Plaintiffs incorporate the foregoing solely to: (i) place Defendants on notice of parallel international criminal investigations concerning the same enterprise; (ii) support the inference of common knowledge, planning, and intent by the principals and promoters of OmegaPro; and (iii) demonstrate the non-isolated, coordinated nature of the misrepresentations, asset transfers, and laundering activities described in the operative complaint.

## VII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

415. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who transmitted or forwarded cryptocurrency, money or property to OmegaPro between January 2018 and December 2023 the Class Period (the "Class"); and were financially damaged when Omegapro blocked Plaintiff's accounts and refused to return the cryptocurrency, money and/or property.

416.    Excluded from the Class are Defendants herein, the officers and directors of Omegapro, OmegaPro, LTD, Traders Domain Forex, LTD, SAEG Capital Management, Algo Capital, LLC, Yas Castellum Financial, LLC, Omnia Tech, ZXN Investment Holding, LTD, OMP Exchange, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

417.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in similar class action lawsuit.

418.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law complained of herein.

419.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation.

420.    Plaintiff has no interests antagonistic to or in conflict with those of the Class.

421.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether the Defendants engaged in a pattern of Racketeering in violation of the Federal and Florida State Civil Racketeering Acts;

- Whether the Defendants' statements to the investing public misrepresented material facts about the conditions of the investment, business, operations, and management of Omegapro;
- Whether Defendants' public statements to the investing public during omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- Whether the Defendants caused Omegapro to issue false and misleading statements to the public;
- Whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;
- Whether the Defendants engaged in a Ponzi Scheme using the money of new investors to pay old investors;
- Whether or not Defendants use commerce and communication such as mail, Internet, email and other form of wire to communicate the fraudulent statements to the public; and
- Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages?

422. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

423. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

424. There will be no difficulty in the management of this action as a class action.

## VIII.   CAUSES OF ACTION AND REQUESTED RELIEF

### COUNT 1
### CONDUCT OR PARTICIPATION IN A RICO ENTERPRISE
### THROUGH A PATTERN OF RACKETEERING ACTIVITY
### UNDER 18 U.S.C. §§ 1961(5), 1964(C)

425. Plaintiff incorporates the allegations of paragraphs 1 - 424 as if stated fully herein.

426. Each of the Defendants, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1096 (c).

## A.  The Enterprise

427.   At all relevant times, the Corporate Defendants collectively constitutes a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise-the Omegapro Enterprise Ponzi Scheme – within the meaning of 18 U.S.C. §§ 1961(4) and 1096 (c).

428.   The Omegapro Enterprise Ponzi Scheme was formed on or about June 2018 and is an organization that functioned as a continuing unit.

429.   The purpose of Omegapro Enterprise Ponzi Scheme was to defraud the members of Class of billions of dollars in investments under false pretense, to illegally funnel the vast portion of the proceeds of their unlawful activity into the Defendants' personal accounts, assets, and property, to conduct financial transactions with the remaining proceeds to promote their Ponzi scheme, and to conceal their ongoing fraud from the members of the Class.

430.   Each of the individual corporations listed in the above paragraphs are distinct persons for the purposes of 18 U.S.C. § 1962(c), and distinct from the association constituting the enterprise Ponzi Scheme.

431.   Thus, the collective group of Corporate Defendants constitute an entity distinct from each individual corporate defendant and is an "enterprise" within the meaning 18 U.S.C. § 1962(c).

432.   The individual corporations were incorporated in numerous different states, had different customer and/or membership bases and ongoing businesses or organizations, and could act independently to advance their own interests.

433.   The individual corporations performed different roles within the enterprise and/or used their separate legal incorporations to facilitate the racketeering activity.

434.   For instance, Defendants working together and in concert utilized the corporate defendant Omegapro, OMP, and OMP Exchange are part of the Omegapro Enterprise Ponzi Scheme members, to:

    a.  Launch a crypto platform that allowed investors to invest their money in the OmegaPro Enterprise Ponzi scheme;

    b.  Operate a website which made several claims and promises, among them that the investors would receive a weekly profit of 5% percent on their investment;

    c.  falsely claim that Omegapro was a licensed hedge fund manager;

    d.  falsely claim that Omegapro was a registered investment adviser;

    e.  falsely claim that Omegapro was a registered broker.

435.   Similarly, Defendants working together and in concert utilized the numerous distinct corporate defendants, also Omegapro Enterprise Ponzi Scheme members, to: Solicit members of the public to participate in the weekly investor zoom meetings, invest in the Omegapro Enterprise Ponzi Scheme, and persuade their family, friends and associates to also invest in the Omegapro Enterprise Ponzi Scheme;

436.   The Defendants used the mail and interstate wire communications facilities to facilitate and execute the Omegapro Enterprise Ponzi Scheme.

437.   At all relevant times, the Omegapro Enterprise Ponzi Scheme was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. §1962(c).

**B.  Defendants' Pattern of Racketeering Activity Through the Enterprise**

438.   At all relevant times, beginning on or around June 2018 and continuing through the Present, the Defendants knowingly and willfully conducted or participated, directly or indirectly, in the conduct of the affairs of the Omegapro Enterprise Ponzi Scheme and did so through a pattern

of racketeering activity, i.e., mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956), and improper use of proceeds derived from racketeering activities (18 U.S.C. § 1957).

439.   To effectuate the illegal objectives of the Omegapro Enterprise Ponzi Scheme and in furtherance of the scheme to defraud, the Defendants committed numerous acts affecting thousands of investors in violation of in violation of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956), and improper use of proceeds derived from racketeering activities (18 U.S.C. § 1957).

440.   These predicate acts constitute a pattern of criminal racketeering activity because (1) at least two of the acts had the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents; (2) as described throughout this Complaint, this series of related acts extended over a substantial period of time; and (3) the last of such related acts occurred within 5 years after a prior incident of criminal activity.

C.     **Predicate Acts**

441.   In violation of those laws, from about June 2018 through January 2024, all Defendants cooperated jointly and severally in the commission of the following acts: (a) wilfully and knowingly devised, and intending to devise, a scheme and artifice to defraud to obtain money and property by means of false and fraudulent pretenses, that is they created and implemented the Omegapro Enterprise Ponzi Scheme to solicit investments in a cryptocurrency exchange platform by false and fraudulent pretenses and promises to current and prospective investors about, among other things, the manner in which their funds would be invested and the performance of their investments, and misappropriated investor funds for uses inconsistent with their representations to

investors and for their own benefit; (b) acted with intent to defraud Plaintiffs; (c) mailed something or caused other people to mail something through the United States Postal Services or private or commercial interstate carriers for the purpose of carrying out their scheme; (d) used interstate wire communication facilities, and caused others to use interstate and foreign wire communication facilities, for the purpose of carrying out their scheme and to conceal their ongoing fraudulent activity.

442.   To achieve their common goals, Defendants knowingly and willfully concealed from the public, and Plaintiffs the unlawfulness of Defendants' conduct, which was committed at the instruction of, and through the directions of the individual Defendants: Andreas Szakacs, Michael Shannon Sims, Jordan Belfort, Steven Seagal, Eric Thomas, Juan Carlos Reynoso Jr., Dilawarjit Singh, and John Doe 1-500.

443.   During the period from at least June 2018 through and including January 2024, all Defendants cooperated jointly and severally in the commission of two or more of the RICO predicate acts under 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. § 1962(b). 228. Such predicate acts included, inter alia, mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956), and improper use of proceeds derived from racketeering activities (18 U.S.C. § 1957). These acts constitute a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(a).

**D.   Continuity**

444.   The Defendants committed two or more of the offenses referred to above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § 1962(b).

445.   The Omegapro Enterprise Ponzi Scheme was "close-ended" in that the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, which were the mechanism employed by the Defendants to orchestrate the scheme, were executed from at least 2018 through November 22, 2022.

446.   The Omegapro Enterprise Ponzi Scheme is "open-ended" because the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, were part of the scheme's regular way of doing business, and because the Defendants have continued to engage in related predicate acts through the present day.

**E.     Damages and Causation**

447.   As a direct and proximate result of the Defendants' orchestration and operation of then Omegapro Enterprise Ponzi Scheme, Plaintiffs have been injured in their property, causing Plaintiffs to suffer monetary losses in the amount of not less than 250 billion dollars with said damages to be proven at trial.

448.   There is a direct relation between the Defendants' conduct and the Plaintiffs' injury. Defendants' fraudulent representations that investor moneys would be invested in cryptocurrency through an automated investment trading platform, that potential investors would double their money within five months of investing by earning 5% weekly return, and that actual investors had earned, and were continuing to earn, at least 5% each week on their investments, together with their fraudulent omissions listed supra, was a substantial factor in each Plaintiff's decision to invest in the Omegapro Enterprise Ponzi Scheme. The direct victims of the Defendants' RICO violations were the Plaintiffs.

449.   Pursuant to 18 U.S.C. § 1962(c), the Plaintiffs are entitled to three times the actual damages caused by the Defendants plus the cost of the suit, including reasonable attorney's fees, and pre-judgement and post-judgment interest.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and all other relief to which Plaintiff may be entitled at law or in equity.

**COUNT 2**
**ACQUISITION AND MAINTENANCE OF AN INTEREST**
**IN AND CONTROL OF**
**AN ENTERPRISE ENGAGED IN A**
**PATTERN OF RACKETEERING ACTIVITY**
**UNDER 18 U.S.C. §§ 1961(5), 1964(B)**

450.   Plaintiff incorporates the allegations of paragraphs 1 - 424 as if stated fully herein.

451.   Each of the Defendants, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1962(a)-(d) as defined by 18 U.S.C § 1961(3).

452.   Each of the Defendants, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in or control of an enterprise (specifically the Omegapro Enterprise Ponzi Scheme) which was engaged in, or the activities of which affected interstate or foreign commerce.

**A.     The Enterprise**

453.   Plaintiff incorporates the allegations of paragraphs 427-437, supra, as if fully stated herein.

454. At all relevant times, the Corporate Defendants as listed in paragraphs 86-100, supra, collectively constituted an enterprise (the Omegapro Enterprise Ponzi Scheme) as defined in 18 U.S.C. § 1961(4), engaged in and whose activities affected interstate and foreign commerce.

### B.      The Defendants' Pattern of Racketeering

455. Plaintiff incorporates the allegations of paragraphs 438-440, supra, as if fully stated herein.

456. At all relevant times, the Defendants individually were agents of, employed by or associated with the Omegapro Enterprise Ponzi Scheme and were persons within the meaning of 18 U.S.C. § 1961(3).

457. In committing the acts plead herein, the Defendants received income derived from a pattern of racketeering activity.

458. Each of the Defendants used the income or proceeds therefrom in their operation and maintenance of Omegapro Enterprise Ponzi Scheme, an enterprise which operates in and affects interstate and foreign commerce.

### C.      Predicate Acts

459. Plaintiff incorporates the allegations of paragraphs 441-443, supra, as if fully stated herein.

460. At various times and places detailed in this complaint and in the accompanying exhibits, Defendants acquired and/or maintained, directly or indirectly, an interest in or control of a RICO enterprise-in-fact composed of persons who were associated in fact and who engaged in, and whose activities affected, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

461.   During the period from at least June 2018 through present, all Defendants cooperated jointly and severally in the commission of two or more of the RICO predicate acts under 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. § 1962(b). Such predicate acts included, inter alia, mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956), and improper use of proceeds derived from racketeering activities (18 U.S.C. § 1957).

### D.  Continuity

462.   The Defendants committed two or more of the offenses referred to above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § 1962(b).

463.   The Omegapro Enterprise Ponzi Scheme was "close-ended" in that the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, which were the mechanism employed by the Defendants to orchestrate the scheme, were executed from at least 2018 through November 22, 2022 and continued with GO GLOBAL presently.

464.   The Omegapro Enterprise Ponzi Scheme is "open-ended" because the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, were part of the scheme's regular way of doing business, and because the Defendants have continued to engage in related predicate acts through the present day.

### E.    Damages and Causation

465.   The Plaintiffs are persons who have been injured by the fraudulent and racketeering activities of the Defendants.

466.   As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in her property, causing Plaintiff to suffer monetary losses in the amount of not less than $ 250 billion dollars, with said damages to be proven at trial.

467.   There is a direct relation between the Defendants' conduct and the Plaintiffs' injury. Defendants' fraudulent representations that investor moneys would be invested in cryptocurrency through an automated investment trading platform, that potential investors would double their money within five months of investing by earning 3% weekly return, and that actual investors had earned, and were continuing to earn, at least 3% each week on their investments, together with their fraudulent omissions listed supra, was a substantial factor in each Plaintiff's decision to invest in the OmegaPro Enterprise Ponzi Scheme. The direct victims of the Defendants' RICO violations were the Plaintiffs.

468.   Pursuant to 18 U.S.C. § 1962(c), the Plaintiff is entitled to three times the actual damages caused by the Defendants plus the cost of the suit, including reasonable attorney's fees, and pre-judgement and post-judgment interest.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and all other relief to which Plaintiff may be entitled at law or in equity.

### COUNT 3
### USE OF INCOME DERIVED FROM A PATTERN OF RACKETEERING ACTIVITY IN THE OPERATION OF AN ENTERPRISE ENGAGED IN ACTIVITIES WHICH AFFECT INTERSTATE OR FOREIGN COMMERCE UNDER 18 U.S.C. §§ 1961(5), 1964(A)

469.   Plaintiff incorporates the allegations of paragraphs 1 - 424 as if stated fully herein.

470.   Each of the Defendants, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1962(a)-(d) as defined by 18 U.S.C. § 1961(3).

471.   Each of the Defendants, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in or control of an enterprise (specifically the Omegapro Enterprise Ponzi Scheme) which was engaged in, or the activities of which affected interstate or foreign commerce.

## A.  The Enterprise

472.   A Plaintiff incorporates the allegations of paragraphs 427-437, supra, as if fully stated herein.

473.   At all relevant times, the Corporate Defendants as listed in paragraphs 86-100, supra, collectively constituted an enterprise (the Omegapro Enterprise Ponzi Scheme) as defined in 18 U.S.C. § 1961(4), engaged in and whose activities affected interstate and foreign commerce.

## B.  The Defendants' Pattern of Racketeering

474.   Plaintiff incorporates the allegations of paragraphs 438-440, supra, as if fully stated herein.

475.   At all relevant times, the Defendants individually were agents of, employed by or associated with the Omegapro Enterprise Ponzi Scheme and were persons within the meaning of 18 U.S.C. § 1961(3).

476.   In committing the acts plead herein, the Defendants received income derived from a pattern of racketeering activity.

477.    At all relevant times hereto, all Defendants agreed to and did use income or proceeds received from a pattern of racketeering activity to form, control, establish, and operate the Omegapro Enterprise Ponzi scheme, which was formed for the purpose of defrauding Plaintiffs, and which was engaged in and affected interstate and foreign commerce.

## C.  Predicate Acts

478.    Plaintiff incorporates the allegations of paragraphs 441-443 supra, as if fully stated herein.

479.    Such predicate acts included, inter alia, mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956), and improper use of proceeds derived from racketeering activities (18 U.S.C. § 1957).

## D.  Continuity

480.    The Defendants committed two or more of the offenses referred to above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § 1962(b).

481.    The Omegapro Enterprise Ponzi Scheme was "close-ended" in that the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, which were the mechanism employed by the Defendants to orchestrate the scheme, were executed from at least 2018 through November 20, 2022, and continuing until 2024.

482.    The Omegapro Enterprise Ponzi Scheme is "open-ended" because the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds

derived from racketeering activities, were part of the scheme's regular way of doing business, and because the Defendants have continued to engage in related predicate acts through the present day.

## E.  Damages and Causation

483.   The Plaintiff is a person who have been injured by the fraudulent and racketeering activities of the Defendants.

484.   As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in her property, causing Plaintiff to suffer monetary losses in the amount of not less than $ 50 billion dollars, with said damages to be proven at trial.

485.   There is a direct relation between the Defendants' conduct and the Plaintiffs' injury. Defendants' fraudulent representations that investor moneys would be invested in cryptocurrency through an automated investment trading platform, that potential investors would double their money within five months of investing by earning 3% weekly return, and that actual investors had earned, and were continuing to earn, at least 3% each week on their investments, together with their fraudulent omissions listed supra, was a substantial factor in each Plaintiff's decision to invest in the OmegaPro Enterprise Ponzi Scheme. The direct victims of the Defendants' RICO violations were the Plaintiffs.

486.   Pursuant to 18 U.S.C. § 1962(c), the Plaintiff is entitled to three times the actual damages caused by the Defendants plus the cost of the suit, including reasonable attorney's fees, and pre-judgement and post-judgment interest.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the

maximum amount allowed by law, and all other relief to which Plaintiff may be entitled at law or in equity.

## COUNT 4
## CONSPIRACY TO ENGAGE IN A PATTERN
## OF RACKETEERING ACTIVITY
## UNDER 18 U.S.C. §§ 1961(5), 1964(D)

487.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

488.   Upon information and belief, the Defendants knew that they were engaging in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.

489.   At all relevant times, beginning in or around June 2017 and continuing at least through present, the Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(a) and (c) as alleged above and incorporated herein, in violation of 18 U.S.C. § 1962(d).

490.   Upon information and belief, the Defendants agreed to the overall objectives of the conspiracy - to defraud the class of Plaintiff of millions of dollars in investments under false pretenses, to illegally funnel the vast portion of the proceeds of their unlawful activity into their personal accounts, assets and property, to conduct financial transactions with the remaining proceeds to promote their Ponzi scheme, and to conceal their ongoing fraud from the Class of Plaintiffs.

491.   Defendants agreed to the commission of at least two predicate acts. Specifically, they agreed to engage in to engage in: (i) a scheme to defraud by transmitting or causing to be transmitted writings, signs, signals, pictures, or sounds in interstate or foreign commerce through the use of the mails and wires, as proscribed by 18 U.S.C. §§ 1341 and 1343, in violation of 18

U.S.C. § 1349; (ii) a financial transaction that they knew involved funds that were the proceeds of some unlawful activity and that those funds were in fact the proceeds of that unlawful activity, in violation of 18 U.S.C. § 1956 and (iii) a financial transaction that they knew involved funds that were the proceeds of some unlawful activity and was designed in whole or in part to disguise or conceal the source, ownership, or control of the proceeds, and that those funds were in fact the proceeds of that unlawful activity, in violation of 18 U.S.C. § 1956. These acts constitute a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(a).

492.   Defendants have knowingly, willfully, and intentionally conspired and agreed on multiple occasions to receive income derived from a pattern of racketeering activity (mail fraud and wire fraud) and launder the proceeds of the illegal acts to promote the continued operation of the Omegapro Enterprise Ponzi Scheme, and to disguise or conceal the source, ownership, or control of the proceeds.

493.   Defendants knew that their actions as alleged above were part of a pattern of racketeering activity and agreed to the commission of those acts to further the conspiratorial scheme described above.

494.   Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c) and (a), in violation of 18 U.S.C. § 1962(d).

A.     **The Enterprise**

495.   A Plaintiff incorporates the allegations of paragraphs 427-437, supra, as if fully stated herein.

496.   At all relevant times, the Corporate Defendants as listed in paragraphs 86-100, supra, collectively constituted an enterprise (the Omegapro Enterprise Ponzi Scheme) as defined in 18 U.S.C. § 1961(4), engaged in and whose activities affected interstate and foreign commerce.

### B. Defendants' Pattern of Racketeering Activity

497. Plaintiff incorporates the allegations of paragraphs 438-440, supra, as if fully stated herein.

### C. Predicate Acts

498. Plaintiff incorporates the allegations of paragraphs 441-443, supra, as if fully stated herein.

499. Such predicate acts included, inter alia, mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956), and improper use of proceeds derived from racketeering activities (18 U.S.C. § 1957).

### D. Continuity

500. The Defendants committed two or more of the offenses referred to above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § 1962(b).

501. The Omegapro Enterprise Ponzi Scheme was "close-ended" in that the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, which were the mechanism employed by the Defendants to orchestrate the scheme, were executed from at least June 2029 through November 2022 and continuing with GO GLOBAL until 2024.

502. The Omegapro Enterprise Ponzi Scheme is "open-ended" because the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, were part of the scheme's regular way of doing business, and because the Defendants have continued to engage in related predicate acts through the present day.

### E.    Damages and Causation

503.    The Plaintiffs are persons who have been injured by the fraudulent and racketeering activities of the Defendants.

504.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in her property, causing Plaintiff to suffer monetary losses in the amount of not less than $ 50 billion dollars, with said damages to be proven at trial.

505.    There is a direct relation between the Defendants' conduct and the Plaintiffs' injury. Defendants' fraudulent representations that investor moneys would be invested in cryptocurrency through an automated investment trading platform, that potential investors would double their money within five months of investing by earning 3% weekly return, and that actual investors had earned, and were continuing to earn, at least 3% each week on their investments, together with their fraudulent omissions listed supra, was a substantial factor in each Plaintiff's decision to invest in the Omegapro Enterprise Ponzi Scheme. The direct victims of the Defendants' RICO violations were the Plaintiffs.

506.    Pursuant to 18 U.S.C. § 1962(c), the Plaintiff is entitled to recover at least three times the actual damages caused by the Defendants plus the cost of the suit, including reasonable attorney's fees, and pre-judgement and post-judgment interest.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and all other relief to which Plaintiff may be entitled at law or in equity.

**COUNT 5**
**BREACH OF CONTRACT**

507.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

508.   As set forth above, the Defendants solicited and entered into an implied contract by which the members of the Class agreed to entrust, pay, transmit, turn over and/or wire not less than $50 billion dollars in investment property and funds to the Defendants, and the Defendants agreed to invest that property and funds in cryptocurrency through an automated investment trading platform which the Defendants guaranteed to earn at least 5% each week.

509.   The members of the Class did entrust, pay, transmit, turn over and/or wire not less than $ 50 billion dollars in investment property and funds to the Defendants as agreed, and fully performed all terms and conditions of the implied contract.

510.   Defendants materially breached the express and implied terms of the contract by failing to invest the property and funds as agreed.

511.   The Defendants made demands to Defendants that Defendants refund their investment funds and property. Despite those demands, Defendants have refused and continue to refuse to refund the investment funds and property to the members of the Class.

512.   Defendants, through their actions described above, breached their contract with the members of the Class in several other material respects, including, but not limited to, engaging in a Ponzi scheme and defrauding and embezzling millions of dollars from the members of the Class as well as taking from them for Defendants' own benefit investment opportunities.

513.   As a direct and proximate result of the Defendants' breaches, the members of the Class have suffered substantial damages in the amount of not less than $50 billion and said damages to be proven at trial.

514.   The Plaintiffs have also suffered additional damages in the form of lost profits on their investment and attorneys' fees and costs as a proximate and foreseeable result of Defendants' conduct.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's damages for Defendants' breach of contract, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

### COUNT 6
### BREACH OF IMPLIED COVENANT OF
### GOOD FAITH AND FAIR DEALING

515.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

516.   As set forth above, the Defendants solicited and entered into an implied contract by which the members of the Class agreed to entrust, pay, transmit, turn over and/or wire not less than $ 50 billion in investment property and funds to the Defendants, and the Defendants agreed to invest that property and funds in cryptocurrency through an automated investment trading platform which the Defendants guaranteed to earn at least 5% each week.

517.   The members of the Class did entrust, pay, transmit, turn over and/or wire not less than $ 50 billion in investment property and funds to the Defendants as agreed, and fully performed all terms and conditions of the implied contract.

518.   Defendants materially breached the express and implied terms of the contract by failing to invest the property and funds as agreed.

519. The Defendants made demands to Defendants that Defendants refund their investment funds and property. Despite those demands, Defendants have refused and continue to refuse to refund the investment funds and property to the members of the Class.

520. Defendants, through their actions described above, breached their contract with the members of the Class in several other material respects, including, but not limited to, engaging in a Ponzi scheme and defrauding and embezzling billions of dollars from the members of the Class as well as taking from them for Defendants' own benefit investment opportunities.

521. The above-referenced implied contract, as with all contracts, contains an implied covenant of good faith and fair dealing.

522. The implied covenant of good faith and fair dealing applies to the parties' performance and rights under the contract.

523. Through the conduct described above, Defendants denied the members of the Class the benefit of the bargain originally intended by the parties and provided by the contract.

524. Through the conduct described above, Defendants acted in bad faith and have breached their implied covenant of good faith and fair dealing.

525. As a direct and proximate result of Defendants' violations of their implied covenant of good faith and fair dealing, the members of the Class have and will suffer significant financial harm, including consequential and other damages, in the amount not less than $250 billion said damages to be proven at trial.

526. The Plaintiffs have also suffered additional damages in the form of lost profits on their investment and attorneys' fees and costs as a proximate and foreseeable result of Defendants' conduct.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's damages for Defendants' breach of implied covenant of good faith and fair dealing, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

## COUNT 7
## UNJUST ENRICHMENT

527.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

528.   At Defendants' request, and in reliance on their promises -- that (i) investor moneys would be invested in cryptocurrency through an automated investment trading platform (ii) potential investors would earn a 5% weekly return on their investment and would double their money within five months using the "Bots Assisted account" to conduct trading (iii) Omegapro would guarantee 5% weekly return on their investments and (iv) actual investors had earned, and were continuing to earn, at least 3% each week on their investments -- the members of the Class entrusted, paid, transmitted, turned over and/or wire not less than $50 billion in investment funds to the Defendants.

529.   Only a portion of the investment funds provided to the Defendants were actually invested by the Defendants, and none were invested as represented, and the vast portion of the funds were stolen or converted by the Defendants for the Defendants' own benefit to the great detriment of the members of the Class.

530.   Defendants failed to invest the vast portion of the investment funds provided to them by the members of the Class as set forth above.

531. Defendants received and retained the benefit of the Plaintiff's performance, including their money and property, in direct violation of Defendants' obligations to the Plaintiffs and without performing in accordance with the Defendants' promises and pretences.

532. Defendants must be required to return to the members of the Class all of their money Defendants wrongfully retained.

533. Defendants have been unjustly enriched, and the Plaintiffs are entitled to be compensated for the benefit they have conferred on the Defendants.

534. The value of the money and property unjustly retained by Defendants is in excess of $50 billion dollars, the exact amount of which will be proven at trial.

535. The Plaintiff has also suffered additional damages in the form of lost profits on their investment and attorneys' fees and costs as a proximate and foreseeable result of Defendants' conduct.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's damages for the money and property unjustly retained by the Defendants, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

## COUNT 8
## CONVERSION / THEFT / EMBEZZLEMENT

536. Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

537. The Defendants received the above-referenced investment funds from the members of the Class, to be invested in accordance with the Defendants' promises and representations.

538. The Defendants did not invest the investment funds as promised and have failed and refused to return the investment funds provided to them by the members of the Class, despite demand, therefore.

539. Instead, the Defendants knowingly obtained or used, or endeavored to obtain or to use, the Plaintiffs' property (i.e., the investment funds) with intent to permanently appropriate the property for the Defendants' own use and benefit through fraud and deceit.

540. As a direct and proximate result of this theft, conversion and/or embezzlement of the Plaintiffs' investment funds, the Plaintiffs have suffered substantial damages in the amount of at least $50 billion plus consequential damages consisting of, among other things, attorneys' fees and costs of investigating and discovering Defendants' fraud and pursuing this action.

541. The Defendants' actions have been willful and outrageous and undertaken with reckless indifference to the rights of the Plaintiffs. Such conduct warrants an award to the Plaintiff of punitive or exemplary damages in an amount sufficient to punish the Defendants and deter similar wrongdoing by others.

**WHEREFORE**, the Plaintiff request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's damages for the money and property unjustly stolen, converted and/or embezzled by the Defendants, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

### COUNT 9
### COMMON LAW FRAUD

542. Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

543.   From June 2018 through January 2024, the Defendants promised and represented to the members of the Class that their money would be, and/or had been invested in cryptocurrency through an automated investment trading platform.

544.   From January 2019 through January 2024, the Defendants committed fraud when they intentionally and falsely represented to the members of the Class that (a) their money would be, and/or had been invested in cryptocurrency (b) they would earn, and in fact did earn, 3% weekly return on their investment (c) Omegapro was a registered hedge fund (d) Omegapro was a registered investment advisor and (e) Omegapro was a registered broker.

545.   The Defendants' above promises and representations were false, and Defendants knew they were false when made, and they made the false promises and representations specifically intending for the members of the Class to rely upon the false promises and representations, and to induce them to invest, to send them money and property, and to stay invested, as part of a scheme to defraud the members of the Class.

546.   The Defendants purposely and intentionally did not invest, as promised, or represented, or at all, the moneys and property provided to them by the members of the Class.

547.   The Defendants did not intend to invest, at promised or represented, the moneys and property provided to them by the members of the Class.

548.   The members of the Class justifiably relied on the Defendants' representations, and based on this reliance, entrusted, paid, transmitted, turned over and/or wire not less than $50 billion in investment funds to the Defendants.

549.   The members of the Class have been substantially harmed by the Defendants' conduct.

550.   As a direct and proximate result of Defendants' deliberate, intentional and vile conduct, all done with malice, fraud and/or oppression, the members of the Class have incurred and will continue to incur damages in the amount of at least $ 50 billion said damages to be proven at trial, plus consequential damages consisting of, among other things, attorneys' fees and costs of investigating and discovering Defendants' fraud and pursuing this action.

551.   Such conduct was done in furtherance of their own private interests, and was willful, malicious, wanton, and oppressive, and done with conscious and callous indifference to the consequences and with specific intent to harm, and therefore further warrants an award to the members of the Class of punitive or exemplary damages in an amount to be proven at trial and sufficient to punish the Defendants and deter similar wrongdoing by others.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

### COUNT 10
### INTENTIONAL MISREPRESENTATION

552.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

553.   The Defendants did not perform as promised and at all times did not intend to perform.

554.   The Defendants intended to enrich themselves at the expense of the members of the Class, and to defraud them by falsely claiming that (a) investor moneys would be invested in cryptocurrency through an automated investment trading platform (b) potential investors would earn a 3% weekly return on their investment (c) Omegapro would guarantee 5% weekly return on

their investments (d) actual investors had earned, and were continuing to earn, at least 3% each week on their investments (e) Omegapro was a registered hedge fund (f) Omegapro was a registered investment adviser and (g) Omegapro,Go Global and Broker Group were registered brokers.

555.   The Defendants false promises and representations were designed to deceive investors such as the members of the Class and cause them to send large sums of money to Defendants for investments.

556.   The members of the Class did reasonably rely on those representations and they entrusted, paid, transmitted, turned over and/or wire not less than $50 billion in investment funds to the Defendants.

557.   The reliance by the members of the Class on the promises of the Defendants was reasonable and a substantial factor in the harm the members sustained

558.   The Defendants did not invest the investment funds as promised and have failed and refused to return the investment funds provided to them by the members of the Class, despite demands therefore.

559.   Instead, the Defendants knowingly obtained or used, or endeavored to obtain or to use, the Plaintiff's property (i.e., the investment funds) with intent to permanently appropriate the property for the Defendants' own use and benefit through misrepresentations, deceit and fraud.

560.   As a result of the intentional misrepresentations and fraud by the Defendants, the members of the Class suffered damages in the amount of at least $50 billion dollars, plus consequential damages consisting of, among other things, attorneys' fees and costs of investigating and discovering Defendants' fraud and pursuing this action.

561.   Defendants' misconduct was willful, intentional, malicious and fraudulent, entitling the Plaintiffs to an award of exemplary or punitive damages in an amount sufficient to punish the Defendants and deter similar wrongdoing by others.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

### COUNT 11
### CIVIL CONSPIRACY

562.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

563.   Upon information and belief, the Defendants agreed, combined and acted with a common plan and purpose to defraud and embezzle money from the members of the Class, and convert the Plaintiff's property to themselves and for their own benefit, by engaging in the unlawful acts described above.

564.   Upon information and belief, the Defendants agreed, combined and acted with a common plan to breach their fiduciary and common law duties owed to the members of the Class by engaging in the unlawful acts described above.

565.   At all relevant times, the Defendants committed overt acts, as described above, including, but not limited to, engaging in a Ponzi scheme and defrauding and embezzling millions of dollars from the members of the Class for their own benefit in furtherance of the common purpose described above.

566.   As a direct and proximate result of the Defendants' acts done in furtherance of the conspiracy, the members of the Class have been damaged in their businesses and properties,

causing Plaintiffs to suffer monetary damages in an amount not less than $50 billion said damages are to be proven at time of trial. The Plaintiffs have suffered, and will continue to suffer, these injuries.

567.    The Defendants' actions have been willful, malicious, wanton, and oppressive, and done with conscious and reckless indifference to the rights of the Plaintiffs and to the consequences and with specific intent to harm the Plaintiffs, warranting an award of exemplary or punitive damages in an amount sufficient to be proven at trial to punish the Defendants and deter similar wrongdoing by others.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

## COUNT 12
## USE OF INCOME DERIVED FROM A
## PATTERN OF RACKETEERING ACTIVITY IN THE
## OPERATION OF AN ENTERPRISE UNDER
## FLORIDA RACHETEERING ACT

568.    Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

**A.  The Enterprise**

569.    At all relevant times, the Corporate Defendants as listed in previous paragraphs supra, collectively constituted an enterprise (the Omegapro Enterprise Ponzi Scheme) that functioned as a continuing unit, and which engaged in and whose activities affected interstate and foreign commerce.

570.   The Omegapro Enterprise Ponzi Scheme constituted an illegal scheme that was organized for the purpose of inducing investors to invest moneys by means of untrue statements of material fact and the omission to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, including the false material representations as detailed supra.

571.   The Omegapro Enterprise Ponzi Scheme was comprised of separate entities (the Corporate Defendants) associated with each other in fact by shared personal and/or agreements, for the common of carrying out an ongoing criminal enterprise to defraud investors and their family and friends.

572.   Each of the Defendants conducted or participated, directly or indirectly, in the Enterprise through a pattern of criminal activity, consisting of numerous and repeated uses of the interstate mails and wire communications, and acts of money laundering, all with the purpose of executing a scheme to defraud.

**B.      Defendants' Pattern of Racketeering Activity and Predicate Acts**

573.   At least three of the following incidents occurred, creating a pattern of racketeering.

a.      The Defendants operated the Omegapro Enterprise Ponzi Scheme beginning on or about June 2018 to present.

b.      The Omegapro Enterprise Ponzi Scheme, as alleged above, was structured to give the appearance to potential/existing investors that was positioned to reap large weekly profits from investment in Crypto Currency.

c.      The Defendants employed false material representations to perpetrate their scheme and conceal their ongoing fraudulent activity; to wit, at all relevant times, Cynthia Petion

together with the named Defendants, held virtual weekly investor meetings ("weekly meetings), to induce investors to invest and stay invested, by falsely representing via wires.

574.   From June 2018 to the present, the Defendants knowingly and willfully concealed or covered up, by their scheme, a material fact that there were operating a scheme in violation of Florida Statute Section 895.03.

575.   The incidents described above occurred every Friday of the month between June 2018 and January 2024, during video zoom calls, calls "Investors' meeting). All of these meetings had the same or similar intents (repeatedly encouraging people to invest money or money based on lies, misrepresentations), resulting in members of the Class invested billions of dollars based on those intentional misrepresentations.

576.   Defendants, with intent to defraud members of the class received proceeds derived, directly or indirectly, from the pattern of racketeering activity, from investors.

577.   Defendants used or invested, directly or indirectly, such proceeds or the proceeds derived from the investment or use thereof, in the establishment and operation of the Omegapro Enterprise Ponzi Scheme in violation of Section 895.03, including but not limited to creating accounts with financial institutions, paying salaries, creating investor documents, creating business plans, travelling, etc., the further descriptions of which cannot be ascertained by Plaintiffs at the time of filing this Complaint.

578.   At all relevant times hereto, all Defendants agreed to and did use income or proceeds received from a pattern of racketeering activity to form, control, establish, and operate the Omegapro Enterprise Ponzi Scheme, which was formed for the purpose of defrauding Plaintiffs, and which was engaged in and affected interstate and foreign commerce

579.   All of the Defendants acted on behalf of Omegapro Enterprise Ponzi Scheme and each other in conducting the affairs of the businesses, have engaged in conduct in violation of article 895.03.

## C. Continuity

580.   The Omegapro Enterprise Ponzi Scheme was an ongoing organization, formal or informal, and functioned both as a continuing unit and has a common purpose of engaging in a course of conduct: unlawfully soliciting investors, obtaining their monies, and hiding their conduct.

581.   The Omegapro Enterprise Ponzi Scheme was "close-ended" in that the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, which were the mechanism employed by the Defendants to orchestrate the scheme, were executed from at least 2018 through November 22, 2022.

582.   The Omegapro Enterprise Ponzi Scheme is "open-ended" because the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, were part of the scheme's regular way of doing business, and because the Defendants have continued to engage in related predicate acts through the present day.

## C.  Damages and Causation

583.   The Plaintiffs are persons who have been injured by the fraudulent and racketeering activities of the Defendants.

584.   As a direct and proximate result of the Defendants' racketeering activities and violations of Florida Racketeering Act, Plaintiff has been injured in her property, causing Plaintiff to suffer monetary losses in the amount of not less than $50 billion dollars, with said damages to be proven at trial.

585.    There is a direct relation between the Defendants' conduct and the Plaintiffs' injury. Defendants' fraudulent representations that investor moneys would be invested in cryptocurrency through an automated investment trading platform, that potential investors would double their money within five months of investing by earning 5% weekly return, and that actual investors had earned, and were continuing to earn, at least 5% each week on their investments, together with their fraudulent omissions listed supra, was a substantial factor in each Plaintiff's decision to invest in the Omegapro Enterprise Ponzi Scheme. The direct victims of the Defendants' RICO violations were the Plaintiffs.

586.    As a proximate result of the Defendants' fraudulent actions, the Class suffer damages in the amount of $50 billion dollars, for which each of the Defendant, individually or severally liable to class members.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

**COUNT 13**
**CONDUCT OR PARTICIPATION IN AN ENTERPRISE**
**THROUGH A PATTERN OF RACKETEERING ACTIVITY UNDER**
**FLORIDA RACKEETERING ACT**

587.    Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

**A.      The Enterprise**

588.    Plaintiff incorporates the allegations of paragraphs 569-572 supra, as if fully stated herein.

589.   At all relevant times, the Corporate Defendants as listed in paragraphs 86-100, supra, collectively constituted an enterprise (the Omegapro Enterprise Ponzi Scheme) that functioned as a continuing unit and which engaged in and whose activities affected interstate and foreign commerce.

590.   The Omegapro Enterprise Ponzi Scheme constituted an illegal scheme that was organized for the purpose of inducing investors to invest moneys by means of untrue statements of material fact and the omission to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, including the false material representations as detailed supra.

591.   The Omegapro Enterprise Ponzi Scheme was comprised of separate entities (the Corporate Defendants) associated with each other in fact by shared personal and/or agreements, for the common of carrying out an ongoing criminal enterprise to defraud investors and their family and friends.

592.   Each of the Defendants conducted or participated, directly or indirectly, in the Enterprise through a pattern of criminal activity, consisting of numerous and repeated uses of the interstate mails and wire communications, and acts of money laundering, all with the purpose of executing a scheme to defraud.

**B.     Defendants' Pattern of Racketeering Activity and Predicate Acts**

593.   At least three of the following incidents occurred, creating a pattern of racketeering.

a.   The Defendants employed devices, schemes, or artifices to defraud, in violation of Florida Section 895.03. The Defendants operated the Omegapro Enterprise Ponzi Scheme beginning on or about January 2019 to present.

b.  The Omegapro Enterprise Ponzi Scheme, as alleged above, was structured to give the appearance to potential/existing investors that was positioned to reap large weekly profits from investment in Crypto Currency.

c.  The Defendants employed false material representations to perpetrate their scheme and conceal their ongoing fraudulent activity; to wit, at all relevant times, Andreas Szakacs together with the named Defendants, held virtual weekly investor meetings ("weekly meetings), to induce investors to invest and stay invested, by falsely representing via wires.

594.  The Defendants obtained money or property by means of untrue statements of a material fact or omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 895.03.

595.  From June 2018 to the present, the Defendants knowingly and willfully concealed or covered up, by their scheme, a material fact that there were operating a scheme in violation of Florida Racketeering Act.

596.  The incidents described above occurred every Friday of the month between June 2018 and January 2024, during video zoom calls, calls "Investors' meeting). All of these meetings had the same or similar intents (repeatedly encouraging people to invest money or money based on lies, misrepresentations), resulting in members of the Class invested billions of dollars based on those intentional misrepresentations.

597.  Defendants, with intent to defraud members of the class received proceeds derived, directly or indirectly, from the pattern of racketeering activity, from investors.

598.  Defendants used or invested, directly or indirectly, such proceeds or the proceeds derived from the investment or use thereof, in the establishment and operation of the Omegapro

Enterprise Ponzi Scheme in violation of Florida laws, including but not limited to creating accounts with financial institutions, paying salaries, creating investor documents, creating business plans, travelling, etc., the further descriptions of which cannot be ascertained by Plaintiffs at the time of filing this Complaint.

599.   At all relevant times hereto, all Defendants agreed to and did use income or proceeds received from a pattern of racketeering activity to form, control, establish, and operate the Omegapro Enterprise Ponzi Scheme, which was formed for the purpose of defrauding Plaintiffs, and which was engaged in and affected interstate and foreign commerce.

600.   All of the Defendants acted on behalf of Omegapro Enterprise Ponzi Scheme and each other in conducting the affairs of the businesses, have engaged in conduct in violation of article 460.

601.   The above -named Defendants were employed by and/or associated with the OmegaPro Enterprise Ponzi Scheme.

602.   At all relevant times, the Defendants conducted, participated in, directly or indirectly in such enterprise by engaging in all the incidents and predicate acts alleged above.

603.   Each incident described above had the same or similar intents (repeatedly lying, and misleading investors for the purpose of getting them to invest in the Ponzi Scheme).

604.   All the Defendants worked together as accomplices of each other and developed methods of commission that compensate them for each investor they brought into Omegapro

**C.   Continuity**

605.   The Omegapro Enterprise Ponzi Scheme was an ongoing organization, formal or informal, and functioned both as a continuing unit and has a common purpose of engaging in a

course of conduct: unlawfully soliciting investors, obtaining their monies, and hiding their conduct.

606.   The Omegapro Enterprise Ponzi Scheme was "close-ended" in that the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, which were the mechanism employed by the Defendants to orchestrate the scheme, were executed from at least 2018 through November 22, 2022.

607.   The Omegapro Enterprise Ponzi Scheme is "open-ended" because the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, were part of the scheme's regular way of doing business, and because the Defendants have continued to engage in related predicate acts through the present day.

**D.     Damages and Causation**

608.   The Plaintiff is a person who have been injured by the fraudulent and racketeering activities of the Defendants.

609.   As a direct and proximate result of the Defendants' racketeering activities and violations of Florida Racketeering Act, Plaintiff has been injured in her property, causing Plaintiff to suffer monetary losses in the amount of not less than $50 billion dollars, with said damages to be proven at trial.

610.   There is a direct relation between the Defendants' conduct and the Plaintiffs' injury. Defendants' fraudulent representations that investor moneys would be invested in cryptocurrency through an automated investment trading platform, that potential investors would double their money within five months of investing by earning 5% weekly return, and that actual investors had earned, and were continuing to earn, at least 5% each week on their investments, together with their fraudulent omissions listed supra, was a substantial factor in each Plaintiff's decision to invest

in the Omegapro Enterprise Ponzi Scheme. The direct victims of the Defendants' RICO violations were the Plaintiffs.

611.   As a proximate result of the Defendants' fraudulent actions, the Class suffer damages in the amount of $50 billion dollars, for which each of the Defendant, individually or severally liable to class members.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

**COUNT 14**
**ACQUISITION AND MAINTENANCE OF AN INTEREST IN**
**OR CONTROL OVER ANY ENTERPRISE**
**UNDER FLORIDA RACKEETRING ACT**

612.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

**A.  The Enterprise**

613.   Plaintiff incorporates the allegations of paragraphs 569-572, supra, as if fully stated herein.

614.   At all relevant times, the Corporate Defendants as listed in paragraphs 86-100, supra, collectively constituted an enterprise (the Omegapro Enterprise Ponzi Scheme) that functioned as a continuing unit and which engaged in and whose activities affected interstate and foreign commerce.

615.   The Omegapro Enterprise Ponzi Scheme constituted an illegal scheme that was organized for the purpose of inducing investors to invest moneys by means of untrue statements

122

of material fact and the omission to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, including the false material representations as detailed supra.

616.   The Omegapro Enterprise Ponzi Scheme was comprised of separate entities (the Corporate Defendants) associated with each other in fact by shared personal and/or agreements, for the common of carrying out an ongoing criminal enterprise to defraud investors and their family and friends.

617.   Each of the Defendants conducted or participated, directly or indirectly, in the Enterprise through a pattern of criminal activity, consisting of numerous and repeated uses of the interstate mails and wire communications, and acts of money laundering, all with the purpose of executing a scheme to defraud.

## B. Defendants' Pattern of Racketeering Activity and Predicate Acts

618.   At least three of the following incidents occurred, creating a pattern of racketeering.

a.   The Defendants employed devices, schemes, or artifices to defraud, in violation of Article 460. The Defendants operated the Omegapro Enterprise Ponzi Scheme beginning on or about June 2018 to present.

b.   The Omegapro Enterprise Ponzi Scheme, as alleged above, was structured to give the appearance to potential/existing investors that was positioned to reap large weekly profits from investment in Crypto Currency.

c.   The Defendants employed false material representations to perpetrate their scheme and conceal their ongoing fraudulent activity; to wit, at all relevant times, Cynthia Petion together with the named Defendants, held virtual weekly investor meetings

("weekly meetings), to induce investors to invest and stay invested, by falsely representing via wires.

619.   The Defendants obtained money or property by means of untrue statements of a material fact or omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 895.03.

620.   From June 2018 to the present, the Defendants knowingly and willfully concealed or covered up, by their scheme, a material fact that there were operating a scheme in violation of Florida Law Section 895.03.

621.   The incidents described above occurred every Friday of the month between June 2018 and January 2024, during video zoom calls, calls "Investors' meeting). All of these meetings had the same or similar intents (repeatedly encouraging people to invest money or money based on lies, misrepresentations), resulting in members of the Class invested billions of dollars based on those intentional misrepresentations.

622.   Defendants, with intent to defraud members of the class received proceeds derived, directly or indirectly, from the pattern of racketeering activity, from investors.

623.   Defendants used or invested, directly or indirectly, such proceeds or the proceeds derived from the investment or use thereof, in the establishment and operation of the Omegapro Enterprise Ponzi Scheme in violation of Florida section 895.03, including but not limited to creating accounts with financial institutions, paying salaries, creating investor documents, creating business plans, travelling, etc., the further descriptions of which cannot be ascertained by Plaintiffs at the time of filing this Complaint.

624.   At all relevant times hereto, all Defendants agreed to and did use income or proceeds received from a pattern of racketeering activity to form, acquire, control, establish,

maintain, and operate the Omegapro Enterprise Ponzi Scheme, which was formed for the purpose of defrauding Plaintiffs, and which was engaged in and affected interstate and foreign commerce.

625.   All of the Defendants acted on behalf of Omegapro Enterprise Ponzi Scheme and each other in conducting the affairs of the businesses, have engaged in conduct in violation of article 460.

626.   The above -named Defendants were employed by and/or associated with the OmegaPro Enterprise Ponzi Scheme.

627.   At all relevant times, the Defendants conducted, participated in, directly or indirectly in such enterprise by engaging in all the incidents and predicate acts alleged above.

628.   Each incident described above had the same or similar intents (repeatedly lying, and misleading investors for the purpose of getting them to invest in the Ponzi Scheme).

629.   All the Defendants worked together as accomplices of each other and developed methods of commission that compensate them for each investor they brought into Omegapro or Go Global.

630.   At all relevant times, the Defendants individually were agents of, employed by or associated with the OmegaPro Enterprise Ponzi Scheme.

631.   In committing the acts plead herein, the Defendants received income derived from the Omegapro Enterprise Ponzi Scheme.

632.   Defendants used the income or proceeds therefrom in their acquisition, operation and maintenance of Omegapro Enterprise Ponzi Scheme, an enterprise which operates in and affects interstate and foreign commerce.

633.   At various times and places detailed in this complaint and in the accompanying exhibits, Defendants acquired and/or maintained, directly or indirectly, an interest in or control of the Omegapro Enterprise Ponzi Scheme.

634.   During the period from at least June 2018  through and including January 2024, all Defendants cooperated jointly and severally in the commission of two or more of the RICO predicate acts.

635.   Defendants committed two or more of the offenses referred to above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities.

### C.    Continuity

636.   The Omegapro Enterprise Ponzi Scheme was an ongoing organization, formal or informal, and functioned both as a continuing unit and has a common purpose of engaging in a course of conduct: unlawfully soliciting investors, obtaining their monies, and hiding their conduct.

637.   The Omegapro Enterprise Ponzi Scheme was "close-ended" in that the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, which were the mechanism employed by the Defendants to orchestrate the scheme, were executed from at least 2018 through November 22, 2022.

638.   The Omegapro Enterprise Ponzi Scheme is "open-ended" because the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, were part of the scheme's regular way of doing business, and because the Defendants have continued to engage in related predicate acts through the present day.

### D.  Damages and Causation

639.    The Plaintiffs are persons who have been injured by the fraudulent and racketeering activities of the Defendants.

640.    As a direct and proximate result of the Defendants' racketeering activities and violations of Florida Racketeering Act, Plaintiff has been injured in her property, causing Plaintiff to suffer monetary losses in the amount of not less than $50 billion dollars, with said damages to be proven at trial.

641.    There is a direct relation between the Defendants' conduct and the Plaintiffs' injury. Defendants' fraudulent representations that investor moneys would be invested in cryptocurrency through an automated investment trading platform, that potential investors would double their money within five months of investing by earning 5% weekly return, and that actual investors had earned, and were continuing to earn, at least 5% each week on their investments, together with their fraudulent omissions listed supra, was a substantial factor in each Plaintiff's decision to invest in the Omegapro Enterprise Ponzi Scheme. The direct victims of the Defendants' RICO violations were the Plaintiffs.

642.    As a proximate result of the Defendants' fraudulent actions, the Class suffer damages in the amount of $50 billion dollars, for which each of the Defendant, individually or severally liable to class members.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

## COUNT 15
## CONSPIRACY TO VIOLATE THE PROVISIONS

**OF FLORIDA RACKEETERING ACT ET SEQ.,**

643.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

644.   The above Defendants in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, namely, to engage in a pattern of racketeering activity described above.

645.   The Defendants knowingly and willfully became members of such conspiracy. At the time they joined the conspiracy, they did so with the specific intent to participate in the affairs of the criminal enterprise with the knowledge and intent that Andreas Szakacs, Michael Shannon Sims or their agents would engage in many incidents of racketeering described in paragraph above, as part of a pattern of racketeering activity. The following Defendants: Andreas Szakacs, Michael Shannon Sims, Steven Seagal, Dilawarjit Singh, Jordan Belfort, Nader Poordeljoo, participated in the affairs of OMEGAPRO.

646.   From June 2018  to about January 2024 by the above Defendants invited several investors to weekly investors' meeting. The purpose of the meetings was to discuss the performance of OMEGAPRO. The Defendants told investors that the company had bots to assist in investment and that the rate of returns was between five to ten percent weekly, and that their money was earning interest daily when the Defendants knew this was not true.

647.   The above Defendants participated in the Fraudulent Scheme, executing documents they knew to be false, including fake reports on return on investment.

648.   As a proximate result of the Defendants' willful participation in the fraudulent scheme, and recruiting investors, members of the class sustained economic damages for which the Defendants are severally and individually liable to the Plaintiffs.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

### COUNT 16
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

649.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

650.   Defendants' actions toward the Plaintiffs and other members of the Class constituted extreme and outrageous conduct and was done intentionally.

651.   Defendants fraudulently coerced members of the class to invest their entire life saving with a false promise of earning more than 5% weekly returns on their investments.

652.   Most of the members of class are not rich and are every-day immigrant who works very hard to save a little bit of money.

653.   The defendants recklessly, with total disregard for their wellbeing took their money for their own personal use.

654.   Defendants' extreme and outrageous conduct subjected the class members to emotional trauma, humiliation, severe emotional and physical distress.

655.   Defendants' actions and the ensuing damages to class members were foreseeable. Upon information and believe some class members have committed suicide upon finding out that OMEGAPRO was a Ponzi Scheme.

656.   As a result of Defendants' intentional actions, the Plaintiffs sustained injuries and damages for which each Defendant is individually and severally liable to Plaintiffs.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's damages caused to them by the Defendant's intentional infliction of emotional distress, including reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

### COUNT 17
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

657.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

658.   Plaintiffs owe a duty of care to the members of the class, that duty is an affirmative duty to tell the truth with regard to the nature of the investment in the Omegapro.

659.   Defendants working together and in concert breach that affirmative duty by repeatedly lying to the Plaintiffs about the nature of the business, the company, the platform, its functionality, and the return on investment.

660.   These lies were material because without them, members of the class would not have invested in Omegapro.

661.   Plaintiffs sustained emotional and economic damages because of the Defendants' actions.

662.   Those damages were foreseeable, and they are the direct result of Defendants' actions.

663.   Defendants' actions are the proximate cause of Plaintiff's injuries, "but for" Defendants actions Plaintiff would not have sustained the damages.

664.   Each named Defendant is individually and severally liable to Plaintiffs for all their damages.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's damages caused to them by the Defendant's intentional infliction of emotional distress, including reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

## COUNT 18
## EXEMPLARY PUNITIVE DAMAGES

665.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

666.   Defendants' actions alleged above were malicious, willful and wanton, and were made with specific intent to harm Plaintiffs.

667.   Defendants' actions alleged above violated 18 U.S.C. § 1343 and Florida Racketeering Act Section 895.03 et al.

668.   Defendants' actions alleged above constitute fraud and conspiracy to commit fraud.

669.   In order to deter such conduct in the future, Plaintiff should be awarded exemplary punitive damages in an amount of not less than $50 billion.

670.   Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury of all issues so triable that are raised herein, or which hereinafter may be raised in this action.

## COUNT 19
## STATUTORY CLAIM FOR FRAUDULENT CONVEYANCE

671.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

672.   Upon information and belief, Defendants developed and implemented a scheme to transfer assets to each other and others to place them outside of the reach of their creditors, including each member of the Class.

673.   The aforesaid transfers were made with actual intent to hinder, delay, or defraud the members of the Class and without receiving a reasonable equivalent value in exchange for the transfer or obligation.

**COUNT 20**
**VIOLATION OF FLORIDA**
**GENERAL BUSINESS LAW**

674.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

675.   The acts and practices of the Defendants alleged herein violated Florida law in that they constituted fraudulent practices, including a scheme to defraud, as defined in Florida Deceptive Practices Act.

**COUNT 21**
**INJUNCTIVE RELIEF**

676.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

677.   Unless Defendants are temporarily, preliminarily, and permanently enjoined from improperly and unlawfully depriving the members of the Class of their rights under the above-referenced implied contract, and from transferring assets to each other and others to place them outside of the reach of their creditors, the members of the Class will be immediately and irreparably harmed by present and/or future economic loss, which is presently incalculable.

678.   The members of the Class have no complete or adequate remedy at law.

679.   The members of the Class will suffer greater injury if an injunction is not granted than Defendants will incur if the injunction is granted.

680.   The public interest will be served by an injunction against Defendants by the enforcement of the requirements of the contract.

681.   By virtue of the foregoing, the Plaintiff has demonstrated a likelihood of success on the merits and that the balancing of equity favors issuance of an injunction against Defendants.

**COUNT 22**
**ACCOUNTING AND INSURANCE**

682.   Plaintiff incorporates the allegations of paragraphs 1-424 as if stated fully herein.

683.   Defendants must account for all transactions regarding their fraudulent scheme.

684.   Defendants must also provide the names, policy numbers, and contact information for their insurance companies, including but not limited to policies providing for general liability, professional liability, and errors and omissions, so the members of the Class can submit claims against the Defendants.

685.   The members of the Class demand that Defendants be required to produce a full and complete accounting of all transactions regarding their fraudulent scheme, including, but not limited to, all transfers of funds to accounts and/or third parties wherever they may be, as well as their insurance companies, insurance contact information, policy numbers, and coverage.

**COUNT 23**
**FAILURE TO SUPERVISE**
**(Against the City of Dubai, The United Arab Emirates)**

686.   Plaintiff incorporates the allegations of paragraphs 1 - 424 as if stated fully herein.

687.   At all times hereinafter mentioned, the City of Dubai and the United Arab Emirate are the employer of Sheikh Faisal Bin Sultan Al Qassimi, and Sheikh Mohammed Bin Maktoun Bin Juma Al Maktoum, both Sheikhs of Dubai and members of the UAE Royal family.[20]

---

[20]   Sheikh Faisal bin Sultan Al Qassimi (Arabic: الشيخ فيصل بن سلطان بن سالم القاسمي) is a member of the royal house of Al Qasimi who rule the Emirates of Sharjah and Ras Al Khaimah.

Sheikh Maktoum bin Mohammed bin Rashid Al Maktoum (Arabic: مكتوم بن محمد بن راشد آل مكتوم; born 24 November 1983) is an Emirati royal and politician who serves as minister of finance of the United Arab Emirates, deputy ruler of Dubai[1] and chairman of Dubai Media Incorporated. He was named as deputy ruler in February 2008 when his elder brother Hamdan was made Sheikh . He served as deputy ruler alongside his uncle Sheikh Hamdan bin Rashid Al Maktoum until the latter's death in March 2021. Since then until 2023, he was the sole deputy ruler under his father Mohammed bin Rashid Al Maktoum's reign. In April 2023, his younger brother Sheikh Ahmed bin Mohammed Al Maktoum was also named deputy ruler. In September 2021, he was appointed deputy prime minister and finance

688.   From February 2019 to about March 2022, the City of Dubai and the United Arab Emirate failed to properly supervise Defendants, the Sheikhs of Dubai, as a result of such failure the Sheiks participated in several public and private meetings with Defendant Andreas Zsakacks, American Actor Steven Seagal promoting the Omegapro Ponzi Scheme as noted in several pictures listed above.

689.   The participation of the Sheikh of Dubai in such public and private events with principals of a company engaged in criminal activities lend credence to the criminal enterprise, and many members of the class invested more money in Omegapro mainly because of the participation of the Prince of Dubai and the tacit acceptance of the City of Dubai and the Arab Emirate.

690.   Defendants have a specific duty to Plaintiffs to conduct themselves as a reasonable person would have in order to avoid giving the public that Omegapro was being endorsed by the crown Sheikhs of Dubai and the City of Dubai including the United Arab Emirates.

691.   As a result of such failure, members of the class sustained injuries that were foreseeable and preventable, had Defendants city of Dubai and the Arab Emirates counseled the Sheikhs and members of the royal family to refrain from participating in such events.

**COUNT 24**
**AIDING AND ABETTING FRAUD**
**(Against Sheikh Mohammed Bin Maktoum Bin Juma Al Maktoum, Crown Sheikh of Dubai, the City of Dubai and the United Arab Emirates, Steven Seagal, Jordan Belfort, Eric Worre and Marina Worre)**

692.   Plaintiffs incorporates by reference paragraphs 1-424 as if more fully set forth herein.

---

minister of the UAE.  Maktoum is also the chairman of Dubai Knowledge Park, formerly known as Dubai Knowledge Village, inaugurated in 2003.

693.   At all times hereinafter mentioned the above defendants participated directly of indirectly in the affairs of Omegapro.

694.   Between February 2019 and May 2020, the Defendants promoted Omegapro in Dubai in four separate public events. During each event, the Sheikh  of Dubai was in attendance, speaking and promoting Omegapro. In addition to the public events attended by the Prince of Dubai. There were videos and pictures of the Prince of Dubai accompanied by Andreas Szakacs and other named Defendants.

695.   The Sheikh of Dubai attended said meetings on behalf of the City of Dubai and the County of the United Arab Emirate. As such the Sheikh of Dubai was acted in his official capacity as a representative of his country and city.

696.   The Defendants knew that Omegapro was a Ponzi Scheme because French and Spanish authorities had issued a fraud alert a few months before the appearance of the Sheikhs of Dubai at the public event.

697.   The Defendants aided and abetted the commission of the fraud by promoting a business that Defendants knew or had reasons to know was fraudulent.

698.   As a result of the Defendants' actions or inactions, Plaintiffs suffered economic damages for which the Defendants are liable.

### IX.   JURY DEMAND

699.   Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable that are raised herein, or which hereinafter may be raised in this action.

### X.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as the Class representative.

2.      Finding that all defendants are jointly and severally liable for all damage caused to Plaintiffs.

3.      Awarding Plaintiffs monetary damages in an amount not less than $50 billion said amount to be proven at trial.

4.      Awarding Plaintiff enhanced (treble) monetary damages pursuant to 18 U.S.C. § 1964(c) and Florida Racketeering Act Section 895.02.

5.      Awarding Plaintiffs its litigation expenses, including reasonable attorneys' fees, costs, and disbursements.

6.       Awarding Plaintiffs punitive damages in the sum of not less than $ 100 billion or an amount otherwise to be decided by a jury.

7.      Granting such other relief as the case may require or as may be deemed proper and equitable.

**Dated** this September 17, 2025

Respectfully submitted,

**/s/ Wil Morris,**
MORRIS LEGAL, PC
2800 Biscayne Blvd, Suite 530
Miami, Florida 33137
(305) 444-3437
Fax: (305)444-3457
Toll Free: 1-866-815-1398
Email: Wilm@morrislegalfla.com

## CERTIFICATE OF SERVICE

I certify that on the date below, I caused a copy of Plaintiff's proposed Amended Complaint to be served on all counsel of records for defendants via CM/EFC court system.

Dated this 17th Day of September 2025.

/s/ Jolyon Wil Morris