**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-23359-CIV-ARTAU/D'ANGELO**

UNITED INVESTOR
COMMUNITY INC., et al.,

      **Plaintiffs,**

vs.

OMEGAPRO FOREX
TRADING LTD., et al.,

      **Defendants.**

_____/

## REPORT AND RECOMMENDATION
## GRANTING DEFENDANTS' MOTION TO DISMISS

**THIS CAUSE** is before the Court on Defendants Eric Worre, Marina Worre, Juan Carlos Reynoso Sr., Francisco Story, Jordan Belfort, and John Maxwell's Joint Motion to Dismiss Second Amended Complaint filed on October 1, 2025 (DE 250).[1]  Plaintiffs filed their Response in Opposition to Defendant's Motion to Dismiss on October 29, 2025 (DE 255), and Defendants replied on November 4, 2025 (DE 258).  On June 11, 2026, the Court held a hearing on the Motion, at which it heard the arguments of the Parties (DE 278).  Having considered the Parties' arguments, the relevant legal authorities, and the pertinent portions of the record, and being otherwise fully advised in the premises, for the reasons stated below, it is respectfully recommended that Defendants' Motion to Dismiss (DE 250) be **GRANTED.**

### I.    FACTUAL BACKGROUND

As set forth in the Second Amended Complaint, Plaintiffs United Investor Community, Inc., Lyadunni Udugba, and Olungbenga Bernard Adesuyi bring this action individually and on

---

[1] This case was referred to the undersigned Magistrate Judge for a Report and Recommendation on Defendants' Joint Motion to Dismiss Second Amended Complaint (DE 261).

behalf of a putative class of persons who allegedly purchased or otherwise acquired investment services from Defendants between January 2017 and January 2024 (DE 240 at 3).  Plaintiffs allege that Defendants defrauded hundreds of thousands of investors worldwide out of over ten billion dollars by promoting two related investment schemes: OmegaPro, Ltd. and GoGlobal, Ltd. (*id.* ¶ 1).  Plaintiffs allege that both platforms were illegal pyramid schemes promising profits of over 200% returns from cryptocurrency trading (*id.* ¶¶ 1, 4).  Specifically, Plaintiffs allege that OmegaPro promised 15-20% monthly returns and 200% returns on investment in 13-16 months and that GoGlobal promised returns of 5-10% per week (*id.* ¶¶ 5, 22).

According to Plaintiffs, the platforms were marketed as online cryptocurrency and Forex investment programs (*id.* ¶¶ 4, 19).  Investors allegedly understood that they would purchase cryptocurrency through outside platforms, transfer that cryptocurrency to OmegaPro or GoGlobal controlled accounts, and Defendants' trading platform would pool and trade those assets to generate weekly or monthly returns for investors (*id.* ¶¶ 112-118).  Plaintiffs further allege that Defendants helped investors, including elderly investors, create email accounts, open accounts with cryptocurrency platforms, such as Binance, Gemini, or Coinbase, purchase cryptocurrency on those platforms, and then transfer cryptocurrency from those platforms to accounts provided by OmegaPro or GoGlobal (*id.*).  In addition to the passive returns through cryptocurrency trading, Plaintiffs allege that investors could earn additional compensation by recruiting new investors (*id.* ¶¶ 6-8, 112, 156).  According to Plaintiffs, any investor who recruited a new investor would receive a 10% direct referral bonus for each new investor recruited and each new investment made, as well as additional recruitment bonuses (*id.* ¶ 118).

Defendants represented that investor cryptocurrency would be pooled and traded by OmegaPro's "experienced team of traders" on OmegaPro's own trading platform (*id.* ¶ 154).

OmegaPro allegedly calculated trading profits weekly, retained 30% of those profits as a performance fee, and distributed the remaining 70% among investors (*id.* ¶ 158). Plaintiffs also claim that OmegaPro posted weekly returns on investment and recruitment bonuses on its investor portal and represented that the recruitment bonuses were paid out of OmegaPro's 30% share of the weekly trading profits (*id.* ¶¶ 159-160). Investors could then either reinvest the funds from their "bonus accounts" into their "trading accounts" or withdraw the funds to outside cryptocurrency wallets (*id.* ¶¶ 161-164).

Plaintiffs allege, however, that Defendants were not actually using investor funds as represented. According to Plaintiffs, OmegaPro directed investors to send cryptocurrency to a payment processor that did not trade cryptocurrency for OmegaPro but merely stored it in OmegaPro wallets (*id.* ¶¶ 26, 153). Plaintiffs further allege that Defendants paid returns and bonuses using funds from new investors, transferred tens of millions of dollars' worth of cryptocurrency out of OmegaPro, and used various corporate entities to launder proceeds of the alleged Ponzi scheme (*id.* ¶¶ 29-31, 191, 209, 226, 672).

Plaintiffs also allege that Defendants made several misrepresentations concerning the legitimacy of the platform, including that OmegaPro was a registered hedge fund, that it was licensed and registered to trade cryptocurrency or Forex, and that GoGlobal was a registered hedge fund broker and financial advisor (*id.* ¶¶ 21-25, 175-187). Plaintiffs further allege that Defendants represented that investors could withdraw their funds at any time, but investors ultimately could not access or withdraw their money from OmegaPro or GoGlobal (*id.* ¶¶ 23, 164, 216-218). Moreover, Plaintiffs allege that each investor's account was designed to lead them to believe that their investment returns were growing daily, but each account depicted false earnings (*id.* ¶¶ 28, 144, 200-201).

Around November 2022, Plaintiffs claim that investors began experiencing withdrawal problems after several weeks of non-payment (*id.* ¶ 9).  OmegaPro purportedly announced that unknown hackers had disrupted its payment systems and taken control of investor data and accounts (*id.* ¶ 10).   Plaintiffs allege that OmegaPro then introduced Broker Group, Ltd., which investors were told would take custody of the affected accounts, to retrieve the funds and data and restore accounts within three to six months (*id.* ¶ 11).  Plaintiffs allege that by March 2023, OmegaPro had ceased communications, and its trading portal became inaccessible (*id.* ¶ 13).  Plaintiffs further allege that after OmegaPro's collapse, Defendants promoted GoGlobal as a successor fraudulent investment scheme (*id.* ¶ 17).  Plaintiffs claim that GoGlobal was supposed to replace OmegaPro and take over initial investor accounts, but investors were never able to withdraw their money from GoGlobal (*id.* ¶ 23).

According to Plaintiffs, Defendants marketed OmegaPro and GoGlobal through websites, investor portals, slide decks, weekly performance reports, social media, YouTube videos, WhatsApp groups, Instagram, Zoom meetings, and in-person events (*id.* ¶¶ 145, 150, 167).  Plaintiffs also allege that OmegaPro and GoGlobal used high-profile individuals, including individual Defendants Jordan Belfort, Steven Seagal, Les Brown, and Sheikh Mohammed Bin Maktoum Bin Juma Al Maktoum, to promote the platforms and create the appearance that the platforms were legitimate (*id.* ¶¶ 2, 67, 128, 310).

## II.   PROCEDURAL POSTURE

On August 31, 2024, Plaintiffs filed their initial Complaint containing twenty-six causes of action against Defendants (DE 1).  Plaintiffs thereafter filed their Amended Complaint on February 13, 2025 and subsequently filed a Second Amended Complaint on September 18, 2025 (DE 127, 240).  Plaintiffs assert twenty-four causes of action, including federal civil Racketeer Influenced

4

Corrupt Organizations Act ("RICO") claims for alleged violations of Title 18, United States Code, Sections 1962(a)-(d), in Counts I through IV, and Florida Civil RICO claims for alleged violations of Florida Statute Sections 895.03(1)-(4), in Counts XXII through XV (DE 240 ¶¶ 425-506, 568-648).  Plaintiffs also bring various state-law claims, including Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, Unjust Enrichment, Conversion/Theft/ Embezzlement, Common Law Fraud, Intentional Misrepresentation, Civil Conspiracy, Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Exemplary Punitive Damages, Statutory Claim for Fraudulent Conveyance, Violation of Florida General Business Law, Injunctive Relief, Accounting and Insurance, Failure to Supervise, and Aiding and Abetting Fraud, in Counts V through XI and Counts XVI through XXIV (DE 240 ¶¶ 507-567, 649-698).

Plaintiffs have not perfected service of process on all Defendants.  As of July 2026, the unserved Defendants include Andreas Szakacs, United Arab Emirates, City of Dubai, OneCoin Limited, Nader Poordeljoo, OmegaPro Forex Trading, Ltd., Go-Global, Ltd., Sheikh Mohammed Bin Maktoum Bin Juma Al Maktoum, Sheikh Saoud Faisal Sultan Al Qassimi Dilawarjit Singh, Ares Global, Ltd, Daniel Onoja, Steven Seagal, Frederick Safanko, Paulo Tuyman, A.K. Khalil, Robert D. Collazo Jr., Mahoussi Rodrigue Sodansou, Omnia Global Malta Limited, Gulf Capital, Ltd., Paulo Tuynman, Nevzat Dikmen, Riitta Dikmen, Omega World, Ltd, Mohamed Mehdi Cherif, Robert Velghe, Eric Thomas, Les Brown, Darin Kidd, Christopher Hamilton, Algo Capital, LLC, Gary Guilford, Viola Money (Europe) Limited, Marcus Todd Brisco, Juan Herman, Saeg Capital Management, LLC, Traders Domain Forex, Ltd, Yas Castellum Financial, LLC, Yas Castellum, LLC, Duncan Malcolm Arthur, Tin Quoc Tran, and John Does 1 to 1,000 (DE 214; DE 229; DE 281).

On January 31, 2025 Plaintiffs moved for default judgment against Defendants Algo Capital, LLC, Michael Shannon Sims, Holton Buggs, and Robert D. Collazo, Jr. for failure to respond to the Complaint or otherwise appear (DE 123).  On July 11, 2025, the undersigned recommended that Plaintiffs' Motion be denied, because Plaintiffs had not followed the proper procedure for obtaining default judgment and failed to demonstrate proper service of process on all defaulting Defendants (DE 207 at 5-8).  On September 9, 2025, the District Court adopted the undersigned's recommendation and denied Plaintiffs' Motion (DE 229).

On October 1, 2025, Defendants Eric Worre, Marina Worre, Juan Carlos Reynoso Sr., Francisco Story, Jordan Belfort, and John Maxwell ("Moving Defendants") filed their Joint Motion to Dismiss the Second Amended Complaint (DE 250).  On June 11, 2026, the Court held a hearing on Defendants' Motion, at which it heard the arguments of the Parties (DE 278).  At that hearing, the Court also directed Plaintiffs to file an updated status report identifying which Defendants remained unserved and describing Plaintiffs' recent efforts to serve any unserved Defendants. Plaintiffs filed a status report on July 8, 2026 (DE 281).  Plaintiffs did not report that service had been perfected on any of the unserved Defendants listed above, and the docket does not reflect executed summons as to any of those Defendants.

## III.   LEGAL STANDARD

### A.  Subject Matter Jurisdiction Under Federal Rule of Civil Procedure 12(b)(1)

Federal courts are courts of limited jurisdiction that are "empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution" and entrusted to them by a jurisdictional grant authorized by Congress.  *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999).  "When a federal court acts outside its statutory subject-matter jurisdiction, it violates the fundamental constitutional precept of limited federal

power." *Id.* "A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises." *Fitzgerald v. Seaboard Sys. R.R.*, 760 F.2d 1249, 1251 (11th Cir. 1985) (citation omitted). Courts must first determine whether there is subject matter jurisdiction before addressing the substantive issues. *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1352 (11th Cir. 2008) ("We first consider our jurisdiction."). If a court "determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### B. Failure to State a Claim Under Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this plausibility standard, a plaintiff must "plead [] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." (quotations omitted)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

Federal Rule of Civil Procedure 9(b) requires that claims of fraud be pled with particularity. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake."). "Claims that sound in fraud must comply not only with the plausibility standard articulated in *Twombly* and *Iqbal*, but also the heightened pleading requirements of Rule 9(b)." *Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 875 (11th Cir. 2023) (citation omitted). The Eleventh Circuit has held that Rule 9(b) is satisfied where the plaintiff alleges: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1380–81 (11th Cir.1997)).

## IV.   DISCUSSION

Moving Defendants seek dismissal of the Second Amended Complaint for failure to state a claim under federal and state law, failure to comply with Federal Rule of Civil Procedure 9(b) specificity requirements for fraud claims, lack of subject matter jurisdiction on the state-law claims, lack of personal jurisdiction as to the Worre Defendants and Defendant Story only, and violation of the statute of limitations as it relates to the state law claims (DE 250 at 15). They argue that Plaintiffs' federal RICO claims, 18 U.S.C. § 1961, *et seq.*, are deficient, because the alleged predicate acts are not pled with the particularity required by Rule 9(b), the Second Amended Complaint impermissibly groups Defendants together, and Plaintiffs do not allege facts sufficient to satisfy the elements of a civil RICO claim (*id.* at 16-32). Moving Defendants also contend that Plaintiffs' RICO claims are barred by the exception in Section 1964(c), prohibiting civil suits based on conduct that amounts to actionable securities fraud (*id.* at 30). Moving Defendants separately argue that if the federal RICO claims are dismissed, the remaining state-law claims should be dismissed for lack of subject matter jurisdiction and for lack of personal

8

jurisdiction as to specially appearing Defendants Eric Worre, Marina Worre, and Francisco Story (*id.* at 33). Finally, Defendants also argue that the state-law claims fail on their merits (*id.* at 36).

Plaintiffs maintain that the Second Amended Complaint alleges sufficient facts as to each Defendant and adequately pleads the existence of a RICO enterprise, predicate acts, and a pattern of racketeering activity (DE 255 at 2-14). Plaintiffs also argue that the securities fraud exception does not bar their claims, because the alleged OmegaPro and GoGlobal transactions were not securities (*id.* at 16-17). Specifically, Plaintiffs contend that the transactions do not qualify as investment contracts, because investors' own recruitment efforts played a primary role in their anticipated profitability (*id.*). Plaintiffs argue that the nationwide service of process provisions of Section 1965 provide the Court with both subject matter jurisdiction and personal jurisdiction (DE 255 at 17-18). Plaintiffs further argue that because the Second Amended Complaint adequately pleads federal RICO claims, the Court has subject matter jurisdiction based on a federal question and should continue to exercise supplemental jurisdiction over the state-law claims (*id.*).

As a threshold matter, the Court is mindful of its obligation to assure itself of both subject matter jurisdiction and personal jurisdiction before proceeding to the merits. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)."). At the June 11, 2026 hearing, the Parties agreed that as pled, the Court has subject matter jurisdiction over this action based on federal question jurisdiction under Title 28, United States Code, Section 1331. The Parties further agreed that the Court has personal jurisdiction over Defendants Eric Worre, Marina Worre, and Francisco Story through RICO's jurisdictional and service provisions. *See* 18 U.S.C. § 1965(a)-(d). Defendants clarified that they only contest the Court's subject matter

9

jurisdiction and personal jurisdiction if the federal RICO claims fail, at which point the Court must then consider the effect of that dismissal on its exercise of supplemental jurisdiction over the state-law claims and on personal jurisdiction over the specially appearing Defendants.  Accordingly, the Court begins with Defendants' argument that Plaintiffs' federal RICO claims should be dismissed pursuant to Rule 12(b)(6) and Rule 9(b).

### A.  The Securities Bar Applies to Plaintiffs' Federal RICO Claims

Section 1964(c) provides a private right of action for persons injured by a pattern of racketeering activity.  *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court.").  However, "[i]n 1995, Congress amended the federal RICO statute by enacting § 107 of the Private Securities Litigation Reform Act (PSLRA)."  *Rosh Chodesh II Ltd. P'ship v. Wimpfheimer*, No. 23-CIV-22148, 2025 WL 641300, at *4 (S.D. Fla. Feb. 4, 2025).  The amendment "creates a carve-out for RICO claims predicated upon conduct that would have been actionable as securities fraud."  *Starks v. Chuhak & Tecson, P.C.*, No. 17-CIV-62366, 2018 WL 11182716, at *8 (S.D. Fla. June 6, 2018).  Section 1964(c) now provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."  18 U.S.C. § 1964(c).

"[C]ourts have applied the RICO bar in § 1964(c) broadly, regardless of whether the plaintiff explicitly relied upon securities fraud as a predicate act or even had standing to pursue a securities fraud claim."  *Licht v. Watson*, 567 F. App'x 689, 693 (11th Cir. 2014).  "A plaintiff may not dodge this bar by pleading other offenses as predicate acts in a civil RICO action if the claim is based on conduct that would have been actionable as securities fraud."  *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1249 (11th Cir. 2016).  "This restriction applies even where a plaintiff

styles the RICO predicates as mail fraud or wire fraud." *Starks*, 2018 WL 11182716, at \*8; *see also Licht*, 567 F. App'x at 693 ("A plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud." (citation omitted)). Accordingly, the threshold question is whether the conduct alleged in the Second Amended Complaint would have been actionable as securities fraud.

Defendants argue that Plaintiffs' federal RICO claims are barred by Section 1964(c), because the Second Amended Complaint is, in substance, predicated on conduct that constitutes securities fraud (DE 250 at 30). Defendants point to the Second Amended Complaint's allegations that OmegaPro and GoGlobal solicited investors for cryptocurrency and Forex investment programs, promised guaranteed returns, represented that investor cryptocurrency would be pooled and traded by experienced traders on OmegaPro's trading platform, and described the platform as licensed, registered, and regulated (*id.* at 31-32). According to Defendants, Plaintiffs' earlier-filed complaint expressly characterized the alleged investments as securities (*id.* at 30). Defendants contend that Plaintiffs cannot plead around the bar by recasting securities-based allegations as mail fraud, wire fraud, money laundering, or general Ponzi-scheme conduct (*id.*).

Plaintiffs respond that the limitations in Section 1964(c) apply only to securities, and the only arguable security that could apply to this case is investment contracts (DE 255 at 16). Plaintiffs contend that the OmegaPro scheme, as alleged, is not an "investment contract" under the Supreme Court's *Howey* test (DE 255 at 16). Specifically, Plaintiffs argue that investors' own recruitment efforts played a primary role in their anticipated profitability, and therefore, any expected profits were not derived from the efforts of others (*id.* at 16-17). At the June 11, 2026 hearing, Plaintiffs also claimed that the first *Howey* prong was not satisfied, because there was no

11

actual exchange or investment of money, as Plaintiffs allege that Defendants never invested the funds as promised.  As a result, Plaintiffs argue that the securities bar in Section 1964(c) is inapplicable to this case (*id.*).

As an initial matter, Section 1964(c)'s bar relates to "conduct that would have been actionable as fraud in the purchase or sale of securities," not solely investment contracts, which is only one type of security.  18 U.S.C. § 1964(c); *see also Silberman v. Premier Beauty & Health LLC*, No. 20-CIV-21984, 2024 WL 1931488, at *3 (S.D. Fla. Jan. 26, 2024) ("The definition of a 'security' under the Securities Act includes 'investment contract(s).'" (citation omitted)).  The Securities Act of 1933 defines a "security" as:

> [A]ny note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1).  "Courts have also found, however, conduct keeping securities-fraud Ponzi schemes 'alive,' such as 'attracting investors to the Ponzi scheme or aiding the scheme with market-making to facilitate the sale of securities,' to fall within the RICO [securities bar]." *Chelder v. Gen. Conf. Corp.*, No. 25-CIV-4313, 2026 WL 696903, at *4 (S.D.N.Y. Mar. 12, 2026). (citation omitted).

Plaintiffs allege that Defendants operated a Ponzi scheme, whereby investors were promised profits from cryptocurrency trading but were paid from the cryptocurrency assets of other investors, and the referral bouses were likewise paid from new investor deposits rather than trading

profits (DE 240 ¶¶ 188-192).  "Ponzi schemes of the type alleged by Plaintiffs can trigger the RICO [securities bar] in at least two ways." *Chelder*, 2026 WL 696903, at *4.  For example, "[t]he sponsors of the scheme itself could use investor money to actually invest in securities." *Id.*  "Alternatively, the relationships between investors and scheme sponsors could constitute investment contracts, which themselves constitute securities." *Id.*  Even viewing allegations in the Complaint in the light most favorable to Plaintiffs, the implied contracts between Plaintiffs and OmegaPro promoters, such as Andreas Szakacs, Michael Shannon Sims, and Steven Seagal, constitute investment contracts subject to the securities bar.

In *S.E.C. v. W.J. Howey Co.,* the Supreme Court set forth the test for whether a transaction qualifies as an investment contract under *sec*urities laws:

> [A]n investment contract . . . means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

328 U.S. 293, 298-99 (1946).  That definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.*  The Eleventh Circuit "has divided the *Howey* test into the three elements: '(1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others.'" *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999) (citation omitted).

"The 'investment of money' required for an 'investment contract' need not be made in cash and refers more generally to 'an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses.'" *Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1348 (S.D. Fla. 2019).  In *Hodges*, the court held that investments

13

made in cryptocurrency satisfied the first prong of *Howey*. *Id.*  The court found, "Plaintiffs' investment of assets, even if such investments were in the form of cryptocurrencies such as Ether and/or Bitcoin, would satisfy the 'investment of money' prong for an investment contract." *Id.*; *see also Rensel v. Centra Tech, Inc.*, No. 17-CIV-24500, 2018 WL 4410126, at *5 (S.D. Fla. June 25, 2018) ("Plaintiffs investment of assets, in the form of Ether and/or Bitcoin, satisfies the 'investment of money' prong for an investment contract.").

The same reasoning applies here.  Plaintiffs allege that investors committed cryptocurrency assets to a purported digital investment platform based on representations that those assets would be used to generate investment returns (DE 240 ¶¶ 112-117).  The fact that the assets were cryptocurrency rather than cash is inapposite, as cryptocurrency constitutes an asset.  *See De Ford v. Koutoulas*, No. 22-CIV-652, 2025 WL 4086346, at *7 (M.D. Fla. Dec. 2, 2025) (finding the investment of money prong satisfied where "Plaintiffs purchased LGBCoins through various exchanges by converting US dollars into forms of cryptocurrencies, like Ethereum."); *See In re BitConnect Sec. Litig.*, No. 18-CIV-80086, 2019 WL 9104318, at *7 (S.D. Fla. Aug. 23, 2019) ("'It is well established that cash is not the only form of contribution or investment that will create an investment contract.' . . . Plaintiffs' investment of Bitcoin satisfies the first element of the *Howey* test.").  Nor does the fact that Defendants allegedly failed to use the assets as promised defeat the first *Howey* prong.  *See Unique Fin. Concepts, Inc.*, 196 F.3d at 1200 (noting the SEC has jurisdiction even when the "security purportedly traded is nonexistent or fictitious . . . A contrary result would encourage rather than curb fraud.").[2]  The relevant question is whether

---

[2] Although *Unique Financial Concepts* discusses the significance of a promoter's alleged failure to use investor funds as promised in the context of the common-enterprise prong, Plaintiffs advanced this argument in challenging the first *Howey* element.  Regardless of which *Howey* element is implicated, the alleged sham nature of the investment does not remove the transaction from securities laws.  *See Unique Fin. Concepts, Inc.*, 196 F.3d at 1200 ("Significantly, the fact

investors committed assets to the venture and thereby subjected themselves to financial loss. Plaintiffs' own allegations answer that question in the affirmative; Defendants allegedly helped investors open accounts on cryptocurrency platforms, purchase cryptocurrency, and transfer that cryptocurrency to OmegaPro's account for purposes of participating in the investment program (DE 240 ¶¶ 112-117).  Therefore, the first element of *Howey* is satisfied here.

As to the second element, "[t]he common enterprise element is defined as '[o]ne in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.'" *Villeneuve v. Advanced Bus. Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir. 1983), *reh'g en banc granted, judgment vacated* (Apr. 6, 1983), *on reh'g,* 730 F.2d 1403 (11th Cir. 1984).  "We have held that the fact that an investor's return is independent of that of other investors in the scheme is not decisive because the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the promoter." *Alunni v. Dev. Res. Grp., LLC*, 445 F. App'x 288, 295 (11th Cir. 2011). "The thrust of the common enterprise element test is that the investors have no desire to perform the chores necessary for a return, and are attracted to the investment solely by the prospects of a return." *Hodges*, 372 F. Supp. 3d at 1348 (quoting *Eberhardt v. Waters*, 901 F.2d 1578, 1580-81 (11th Cir. 1990)).

According to Plaintiffs, OmegaPro pooled investor cryptocurrency and represented that an experienced team of traders traded those pooled assets on OmegaPro's platform (DE 240 ¶¶ 112-118).  Plaintiffs further allege that OmegaPro calculated trading profits weekly, retained a portion of the profits as a performance fee, and distributed the remainder to investors as weekly ROI (*id.*

---

that an investment company's operations are a sham and thus might not actually satisfy the common enterprise prong of the *Howey* test does not mean that the investment company can avoid the Securities Act.").

¶ 112*, 156-158).   These allegations tie the investors' fortunes to the success and efficacy of OmegaPro and its promoters.  *See In re BitConnect Sec. Litig.*, 2019 WL 9104318, at *8 (holding the BitConnect Platform was the common enterprise where investors purchased BCC to earn investment returns, the value of BCC depended on defendants' operation of the lending and staking programs, and investors lacked the desire or capacity to operate those programs themselves).  That is sufficient to satisfy the common-enterprise prong.  *See Unique Fin. Concepts, Inc.*, 196 F.3d at 1200-01 (finding "the terms of the offer explicitly state that investors' funds will be pooled and apportioned proportionately by Appellants to each account" and such language "clearly presents an offer for an investment in a common enterprise").

The third *Howey* prong—whether Plaintiffs had an expectation of profits derived solely from the efforts of others—is also satisfied.  Plaintiffs argue that the Second Amended Complaint alleges that each investor's own recruitment efforts played a significant role in determining their profitability, because investors could earn referral bonuses by recruiting new investors (DE 255 at 16-17).  According to Plaintiff, these allegations defeat the third requirement that the expectation of profits be derived solely from the efforts of others (*id.*).  Yet, the Eleventh Circuit has held that the word "solely" in the third prong "is not interpreted restrictively." *Alunni*, 445 F. App'x at 296 (quoting *United States v. Wetherald,* 636 F.3d 1315, 1325 (11th Cir.2011)); *see also Hodges*, 372 F. Supp. 3d at 1349  ("Although *Howey* stated that the expectation of profits must come solely from the efforts of others, many courts, including the Eleventh Circuit, have rejected a literal or strict interpretation and have instead interpreted 'solely' to mean substantially or primarily"); *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975) ("The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.").  "[T]he crucial inquiry is the

16

amount of control that the investors retain under their written agreements." *Albanese v. Fla. Nat. Bank of Orlando*, 823 F.2d 408, 410 (11th Cir. 1987). Courts "look[ ] to the economic reality, focusing on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other party." *Wetherald,* 636 F.3d at 1325 (citation omitted).

Here, the economic reality alleged in the Second Amended Complaint is that investors were offered a passive investment opportunity. Plaintiffs allege that OmegaPro's website invited investors to earn income of up to 300% in the form of return on investments, OmegaPro promised monthly or weekly trading profits, OmegaPro represented that its experienced team would trade pooled cryptocurrency, and OmegaPro "exercised total discretion" over whether and how investor cryptocurrency would be traded (DE 240 ¶¶ 112, 156-158). Defendants allegedly advertised that investors could "earn without having to trade" and that "no experience" was needed (*id.* ¶ 156). Those allegations establish that Plaintiffs' expected investment returns depended primarily on OmegaPro's trading activity, platform operation, and managerial efforts, and they exercised little or no control over their assets once they were provided to Defendants. *See Unique Fin. Concepts, Inc.*, 196 F.3d at 1201 (finding the third *Howey* prong satisfied where the customer agreement gave defendants "the 'sole discretion to use the total funds' deposited by the investors.").

Plaintiffs' reliance on referral bonuses does not change the analysis. While the allegations in the Second Amended Complaint state that investors could earn referral bonuses for recruiting new participants, the existence of a recruitment component does not negate an investment contract where the scheme is promoted as an investment, and the essential managerial efforts remain with the promoters and managers. *See Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 784 (9th Cir. 1996) ("By the very structure of a pyramid scheme, participants' efforts are focused not on selling products but on recruiting others to join the scheme. . . . [T]his is enough to bring investments in

17

the program within the definition of 'investment contracts.'"); *In re BitConnect Sec. Litig.*, 2019 WL 9104318, at \*9 (recognizing BitConnect used a multilevel affiliate-marketing system that paid referral commissions and shares of later investments and finding the third *Howey* prong satisfied because nominal investor involvement did not defeat investment contract status where investors' profits depended on managers' and promoters' efforts). "In our view, the scheme is no less an investment contract merely because [the investor] contributes some effort as well as money to get into it." *Sec. & Exch. Comm'n v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973).

The third prong does not require that investors play no role whatsoever in generating returns for themselves. The inquiry is whether the expected profits depend primarily on the "undeniably significant" managerial or entrepreneurial efforts of others. *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 (5th Cir. 1974) (holding the existence of a recruitment component did not preclude an investment contract where the promoters retained the essential managerial and entrepreneurial efforts underlying the scheme). The Second Amended Complaint alleges not merely recruitment commissions, but also guaranteed or fixed returns, pooled cryptocurrency, weekly ROIs, performance fees, and representations that OmegaPro's experienced traders would generate profits (DE 240 ¶¶ 112-117). Thus, even accepting Plaintiffs' allegation that investor-driven recruitment bonuses contributed to some investor profitability, the alleged scheme still depended primarily on the efforts of OmegaPro and its promoters to operate the platform, calculate the ROI, maintain the investor portal, control pooled assets, and purportedly conduct trading activity.

*Chelder v. General Conference Corp.* is particularly persuasive on this point. There, like this case, the plaintiffs alleged a crypto-related Ponzi scheme that promised extraordinary returns while also rewarding investors for recruiting others. No. 25-CIV-4313, 2026 WL 696903, at \*1-6

18

(S.D.N.Y. Mar. 12, 2026). The *Chelder* plaintiffs also argued that the scheme did not satisfy *Howey's* third prong, because investors' recruitment efforts played a primary role in anticipated profitability. *Id.* at *4–5. The court rejected that argument, explaining that pyramid-style recruitment efforts do not defeat investment-contract status where the promoters retain control over the essential managerial conduct of the enterprise, and investor profits are tied to the success of the promotional scheme. *Id.* at *5. After surveying case law from across the country, the court concluded that the relationships between the investors and promoters constituted investment contracts, and the civil RICO claims were barred by Section 1964(c). *Id.* at *6–7. Similar to *Chelder*, the recruitment feature here does not transform the alleged investment relationship into something other than an investment contract, where the essential efforts affecting the success or failure of the enterprise came from OmegaPro, its principals, and its promoters—not the individual investors. Accordingly, the transactions between Plaintiffs and OmegaPro, as alleged, constitute investment contracts and are therefore securities.

Having concluded that Plaintiffs' investments were "investment contracts" and therefore securities, the Court next considers whether the alleged conduct amounts to actionable securities fraud, such that the RICO claims are barred under Section 1964(c). "To define what constitutes conduct actionable as fraud in the purchase or sale of securities, courts have consulted Section 10(b) of the Securities Exchange Act of 1934, which makes it unlawful to employ a deceptive device *in connection with* the purchase or sale of any security." *Rosh Chodesh II Ltd. P'ship*, 2025 WL 641300, at *4 (quotation omitted) (emphasis added). "[F]raudulent conduct is 'in connection with' the purchase or sale of securities when that alleged fraud 'coincides' with securities transactions and the events are 'not independent.'" *Adams v. Rothstein*, No. 11-CIV-61688, 2012 WL 1605098, at *5 (S.D. Fla. May 8, 2012) (quoting *SEC v. Zandford,* 535 U.S. 813, 822 (2002)).

19

Although not required, "[t]he 'in connection with' element is generally met when the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value . . . ." *Chelder*, 2026 WL 696903, at \*4; *see also Leisure Founders, Inc. v. CUC Int'l, Inc.*, 833 F. Supp. 1562 (S.D. Fla. 1993) (noting to state an action for securities fraud, the fraudulent misrepresentations must be in connection with the purchase or sale of securities, but does not require that fraud go to the nature or value of the securities).

"In determining whether misrepresentations coincided with the purchase or sale of securities, courts consider the allegedly fraudulent scheme as a whole." *Rosh Chodesh II Ltd. P'ship*, 2025 WL 641300, at \*4 (quotation omitted); *see also Licht*, 567 F. App'x at 693 ("Although Licht alleges that the defendants also engaged in wire fraud and mail fraud, this conduct was in furtherance of the defendants' overarching scheme to commit securities fraud."). Plaintiffs allege that Defendants induced investors to purchase cryptocurrency, transfer those assets to OmegaPro-controlled wallets, and participate in the OmegaPro investment program by making material representations concerning the nature of the investment itself (DE 240 ¶¶ 135-137, 151-158). Plaintiffs also allege that Defendants represented investor cryptocurrency would be pooled and traded by an experienced team of traders, that investors would receive guaranteed or fixed returns, that OmegaPro was properly licensed and regulated, that investor assets would generate profits through legitimate cryptocurrency trading, and that investors would be able to withdraw their funds at any time (*id.*). Plaintiffs allege that these representations were false, and they relied on them when deciding to invest (*id.* ¶ 144). The alleged misrepresentations were not collateral to the investment relationship; they were the very means by which Defendants solicited investments and induced investors to transfer assets into the OmegaPro platform. *See Sec. & Exch. Comm'n v. Complete Bus. Sols. Grp., Inc.*, No. 20-CIV-81205, 2021 WL 5407308, at \*7 (S.D. Fla. Nov. 19,

20

2021) (finding statements to investors related to insurance coverage were made to attract investors to purchase the securities offered and thus, "made in furtherance of the fraudulent scheme").

Plaintiffs also allege that Defendants continued making false representations regarding weekly ROIs, investor account balances, trading performance, regulatory legitimacy, and withdrawal rights to maintain investor confidence, discourage withdrawals, and continue attracting new investors (DE 240 ¶¶ 159-161, 174-179, 201).  The timing of those statements does not remove them from the alleged securities-fraud scheme.  Such conduct was "undertaken to keep a securities fraud Ponzi scheme alive" and thus, "is conduct undertaken in connection with the purchase and sale of securities."  *Dusek v. JPMorgan Chase & Co.*, 132 F. Supp. 3d 1330, 1354 (M.D. Fla. 2015), *aff'd,* 832 F.3d 1243 (11th Cir. 2016) (finding allegations that Defendant committed mail and wire fraud "by sending customers periodic trade confirmations reflecting trades in their accounts that, in fact, did not occur, and monthly account statements that stated falsely that the customers' money was invested in various securities" constituted conduct that "is integrally related to the purchase and sale of securities."); *Adams*, 2012 WL 1605098, at *6 ("[C]onduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities." (citation omitted)).

Nor can Plaintiffs avoid the securities bar by characterizing Defendants' conduct as mail fraud or wire fraud.  *See Goldberg for Jay Peak, Inc. v. Raymond James Fin., Inc.*, No. 16-CIV-21831, 2017 WL 7791564, at *9 (S.D. Fla. Mar. 27, 2017) ("A plaintiff may not dodge this bar by pleading other offenses as predicate acts in a civil RICO action if the claim is based on conduct that would have been actionable as securities fraud.") (citation omitted).  The Court must look to the substance of the alleged misconduct rather than labels attached to the predicate acts.  *See Licht*, 567 F. App'x at 693 (finding although the defendants allegedly engaged in wire and mail fraud,

21

"this conduct was in furtherance of the defendants' overarching scheme to commit securities fraud."). Viewed as a whole, the Second Amended Complaint alleges that Defendants induced investors to provide cryptocurrency assets based on misrepresentations concerning profitability, legitimacy, regulatory status, and investor protections and then perpetuated the same investment scheme through continuing misrepresentations designed to preserve investor confidence, prevent withdrawals, and facilitate new investments. *See Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1046 (11th Cir. 1986) (finding the "in connection with" requirement satisfied where "the purchase or sale of a security and the proscribed conduct are part of the same fraudulent scheme.").

Accordingly, because Plaintiffs' federal RICO claims rely on conduct that would have been actionable as fraud in connection with the purchase or sale of securities, Section 1964(c) bars Plaintiffs' federal civil RICO claims. Therefore, it is respectfully recommended that Counts I through IV of the Second Amended Complaint be dismissed with prejudice. *See Licht*, 567 F. App'x at 694 (affirming the district court's dismissal with prejudice and noting "[b]ecause the PSLRA bars this type of securities fraud from serving as a predicate act for RICO, the district court correctly found that amendment would be futile.").

### B. Failure to State a Claim Under RICO

Even if Counts I through IV were not barred by Section 1964(c), though they are, the claims would still fail, because the Second Amended Complaint does not adequately plead the necessary elements of a federal RICO claim. "To state a civil RICO claim, a plaintiff must allege (1) a civil violation of 18 U.S.C. § 1962; (2) injury to business or property; and (3) that the violation caused the injury." *Gibbs v. United States*, 517 F. App'x 664, 669 (11th Cir. 2013). "Section 1962 provides four subsections under which a plaintiff may claim a RICO violation." *Fuller v. Home Depot Servs., LLC*, 512 F. Supp. 2d 1289, 1293 (N.D. Ga. 2007). "Each of the four subsections allows

for a different cause of action depending on the defendant's alleged conduct in relation to an enterprise." *NardolillI v. Bank of Am. Corp.*, No. 12-CIV-81312, 2013 WL 12154541, at *6 (S.D. Fla. Dec. 5, 2013). Although the subsections require a plaintiff to plead and prove different things, "[e]ssential to any successful RICO claim are the basic requirements of establishing a RICO enterprise and a 'pattern of racketeering activity.'" *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004) (citation omitted); *see also Joseph v. Bank of Am., N.A.*, No. 11-CIV-3909, 2012 WL 13012507, at *7 (N.D. Ga. July 9, 2012) (noting "the different subsections require a plaintiff to plead and prove different things.").

### 1.  Pattern of Racketeering Activity

In a civil RICO action, a plaintiff "must identify and prove a pattern of racketeering activity, defined as two 'predicate acts' of racketeering activity within a 10 year period." *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1311-12 (11th Cir. 2000) (citing 18 U.S.C. § 1961(5)); *see also Saveljic v. Baytarian*, No. 25-CIV-20559, 2025 WL 1472758, at *3 (S.D. Fla. May 22, 2025) ("An essential element of any RICO claim is a pattern of racketeering activity."). "The phrase 'racketeering activity' is defined as including any act which is indictable under a lengthy list of criminal offenses, including the federal statutes prohibiting mail and wire fraud." *Langford*, 231 F.3d at 1312. "When the underlying allegations assert claims that are akin to fraud, the heightened pleading standards of Rule 9(b) apply to the RICO claims." *Miccosukee Tribe of Indians of Fla. v. Cypress*, 814 F.3d 1202, 1212 (11th Cir. 2015). Here, Plaintiff identifies three categories of predicate acts—mail fraud, wire fraud, and money laundering.[3]  Therefore, Plaintiff

---

[3] "At least one court in this District has held that the predicate act of money laundering, unlike mail or wire fraud, need not be pleaded with particularity because it lacks an element of fraud." *Saveljic*, 2025 WL 1472758, at *4, n.2 (citing *Wolff v. Leadenhall Bank & Tr.*, No. 03-CIV-22778, 2005 WL 8165194, at *7 (S.D. Fla. Apr. 1, 2005)); *but see Ageloff v. Kiley*, 318 F. Supp. 2d 1157, 1159 (S.D. Fla. 2004) (finding plaintiff failed to sufficiently allege the predicate act of money

must "provide detailed allegations identifying the who, what, when, where, and how of the alleged predicate acts, as Rule 9(b) requires." *Saveljic*, 2025 WL 1472758, at *4.

Mail and wire fraud requires: "(1) intentional participation in a scheme to defraud; and (2) the use of the interstate mails or wires in furtherance of that scheme." *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1099 (S.D. Fla. 2019) (citing *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009)). "A 'scheme to defraud' requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." *Id.* "But alleging a scheme is not enough — under Rule 9(b), Plaintiff must plead the fraud with particularity." *Saveljic*, 2025 WL 1472758, at *5. "That means setting out: '(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled [the plaintiff]; and (4) what the defendants gained by the alleged fraud.'" *Id.* (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010)).

Measured against those standards, Plaintiffs' predicate act allegations in the Second Amended Complaint are wholly deficient. Plaintiffs allege in a sweeping, collective fashion that "all Defendants" cooperated "jointly and severally" in devising a scheme to defraud, "mailed something or caused other people to mail something," "used interstate wire communication facilities, and caused others to use interstate and foreign wire communication facilities" to carry

---

laundering with the particularity required under Rule 9(b)); *Rubinstein v. Keshet Inter Vivos Tr.*, No. 17-CIV-61019, 2018 WL 8899231, at *4 (S.D. Fla. Oct. 29, 2018), *report and recommendation adopted*, No. 17-CIV-61019, 2018 WL 8899306 (S.D. Fla. Nov. 15, 2018) (finding allegations of money laundering "fall[] far short of meeting the pleading requirements under Rule 9(b)"). Plaintiffs did not argue that they do not need to meet the heightened pleading standard for fraud, so any such argument has been waived. *See Shah v. Spirit Airlines, Inc.*, No. 24-CIV-21143, 2024 WL 4527353, at *3 (S.D. Fla. Oct. 18, 2024) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.") (quoting *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009)).

24

out and conceal the scheme (DE 240 ¶¶ 441-43).  As the Eleventh Circuit stated, complaints alleging a RICO claim do not meet the Rule 9(b) standard where the complaint is "devoid of specific allegations with respect to the separate Defendants" and simply "lump[] together all of the Defendants in their allegations of fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997).

Moreover, Plaintiffs fail to allege how or in what way each Defendant participated in the purported mail or wire fraud.  Plaintiffs do not identify any mailing, who sent it, who received it, when it was sent, what it contained, how it furthered the alleged scheme, or which Moving Defendant was responsible for it.  Alleging that Defendants "mailed something" or caused someone else to "mail something" is plainly not enough.  *See Halpin v. David*, No. 06-CIV-457, 2009 WL 1753759, at *12 (N.D. Fla. June 22, 2009) (finding plaintiff's allegation that "Defendants Alcorn and Dugger sent bids for contracts" provided "no indication of who mailed what to whom, or when.").  Likewise, Plaintiffs do not identify the specific fraudulent communications made by each Moving Defendant.  Nor do they identify when and where each communication was made, whether any of the named Plaintiffs heard or saw the statement, how the statement misled Plaintiffs, and what Defendants gained.  *See Saveljic*, 2025 WL 1472758, at *5 (finding plaintiff failed to establish predicate acts of mail and wire fraud when plaintiff "never describe[d] the contents of [the] communications, who sent them, or how they misled him").

Plaintiffs argue that they satisfy the heightened pleading standard under Rule 9(b), because they included Defendant-specific allegations detailing the misrepresentations made by each Moving Defendant (DE 255 at 14).  But, the inclusion of separate headings in the Second Amended Complaint for each Moving Defendant, does not, by itself, satisfy Rule 9(b).  *See Brooks*, 116 F.3d at 1381 ("To maintain a RICO action, at a minimum, the plaintiffs must allege sufficient facts with

enough specificity to show probable cause that the predicate acts were committed."). Plaintiffs'

allegations must identify the particular fraudulent statements or omissions attributable to a specific

Defendant, when and where those statements were made, who heard or received them, how they

misled Plaintiffs and what each Defendant obtained as a result. *See Am. Dental Ass'n*, 605 F.3d at

1291-92 (finding plaintiff failed to adequately plead mail or wire fraud where plaintiff did "not

point to a single specific misrepresentation by Defendants" nor did plaintiffs "allege the manner

in which they were misled by the documents, as they are required to do under Rule 9(b)"). The

Second Amended Complaint contains no such allegations.

Next, Plaintiffs assert that certain Moving Defendants appeared in recorded promotional

content, participated in live or virtual presentations, endorsed OmegaPro or GoGlobal on social

media, and repeated and/or ratified the enterprise's general message concerning returns, licensing,

banking affiliations, and withdrawal access (DE 240 ¶¶ 292-309, 318-322, 327-348).

Nevertheless, these allegations are too general to plead mail or wire fraud with particularity (*id.*).

For example, Plaintiffs allege that "[Defendant] Belfort's appearance and endorsement were used

to lend legitimacy to OmegaPro's uniform sales script" and that "Plaintiffs recognized [Defendant]

Belfort as one of the 'Trainers/major influencers' whose participation induced investment" (*id.* ¶

337). Plaintiffs do not identify the content of any specific communication, the date and location

of where it was made, which particular Plaintiff heard the communication, and how it was relied

upon. *See Solomon v. Blue Cross & Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1293 (S.D. Fla.

2008) ("Plaintiff must set forth in the complaint as to each Defendant the 'who, what, when, where

and how' about the fraud that took place.").

Even where the Second Amended Complaint provides a date or date range, it still does not supply the necessary Rule 9(b) details.  For example, Plaintiffs allege that Marina Worre delivered on stage presentations at an October 29 to November 3, 2022 event in the Maldives.  Plaintiffs claim that Defendant M. Worre promoted "Pulse/XLP," and she warned that failure to embrace Pulse/XLP would mean "loosing opportunities" (*id.* ¶ 304).  In any event, Plaintiffs do not explain how this statement was fraudulent, what Pulse/XLP is, or how it relates in any way to OmegaPro or GoGlobal.  Nor do Plaintiffs identify who heard the statement other than the "OmegaPro community members" in general, how Plaintiffs relied on the statement, or what Defendant M. Worre gained.  Of the entire 699 paragraphs contained in the Second Amended Complaint, this deficient allegation is the most specific.  Similarly, Plaintiffs allege that John Maxwell conducted a virtual training seminar on September 23, 2022 (*id.* ¶ 342).  Yet, the allegations contain no mention of any specific statement made by Defendant Maxwell.  Rather, Plaintiffs allege only that Defendant Maxwell's "appearances and endorsements amplified OmegaPro's core misrepresentations" without explaining how they did so (*id.* ¶ 344).  *See Kerfoot v. FNF Servicing, Inc.*, No. 13-CIV-33, 2013 WL 5797662, at *4 (M.D. Ga. Oct. 25, 2013) (finding plaintiffs "did not identify any specific deceptive content of the communications, nor did they describe how the content misled them, as required under Eleventh Circuit law.").

The money laundering allegations in the Second Amended Complaint fare no better.  To plead money laundering as a RICO predicate, a plaintiff must allege facts showing that a defendant conducted a financial transaction involving proceeds of specified unlawful activity, with the required knowledge and intent to promote unlawful activity or conceal the source, ownership, or control of the proceeds.  *See* 18 U.S.C. §§ 1956, 1957; *see also Saveljic*, 2025 WL 1472758, at *5 ("To qualify as a predicate act under RICO, money laundering demands more than conclusory

labels — rather, it requires 'allegations that a person conducted a financial transaction with money he knew to be the proceeds of unlawful activity, with the intent to promote the carrying on of specified unlawful activity, knowing that the transaction is designed to conceal or disguise the source or nature of the activity.'") (citation omitted).  Plaintiffs provide no allegations supporting those elements.  The Second Amended Complaint does not identify any specific transaction by any Moving Defendant, the unlawful proceeds involved, or facts showing that the transaction was designed to promote or conceal unlawful activity.  Because Plaintiffs fail to adequately plead at least two predicate acts, they also fail to plead a pattern of racketeering activity.

Plaintiffs' attempt to establish a pattern of racketeering activity fails for another reason.  To successfully allege a pattern of racketeering activity, a plaintiff must also plead sufficient facts to show that "the predicate acts were related to one another" and that "the predicate acts demonstrated criminal conduct of a *continuing* nature."  *Jackson*, 372 F.3d at 1264; *see also In re Sahlen & Assocs., Inc. Sec. Litig.*, 773 F. Supp. 342, 365–66 (S.D. Fla. 1991) ("[T]o prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.") (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239 (1989)).  "A plaintiff can establish continuity by (1) either proving a series of related predicate acts extending over a substantial period of time (close ended continuity), or (2) by establishing that the predicate racketeering acts themselves include a specific threat of repetition or that the predicate acts are part of an ongoing entity's regular way of doing business (open ended continuity)."  *Townsend v. City of Miami*, No. 03-CIV-21072, 2007 WL 9710944, at *3 (S.D. Fla. Nov. 7, 2007).

28

Plaintiffs argue that they have sufficiently alleged the predicate acts were related and constitute both open ended and close ended continuity (DE 255 at 14). However, the Second Amended Complaint largely recites conclusory assertions that Defendants committed "thousands" of related predicate acts over a multi-year period and that those acts were part of the scheme's regular way of doing business (DE 240 ¶¶ 445-446). Since Plaintiffs do not identify any particular mailings, wire communications, or money laundering transactions attributable to Moving Defendants, the Court cannot determine whether any such acts were related to one another or whether they demonstrate the continuity required to plead a RICO pattern of racketeering. *See Gore v. Eichholz*, No. 491-CIV-084, 1992 WL 96316, at \*5 (S.D. Ga. Apr. 24, 1992) ("Because the Gores have failed to plead the predicate acts of mail and wire fraud with specificity, the Court cannot, at this point, determine whether the predicate acts are sufficiently related to constitute a pattern, as defined by the Supreme Court."). In sum, Plaintiffs fail to allege that Moving Defendants engaged in a pattern of racketeering, which is required to state a federal RICO claim.

### 2. Racketeering Enterprise

Additionally, Plaintiffs' federal RICO claims fail, because the Second Amended Complaint does not adequately plead the existence of a racketeering enterprise. Section 1961(4) defines "enterprise" broadly to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity . . . ." 18 U.S.C. § 1961(4). Plaintiffs argue that their allegations demonstrate the Corporate Defendants, which Plaintiffs label as the "Omegapro Enterprise Ponzi Scheme," are an association-in-fact enterprise under the RICO statute (DE 255 at 12). "[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). "To plead an association-in-fact enterprise, the Supreme Court has held that a plaintiff

29

must allege that a group of persons shares three structural features: (1) a 'purpose,' (2) 'relationships among those associated with the enterprise,' and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (citation omitted); *see also Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) ("[A]n associated-in-fact enterprise can be either 'formal or informal,' as long as the enterprise's 'various associates function as a continuing unit.'" (citation omitted)).

Though Plaintiffs identify the enterprise as the Corporate Defendants collectively, they do not plausibly allege the existence of an association-in-fact enterprise with the required features (DE 240 ¶¶ 427–31). For example, there are no well-pled facts showing a shared purpose among all alleged participants, defined relationships among them, or a coordinated decision-making framework that would allow the group to function as a continuing unit. *See Almanza*, 851 F.3d at 1068 (finding "[t]o show that Defendants acted as a continuing *unit*, and not merely independently," plaintiff needed to plead more than conclusory allegations asserting that defendants entered an agreement, and instead, "must allege a further circumstance pointing toward a meeting of the minds."). Moreover, Plaintiffs do not adequately allege how each Moving Defendant was connected to, controlled, acquired an interest in, used income in, or conducted the affairs of the alleged enterprise. *See Bill Buck Chevrolet, Inc.*, 54 F. Supp. 2d at 1132 ("The essence of a RICO violation is a defendant's conduct in relation to an enterprise."). At most, the Second Amended Complaint alleges that Moving Defendants promoted OmegaPro or GoGlobal, appeared in promotional content, participated in presentations, or endorsed the platforms. Even when taken as true and viewed in the light most favorable to Plaintiffs, those allegations do not plausibly show the role each Moving Defendant played in the alleged enterprise, the relationships

among them, or the existence of a cohesive enterprise separate from the alleged racketeering activity itself.  This is fatal to Plaintiffs' federal RICO claims.

These deficiencies are compounded by the Second Amended Complaint's failure to clearly identify the statutory basis for each federal RICO count.  This is not a mere technical defect.  The subsections of Section 1962 impose different requirements.  Courts in our Circuit have explained:

> The essence of a RICO violation is a defendant's conduct in relation to an enterprise. 18 U.S.C. § 1962(a) makes it unlawful to invest income derived from a pattern of racketeering in an enterprise. Section 1962(b) makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering activity. And Section 1962(c) makes it unlawful to conduct or participate in an enterprise's affairs through a pattern of racketeering activity. Moreover, the different RICO sections require plaintiffs to prove different things. For example, under § 1962(c), the plaintiff must show that the enterprise and the defendant are different entities; under § 1962(a), however, the defendant may be the enterprise. Thus, it is essential to plead precisely in a RICO case the enterprise alleged and the RICO section allegedly violated.

*Bill Buck Chevrolet, Inc.,* 54 F. Supp. 2d at 1132 (M.D. Fla. 1999) (quoting *Reynolds v. East Dyer Dev. Co.,* 882 F.2d 1249, 1251 (7th Cir.1989)).  Similarly, courts have concluded that the different RICO subsections require a plaintiff to plead and prove different causation and injury theories.  *See Lockheed Martin Corp. v. Boeing Co.,* 357 F. Supp. 2d 1350, 1369 (M.D. Fla. 2005) ("In contrast to the injury requirement under § 1962(c), which may be satisfied by harm alleged to be the result of racketeering activity, a majority of courts that have addressed the issue have determined that a claimant under § 1962(a) must plead an injury which stems not 'from the racketeering predicate acts themselves' but from the 'use or investment of . . . racketeering income.'" (citation omitted)).

At the June 11, 2026 hearing, Plaintiffs' counsel stated that Count I proceeds under Section 1962(c) and Count II proceeds under Section 1962(b).  But, Plaintiffs' counsel could not clearly identify the statutory basis for Count III and ultimately suggested that Count III may also proceed

31

under Section 1962(b), even though Count II already invokes that subsection. That uncertainty matters, because Count III is styled as a use-of-income claim, which seemingly corresponds to Section 1962(a), but the body of the count alleges that Defendants acquired or maintained an interest in or control of an enterprise, which corresponds to Section 1962(b) (DE 240 ¶¶ 469-471). The Court cannot rewrite Plaintiffs' RICO theories or plead the correct claim on Plaintiffs' behalf, particularly where such choices affect the applicable elements, including whether distinctness must be shown and what type of enterprise and injury must be pled. *See United States v. Eldick*, 223 F. App'x 837, 839 (11th Cir. 2007) ("A plaintiff may not impose upon the district court the burden of sorting out the facts, deciding which legal theories apply, and deciding which one is his best avenue to recovery."). Accordingly, the Court cannot properly assess Counts I, II, and III, and even if the Court could reach the elements, Plaintiffs have not adequately pled the necessary enterprise to sustain their federal RICO claims.

### 3. RICO Conspiracy

In Count IV, Plaintiffs bring a claim for Conspiracy to Engage in a Pattern of Racketeering Activity under Section 1962(d) (DE 240 ¶¶ 487-506). "Under § 1962(d), it is unlawful to conspire to violate § 1962(a), (b), or (c)." *Est. of Lambou*, 2025 WL 1807475, at *19 (N.D. Fla. June 24, 2025). "Although a defendant may be held liable for a conspiracy claim under § 1962(d) even if the defendant is not liable for the underlying offense itself, 'if the underlying allegations of RICO violations are not viable, a conspiracy claim based on those violations must also fail.'" *Joseph*, 2012 WL 13012507, at *9 (quoting *Fuller*, 512 F. Supp. 2d at 1295); *see also Jackson*, 372 F.3d at 1269 ("If the underlying cause of action is not viable, the conspiracy claim must also fail."). Since Plaintiffs failed to state a substantive RICO claim under Sections 1962(a), (b), or (c), any claim under Section 1962(d) also fails.

As explained above, the substantive RICO claims are not viable as pled for various reasons. The pattern of racketeering is not adequately alleged, and Plaintiffs fail to sufficiently plead the existence of an enterprise. Plaintiffs also fail to identify the specific violations and the applicable subsections of Section 1962.  Nor does the Second Amended Complaint contain adequate allegations of a conspiracy.  *See Audette-Weaver v. J.G. Wentworth, S.S.C., L.P.*, No. 07-CIV-2056, 2008 WL 11336685, at *7 (M.D. Fla. Feb. 26, 2008) (noting plaintiffs' conspiracy claim fails because "a plaintiff must allege facts, not merely conclusions, showing that each defendant either agreed to the overall objective of the conspiracy or, absent agreement on the overall objective, agreed to commit at least two predicate acts."); *see also Babieca Cap., LP v. Cohen Anytime, Inc.*, No. 24-CIV-24460, 2025 WL 1488524, at *10 (S.D. Fla. May 23, 2025) (noting "Plaintiff premises its conspiracy claim solely on the allegations supporting the substantive claim[,]" and "if there are no additional allegations supporting a RICO conspiracy claim, and the substantive RICO claim's allegations are insufficient, the conspiracy claim must fail.").

Here, Plaintiffs do not identify who participated in the conspiracy or allege any facts to show an agreement to violate one of RICO's substantive provisions.  *See Audette-Weaver*, 2008 WL 11336685, at *7 (finding "Plaintiffs do not identify precisely who they claim participated in the conspiracy" to support a Section 1962(d) claim).  Rather, Plaintiffs only state conclusory assertions that Defendants conspired and "agreed together and with others to violate 18 U.S.C. § 1962(a) and (c)" (DE 240 ¶ 489).  Lastly, as set forth above, Plaintiffs' substantive RICO claims are subject to the securities bar in Section 1964(c).  As other courts in this District have held, "[w]hen section 107 of the PSLRA precludes a plaintiff's RICO claims, it likewise precludes any corresponding RICO conspiracy claims." *Woods v. Michael*, No. 20-CIV-80651, 2021 WL

1055816, at *3 (S.D. Fla. Feb. 10, 2021), *aff'd*, No. 21-CIV-10818, 2021 WL 3355459 (11th Cir. Aug. 3, 2021). Accordingly, Plaintiffs have failed to state a claim under Section 1962(d).

### C. Supplemental Jurisdiction Over Plaintiffs' State Law Claims

The Parties agree that the Court's subject matter jurisdiction attaches to Plaintiffs' federal RICO claims under Section 1962 in Counts I through IV, and Plaintiffs ask the Court to exercise supplemental jurisdiction over their state-law claims in Counts V through XI and Counts XVI through XXIV (DE 240 ¶¶ 425-506, 568-648). However, Plaintiffs' RICO claims are precluded by the securities bar in Section 1964(c), and even if the claims were not barred, the allegations fail to state a claim upon which relief can be granted. The Second Amended Complaint also fails to establish complete diversity under Section 1332, because Plaintiffs and multiple Defendants are alleged to be citizens of Florida (*id.* ¶¶ 51, 58-103). Upon the dismissal of the federal RICO claims, Defendants argue that the Court should decline to exercise supplemental jurisdiction over the remaining state-law claims. Plaintiffs do not materially respond to Defendants' argument. Rather, Plaintiffs maintain that the Second Amended Complaint adequately pleads federal RICO claims, and the Court has supplemental jurisdiction to hear the state-law claims (DE 255 17-18).

"A district court may decline to exercise supplemental jurisdiction over a claim if, *inter alia*, 'the district court has dismissed all claims over which it has original jurisdiction.'" *Humana Inc. v. Teva Pharms. USA, Inc.*, 787 F. Supp. 3d 1298, 1307 (M.D. Fla. 2025) (quoting 28 U.S.C. § 1367(c)). In making this determination, the Court should consider factors such as "comity, judicial economy, convenience, fairness, and the like." *Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir. 1999). "Although this decision is discretionary, the dismissal of state law claims is strongly encouraged where the federal claims are dismissed prior to trial." *Audette*-Weaver, 2008 WL 11336685, at *7; *see also Busse v. Lee Cnty., Fla.*, 317 F. App'x 968, *4 (11th Cir. 2009)

34

("[W]e expressly encourage district courts to [refrain from exercising supplemental jurisdiction over state-law claims] when all federal claims have been dismissed pretrial"). Plaintiffs provide no basis why this Court should exercise jurisdiction over the remaining claims, and the Court cannot discern any basis upon its own review of the record.[4] Therefore, in the interest of judicial economy and convenience, it is respectfully recommended that the Court decline to exercise its supplemental jurisdiction over the remaining state-law claims in this action.[5]

### D.  The Remaining Unserved Defendants and Diligent Prosecution of this Case

To the extent any claims in the Second Amended Complaint survive, though it is the undersigned's recommendation that none do, Plaintiffs have failed to demonstrate reasonable progress toward effectuating service on numerous unserved Defendants despite nearly two years passing since this action was commenced. The original Complaint was filed on August 31, 2024 (DE 1). Since that time, the Court has repeatedly directed Plaintiffs to provide updates regarding service of process on the unserved Defendants. In July 2025, Plaintiffs represented that service was "pending" on numerous foreign Defendants through Hague Convention procedures, letters rogatory, and diplomatic service through the United States Department of State (DE 214 at 2).

---

[4] The Eleventh Circuit's decision in *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1220 (11th Cir. 2020) held that the district court retained original jurisdiction over the state-law claims under the Class Action Fairness Act ("CAFA") after dismissal of the federal claims. *Cisneros*, however, is distinguishable. There, the plaintiff expressly alleged CAFA as an independent basis for subject matter jurisdiction in the complaint, and the Eleventh Circuit concluded that the complaint adequately pleaded CAFA's jurisdictional requirements. *Id.* Here, by contrast, Plaintiffs do not invoke CAFA or allege jurisdiction pursuant to Section 1332(d). Instead, the Second Amended Complaint asserts federal question jurisdiction under Section 1331 based on the federal RICO claims, diversity jurisdiction based on Section 1332(a), and supplemental jurisdiction based on Section 1367. Accordingly, *Cisneros* does not suggest an independent basis for subject matter jurisdiction in this action.

[5] Since it is respectfully recommended that the Court decline to exercise supplemental jurisdiction over the remaining state-law claims, the undersigned does not address the personal jurisdiction arguments raised by the Worre Defendants and Defendant Story.

35

Plaintiffs also represented that they were continuing efforts to locate and serve several domestic Defendants (*id.* at 3).

Nearly a year later, Plaintiffs' July 2026 status report reflects substantially the same situation (DE 281). With respect to the unserved foreign Defendants, Plaintiffs again report that service remains pending through diplomatic channels or Hague Convention procedures, and they continue to await confirmation from the Department of State or foreign authorities (*id.* at 4-5). Despite advising the Court that service has stalled, because the Department of State has not provided confirmation or otherwise acted on the service requests, Plaintiffs have not sought any relief from the Court regarding those delays, requested alternative service procedures, or otherwise addressed the lack of progress. Although Federal Rule of Civil Procedure 4 does not specify a time frame to effectuate service in a foreign county, this "does not mean that the plaintiff enjoys an unlimited amount of time to effectuate service." *Naseer v. Mirabella Found.*, No. 608-CIV-1360, 2009 WL 10706234, at *5 (M.D. Fla. Feb. 19, 2009). "[A] plaintiff's complaint may be dismissed upon a showing that she failed to exercise diligence in attempting to effectuate service on a foreign defendant." *Harris v. Orange S.A.*, 636 F. App'x 476, 486 (11th Cir. 2015). In this case, there are several foreign Defendants who remain unserved, and Plaintiffs have not identified additional efforts they have made to accomplish service over the past year. It is respectfully recommended that if this action survives, the Court issue an Order to Show Cause as to why any unserved foreign Defendants should not be dismissed.

Notably, the record is particularly concerning as to the domestic Defendants that remain unserved. On January 31, 2025, Plaintiffs moved for default judgment against Defendants Algo Capital, LLC, Michael Shannon Sims, Holton Buggs, and Robert D. Collazo, Jr. (DE 123). The undersigned recommended denial of that Motion, because Plaintiffs failed to establish proper

service and otherwise failed to satisfy the procedural requirements for entry of default judgment (DE 207 at 5-8). On September 9, 2025 the District Court denied the Motion for Default Judgment (DE 229). Since that time, Plaintiffs have not demonstrated proper service on Algo Capital, LLC and Robert D. Collazo, Jr., nor have Plaintiffs renewed their request for default judgment as to Michael Shannon Sims and Holton Buggs after correcting the deficiencies previously identified by the Court.

The July 2026 status report also omits several Defendants previously identified as unserved in Plaintiffs' July 2025 status report (DE 214 at 3). Plaintiffs neither represent that service has been accomplished as to those Defendants nor explain why they are no longer included in the updated status report. The docket does not reflect executed service as to those Defendants. Thus, the present record does not counsel in favor of finding that Plaintiffs are exercising continuing diligence to serve the remaining unserved Defendants, foreign and domestic, and prosecute this case. Accordingly, to the extent that any causes of action survive, it is respectfully recommended that the Court issue an Order to Show Cause as set forth herein.

## V.   CONCLUSION

Based on the foregoing, it is respectfully recommended that Defendants' Motion to Dismiss (DE 250) be **GRANTED** and that the federal RICO claims in Counts I through IV be **DISMISSED WITH PREJUDICE** and the remaining state-law claims in Counts V through XXIV be **DISMISSED WITHOUT PREJUDICE.** It is further respectfully recommended that all pending motions be **DENIED AS MOOT** and that the Clerk of Court be directed to **CLOSE** this case.

## VI.   OBJECTIONS

The parties will have **fourteen (14) days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Ed Artau, United States District Judge. Failure

to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in this Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report, except upon grounds of plain error, if necessary, in the interest of justice.  28 U.S.C. § 636(b)(1) (2009); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on this 30th day of July, 2026.

_____
ELLEN F. D'ANGELO
UNITED STATES MAGISTRATE JUDGE

cc:    All Counsel of Record

38